

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2016 SEP 30  A 10: 49

WILLIAM W. BLEVINS
CLERK

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES *ex rel.* [UNDER SEAL], <br><br> Plaintiffs, <br><br> v. <br><br> [UNDER SEAL], <br><br> Defendant. | Case No: <br><br> # 16-15092 <br><br> **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *et seq.*]** <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**SECT. L MAG. 4**

**DOCUMENT TO BE KEPT UNDER SEAL**

___ Fee 400.00
___ Process___
_X_ Dktd___
___ CtRmDep___
___ Doc. No.___

-1-

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ROBERT ROMERO,<br><br>                Plaintiffs,<br><br>     v.<br><br>AECOM, XAVIER UNIVERSITY and the ARCHDIOCESE OF NEW ORLEANS,<br><br>                Defendants. | Case No:<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *et seq.*]**<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

## COMPLAINT

Pursuant to the *qui tam* provisions of federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* (the "False Claims Act" or the "FCA"), *qui tam* Plaintiff-Relator Robert Romero (hereinafter "Relator"), on behalf of the United States of America for this Complaint against AECOM, Xavier University, and the Archdiocese of New Orleans (collectively, "Defendants"), alleges as follows:

## I.   INTRODUCTION AND OVERVIEW

1.   Making landfall on August 29, 2005, Hurricane Katrina severely damaged New Orleans triggering a surge of federal disaster aid into the region. Soon thereafter, FEMA, pursuant to its authority under the Stafford Act and federal regulations, began to make funds available under its Public Assistance program, a program which is still funding recovery from Katrina over ten years later. Once an applicant requested evaluation for the program, FEMA personnel or contractors would conduct a site visit to assess Katrina-related

damage. For any particular facility, if the estimated cost for repairs fell below 50% of the estimated cost to replace the facility, FEMA would fund the repairs. If, however, the estimated cost of repairs exceeded 50% of the estimated cost to replace, FEMA would grant funds to completely replace the structure.

2.     Defendant AECOM has been a FEMA contractor since 2000, providing technical assistance to support FEMA's disaster response. In that capacity, its employees were present in New Orleans after Katrina, and did numerous site evaluations to determine whether applicants were eligible for funds under the Public Assistance program.

3.     Beginning no later than 2008, AECOM employees have repeatedly submitted false or misleading information to FEMA - including deflated building replacement estimates, inflated repair costs, and false photo documentation of damage. These misrepresentations falsely qualified many buildings for demolition and replacement that should only have been eligible for repairs. This wrongly increased by tens of millions of dollars the amount of federal funds that FEMA distributed to applicants, and allowed AECOM to charge FEMA for hundreds of additional billable hours. These misrepresentations also allowed AECOM advantages in FEMA contract renewal, as FEMA evaluated contractors based on metrics including total productivity.

4.     By 2010, the management of AECOM was aware of at least one employee systemically engaged in the fraud, Randall Krause. On information and belief, AECOM terminated Krause because of his fraudulent practices, but failed to inform the government of the fraud, or mitigate the overpayments and damages.

5.     Defendant Xavier University, a beneficiary of FEMA's Public Assistance program, knowingly, recklessly, and/or with willful blindness submitted and/or caused to be submitted false and misleading documentation to FEMA representatives to qualify ineligible structures for replacement. Xavier University and AECOM also made material omissions to

FEMA representatives, wrongfully using FEMA funds to pay for the building of facilities that included significant construction upgrades, rather than limiting federal financing to the cost of repairing or replacing such facilities to a level commensurate to what had existed prior to Katrina. As a result of the fraud, Xavier University wrongfully received approximately $8 million dollars of FEMA funding towards an expanded new sports complex, and approximately $6 million dollars towards a substantially upgraded electrical distribution system to replace one that had remained operational and that would have been functionally adequate with only minor repairs – if any at all – after the storm.

6.      Defendant Archdiocese of New Orleans, another beneficiary of FEMA's Public Assistance program, also knowingly, recklessly and/or with willful blindness submitted and/or caused to be submitted false and misleading documentation to FEMA representatives to qualify ineligible structures for replacement. As a result of the fraud, the Archdiocese wrongfully received approximately $5 million dollars to replace its St. Raphael Cafeteria Building and $38 million dollars to replace Buildings #2 and #3 at the Villa St. Maurice complex.

## II.      PARTIES

### A. The Relators

7.      Plaintiff-Relator Robert Romero is an individual residing and domiciled in the State of Florida.  He has worked for AECOM since 2008, and has been assigned to work on multiple natural disasters. In December 2010, Relator was assigned to New Orleans to work for AECOM as a Project Specialist under the FEMA Technical Assistance Contract for Hurricane Katrina, overseeing the administration of FEMA's Hurricane Katrina relief.

8.      In that capacity, Relator personally witnessed Defendants' submission of false claims, claims and reports to FEMA and the wrongful receipt and retention of overpayments from FEMA that resulted.

-4-

**B.    Defendants**

9.    Defendant AECOM is a Fortune 500 company that provides planning, consulting, architectural and engineering design, and construction services. It has a substantial number of contracts with the Federal Government. It is headquartered at 1999 Avenue of the Stars, Suite 2600, Los Angeles, California 90067.

10.    Defendant Xavier University of Louisiana ("Xavier") is a private, coeducational Catholic liberal arts college in New Orleans. It is headquartered at 1 Drexel Drive, New Orleans, Louisiana 70125.

11.    Defendant Archdiocese of New Orleans is a subdivision of the Roman Catholic Church located at 7887 Walmsley Ave., New Orleans, Louisiana 70125.

## III.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732, which authorizes nationwide service of process. Moreover, each Defendant can be found, resides in, or has transacted the business that is the subject matter of this lawsuit in this District.

14.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside in, or have transacted the business that is the subject matter of this lawsuit in this District.

15.    Although it is no longer jurisdictional, the public disclosure bar of the federal False Claims Act does not bar this suit. The Plaintiff-Relator's complaint is not based upon allegations or transactions of fraud that have been publically disclosed within the meaning of

the False Claims Act.  Even if the allegations or transactions of fraud had been publicly disclosed, the Plaintiff-Relator would qualify an "original source" of the information within the meaning of the FCA.  His information is based upon his personal observations, independent of any relevant public disclosure and materially adds to any information that could have been publicly disclosed.  Relator, moreover, voluntarily provided the information upon which this action is based to the United States government before filing this case.

## IV.  **APPLICABLE LAW**

### A.  **The False Claims Act**

16.  The federal False Claims Act (the "FCA") was originally enacted during the Civil War.  After finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization, Congress substantially amended the FCA in 1986 to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.  Congress further substantially amended the FCA in 2009 and 2010 to, among other things, strengthen whistleblowers' ability to bring and maintain actions on the Government's behalf.

17.  The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; and (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and

-6-

improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these three sections of the FCA. 31 U.S.C. §§ 3729(a)(1)-(3) and (7) (1986) and 31 U.S.C. §§ 3729(a)(1)(A)-(C) and (G) (2009). Any person who violates the FCA is liable for a civil penalty of up to $21,563 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1).

18.     For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *See* 31 U.S.C. § 3729(b)(1) (2009) and 31 U.S.C. § 3729(b) (1986). The FCA does not require proof that the Defendant specifically intended to commit fraud. *Id.* Unless otherwise indicated, whenever the word "know" and similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

19.     Each claim for payment that defendants have submitted or caused to be submitted to FEMA and received, for which payment was inflated, is a false and/or fraudulent claim within the meaning of the FCA, so long as defendants knew the claims were false when they were submitted, or the defendants later discovered the falsity and refused to correct the claims.

20.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the *qui tam* relator's complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

**B.**     <u>Robert T. Stafford Disaster Relief and Emergency Assistance Act</u>

21.     Congress enacted the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. § 5121 *et seq.* "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which results from [] disasters by . . . [*inter alia*,] providing Federal assistance programs for both public and private losses sustained in disasters." *Id.* at § 5121(b).

22.     Title IV of the Stafford Act gives the President broad authority to respond to major disasters by contributing federal money for the "repair, restoration, reconstruction, or replacement" of private nonprofit facilities, including educational and custodial care facilities. *See* 42 U.S.C. §§ 5122, 5172. Eligible costs for repairing, restoring, reconstructing or replacing a facility shall be estimated on the basis of the design of the facility as it existed immediately before the major disaster. 42 U.S.C. § 5172(e)(1)(A)(i).

23.     In 2003, President George W. Bush delegated most of his authority under the Act to the Secretary of Homeland Security, who then re-delegated the authority to the Director of the Federal Emergency Management Agency ("FEMA"). Exec. Order 13286, 68 Fed. Reg. 10619, 10628 (Feb. 28, 2003); Department of Homeland Security Delegation Number 9001.1 (Dec. 10, 2010).

**C.**  <u>The Public Assistance Program</u>

24.     Exercising its authority under the Stafford Act, FEMA has enacted a Public Assistance program that governs the distribution of federal disaster assistance following major disasters. *See* 42 U.S.C. § 5121 *et seq.*; 44 C.F.R. § 206 *et seq.*

25.     After the President has declared a major disaster in a state, the Public Assistance program requires that the state enter into a FEMA-State Agreement to receive aid.

44 C.F.R. §§ 206.44. After an agreement is in place, both FEMA and the state solicit applications for disaster assistance from eligible entities referred to as "subgrantees."

26. Subgrantees may be state agencies, local governments, or eligible private nonprofit organizations. 44 C.F.R. § 206.201. Private nonprofit educational and custodial care facilities (including facilities for the aged) qualify for this designation. 42 U.S.C. § 5172, 44 C.F.R. § 206.221. In the case of private nonprofits, in order for a facility to be eligible for financial assistance, it must be owned and operated by the applicant. *Id.* at § 206.223(b).

27. After a subgrantee submits a request for aid, FEMA, the state, and the subgrantee document projects that are eligible for disaster assistance in a Project Worksheet. 44 C.F.R. § 206.202(d). The Project Worksheet identifies the damage, specifies the scope of work required, and estimates the cost of repair or replacement. It also specifies the portion of the cost that will be funded by the Federal Government. Based on the Project Worksheet, FEMA may make federal disaster assistance funds available (i.e. obligate funds) to the state, which then approves the subgrants based on the approved Project Worksheets. *Id.* at § 206.202(e).

28. In assessing a request for aid, FEMA will estimate both the cost to repair a facility to its pre-disaster condition and also the cost to replace the facility. Cost estimates at this stage do not include project management, overhead, or several other ancillary costs. If the cost to repair the facility is under fifty percent of the cost to replace, the facility is considered repairable, and the grant of federal aid will be limited to the cost of repair. If the cost to repair exceeds fifty percent of the cost to replace, the subgrantee will be eligible to receive grants that would fund the entire cost to demolish and replace the facility with an essentially equivalent structure. 44 C.F.R. § 206.226(f).

29.     If subgrantees wish to make improvements to a facility above and beyond what is required to restore it to pre-disaster function, they may do so if they seek and are given approval by the state. *Id.* at § 206.203(d)(1).

30.     As a condition of the receipt of any Stafford Act disaster assistance, applicants shall carry out repairs and construction in accordance with applicable standards of safety, decency, and sanitation, and in conformity with applicable codes, specifications, and standards. *Id.* at § 206.400(a).

## V.     ALLEGATIONS

### A. Defendants knowingly, recklessly or with willful blindness submitted false information to FEMA, to qualify ineligible buildings for post-Katrina replacement funding.

#### a.   Xavier University - Gymnasium

31.     Defendants Xavier University and AECOM knowingly submitted false photo documentation of damages and inflated repair costs to falsely represent that the cost to repair the University's gymnasium exceeded fifty percent of the cost to replace the gymnasium, thereby causing FEMA to pay in full for the building's replacement rather than just its repair.

32.     During Hurricane Katrina, the Xavier University Gymnasium was submerged in 2'6" of floodwater for approximately three weeks. Flood water damaged the interior of the building, and high winds damaged the exterior. By the arrival of FEMA evaluators in January 2006, initial repairs to the gymnasium were substantially complete. By August 2006, Xavier had already installed new wood flooring for the basketball court.

33.     In March 2007, a Project Worksheet was prepared by Project Officer Mira Stanchak, to capture completed repairs that had been made to 22 Xavier University sites, including the gymnasium. *See* Project Worksheet 15866.0 (Exhibit 1). At this time, Ms. Stanchak assessed that the gym required $813,052.00 in funding for architectural repairs to the building's doors, windows, ceilings, walls, and floor; repairs to the building's plumbing

and HVAC; and replacement of damaged electrical components and lockers. Ms. Stanchak estimated the gymnasium's replacement cost at $2,814,928. The ratio of repair cost to replacement cost was thus 29%, under the 50% threshold, so FEMA obligated only the $813,052.00 in repair costs.

34.     Two years later, in February 2009 and September 2009, Xavier requested two additional site visits to evaluate additional damage. In February, AECOM evaluators, on behalf of FEMA, visited the gymnasium and found additional eligible damages to the gymnasium roof. A Project Worksheet was prepared to fund an additional $80,498.76 to the repair cost of the gym. 1In September, 2009, additional eligible damages were found in the gymnasium floor. Another Project Worksheet was created to fund an additional $109,148.00 to the repair cost of the gym. *See* Project Worksheet 15866V11 (Exhibit 2). No repair versus replacement estimate was performed after either visit, since damages were limited. FEMA obligated funds in both cases.

35.     On December 22, 2009, AECOM inspector Randall Krause performed an additional site visit at Xavier University's request.  On December 29, 2009, Krause submitted a Project Worksheet purporting to detail extensive additional damage to the gymnasium. *See* Project Worksheet 19154.0 (Exhibit 3). Most significantly, Krause claimed to discover substantial structural damage to a concrete floating foundation slab beneath the gymnasium's basketball court, as well as damage to the exterior block wall. Xavier's Director of Facility Planning & Management, Marion Bracy, also signed the Project Worksheet.

36.     The alleged damage to the foundation and floor would have been plainly visible to Xavier personnel when the gymnasium floor was exposed between 2005 and 2006. However, no foundation damage was mentioned in the March 2007, February 2009, or September 2009 AECOM visits or worksheet reports.

37.     Under the updated assessment, the newly discovered foundation replacement would cost $951,630.32. Due to this significant increase to the repair cost, Krause calculated a new repair versus replacement ratio. The repair estimate was increased to $1,551,791.67, and the replacement estimate was lowered to $2,574,080.08, thus Krause reported that the new ratio was 60%, qualifying the gymnasium for full FEMA replacement funding.

38.     At the time of Krause's visit, the Xavier gymnasium was in active use. In addition, new flooring to the basketball court had been installed in 2006, thereafter leaving none of the foundation exposed.

39.     The photographs of foundation cracks that Krause and Xavier submitted to support the revised damage estimates in the Project Worksheet were fraudulent. *See* Photographs used in Project Worksheet 19154 (Exhibit 4). They were not photographs of the gymnasium. They were not taken in New Orleans. In fact, the photographs were taken off the internet, a fact easily ascertainable by searching for the images online. *See* Google Reverse Image Searches of Photographs from Ex. 4 (Exhibit 5). Indeed, the photographs were not even representative of the kind of foundation construction that existed in the gymnasium.

40.     After qualifying the building for replacement with an estimated replacement cost of $2,574,080.08, a revised Project Worksheet was prepared to change the estimated replacement cost of the gymnasium building to $3,038,966.60. This increased the amount of money available to Xavier, while lowering the repair to replacement ratio to 51%, just slightly above the eligibility threshold. *See* Project Worksheet 19154.1 (Exhibit 5.1; Exhibit 5.2). With demolition, project management, and other costs factored in, a total of $5,537,304.00 was ultimately requested. Again, Xavier's Director of Facility Planning & Management, Marion Bracy, signed the Project Worksheet. FEMA approved that request based on the false representations made therein.

41.     The Xavier Gymnasium University was found to be eligible for replacement, and not simply repair, solely due to Krause and Xavier's fraudulent inclusion of concrete foundation repair estimates.

42.     In June 2010, an additional Project Worksheet was prepared, indicating that replacing the building on the original site would not be feasible given the damage. *See* Project Worksheet 19154.1 (Exhibit 5).  The new Xavier Gymnasium was thus scheduled to be moved to a more suitable location, and more square footage approved. Funding requirements increased to $7,663,459.

43.     On September 30, 2010, FEMA obligated $7.7 million dollars for replacement of the Xavier University Gym.

44.     At some time prior to January 2011, Paul Kilbride, a Program Examiner at the Office of Management and Budget, opened an inquiry into the Xavier University Gymnasium project. Kilbride had become aware of the gym's project through review procedures for FEMA projects greater than $1M ("the million dollar queue").  Kilbride noted that then-Senator Barack Obama had spoken at Xavier University's Commencement on August 11, 2006, in the gymnasium that was soon thereafter scheduled to be demolished for lack of structural soundness.  Kilbride also noticed that intercollegiate sporting events appeared to have been held in the gym shortly after it reopened post-Katrina, and – even at the time of Kilbride's review – continued to be scheduled there regularly.

45.     On January 10, 2011, AECOM responded to the OMB Inquiry, which raised concerns about the gymnasium's replacement eligibility, given its continued use and apparently adequate functionality. *See* Response To Inquiry #3584 (Exhibit 6). In a response prepared by AECOM personnel for FEMA Public Assistance Officer Mike McCloskey, the false claims regarding foundation damage from Krause's December 2009 report were reasserted, and the fraudulent photographs of the alleged damage resubmitted to support

continued approval of the FEMA replacement funding plan. On April 22, 2011, a timeline summarizing the Xavier Gymnasium project was sent to OMB. *See* Response To Inquiry #3803 (Exhibit 7). The OMB inquiry ended after AECOM reasserted their false justifications for approving the false claim for paying the cost of replacing the gymnasium, including resubmission of four pictures used in the initial Project Worksheet, three of which were false.

46.     In November 2012, Xavier's new sports complex, the "Convocation Center," was dedicated and opened for use. Xavier had begun planning and discussing the construction of this new sports complex in 2005, prior to Hurricane Katrina. After the old gymnasium site was deemed unsuitable for a rebuild, the funds FEMA supplied for the replacement of the Xavier University Gymnasium were ultimately dedicated to the Convocation Center's construction. Until its completion, Xavier continued to use the old Gymnasium. In May 2013, Xavier began demolition on the old Gymnasium.

47.     While the old Xavier University Gymnasium was undergoing demolition, Relator visited the worksite because he understood that AECOM had become concerned about Krause's integrity. Relator was particularly suspicious about the claim that serious foundation damage of the nature alleged could exist as a result of Katrina, and been missed during the entire prior history of evaluation. Relator thus doubted that Xavier University was lawfully entitled to receive any FEMA funding for the gymnasium beyond the repair costs originally received. Initial building demolition had begun two days prior, and the gymnasium's flooring and walls had been removed, exposing the building's foundation.

48.     Upon inspection, Relator discovered nothing resembling the damage description alleged in Krause's 2009 report. In fact, there was no evidence at all of a cracked floating concrete slab under the Xavier Gym basketball court, as claimed in the Project Worksheet. The Relator photographed the condition of the exposed actual subfloor and base,

which appeared to have no serious cracking or structural issues. *See* Relator's Pictures of the Xavier Gym Demolition (Exhibit 8).

### b. Xavier University – Electrical Distribution System

49.     Following Hurricane Katrina, Xavier University also requested an evaluation of damages to the University's underground electrical distribution system. In 2009, Randall Krause served as AECOM Preparer for Xavier University's application. Xavier University's engineers, Crumb Engineering LLC, provided an assessment that saltwater intrusion had damaged the high-voltage electrical distribution system to the extent that it needed to be substantially repaired.

50.     On March 18, 2009, Krause prepared a Project Worksheet integrating Crumb Engineering's estimate that $5,496,450 would be required to perform the work. The scope of work proposed would restore the distribution system to its pre-disaster condition. *See* Project Worksheet 18578 (Exhibit 9).  Neither Krause nor Crumb Engineering provided evidence that they physically inspected the distribution system for damage, and Krause did not provide any evidence verifying Crumb Engineering's report.

51.     The Project Worksheet indicated that work included only repairs to damaged property owned by Xavier University, and not their utility company, Entergy Corporation. *See* Project Worksheet 18578 (Exhibit 9).  On information and belief, approximately $1.3M worth of transformers and equipment on the high-voltage delivery system proposed in fact belong to Entergy, which supplies electricity and natural gas to businesses and individual home owners in New Orleans.

52.     On June 25, 2009, FEMA obligated $5,944,411 for the project, covering Crumb Engineering's full estimate and additional project management costs. *See* Project Worksheet 18578 (Exhibit 9).

53.     In 2013-2014, Xavier University submitted an application to have its chilled water line system replaced. The underground chilled water line system, located in the same area as the underground electrical distribution and submerged in the same flood conditions, was deemed ineligible for replacement by FEMA personnel in September 2016. Based on Relator's experience with similar matters, Relator believes that any event sufficient to damage the electrical system would also certainly have caused similar damage to the underground chilled water line. Thus, the fact that the chilled water line was not damaged sufficiently to warrant replacement suggests that the electrical system was not either.

54.     In 2010, Relator was assigned to be the Public Assistance Coordinator for Xavier University, and among his duties was review and management of the Xavier Electrical Distribution Project. Relator conducted an on-site walkthrough of Xavier's mechanical system with Crumb Engineering in 2013. At this time, approximately eight years after Katrina, the original electrical grid was still operating, and repairs had not yet begun. Relator noted that, not only was the original electrical delivery grid still in use, all buildings on the Xavier University campus had power.

55.     Construction for the fully repaired electrical distribution grid was completed by 2014. During construction, the State government discovered that Xavier's proposal included ineligible upgrades to Entergy equipment, and withheld $1.3M of funds from Xavier University.

56.     On December 7, 2015, Relator requested detailed sketches of the completed replacement electrical loop, to ensure that the scope of work matched the initial Project Worksheet. During this process of reconciliation, actual construction costs are compared to proposed construction costs, and any excess must be transmitted back to FEMA. After numerous follow ups, Relator was finally provided the proposed electrical loop schematics on February 11, 2016.

57.     In 2016, Xavier submitted their final request for the reconciliation of estimated repair costs versus actual incurred cost. *See* Project Worksheet 18578.1 (Exhibit 10).

58.     The electrical loop actually constructed by Xavier included a substantially changed electrical system, with unnecessary redundancies and increases to capacity built in. Although FEMA had approved a system that would repair the grid to pre-disaster conditions, FEMA funds were used pay the full cost to complete a very substantially upgraded replacement. *See* Diagrams of Old and New Electrical System (Exhibit 11).

59.     The diagram detailing the upgraded electrical grid was dated October 2010. However, February 2016 was the first time the new electrical loop system had been presented to any FEMA personnel.

### c.  St. Raphael – Cafeteria Building

60.     The St. Raphael School's Cafeteria Building is a two story building, constructed of brick veneer and concrete block. During Hurricane Katrina, the cafeteria was submerged in approximately eight feet of water for two weeks.

61.     In April 2006, an initial FEMA evaluation estimated that the flooding had caused approximately $81,000 of damages. Fourteen of the 24 rooms in the two-floor building required floor, ceiling and wall replacements. *See* Project Worksheet 7319.0. (Exhibit 12).

62.     More than one year later, on August 24, 2007, new AECOM Preparers Randall Krause and Namhuyuk reevaluated the repair and replacement costs for the building. Under Krause's calculations, the estimated repair cost for the cafeteria was reported to be $1,271,874.58, while the estimated replacement cost for the entire structure reportedly would be $2,183,978.52. Since the reported repair to replacement ratio was 58%, the building

-17-

appeared on the paperwork Krause prepared to be qualified under FEMA rules for
replacement.

63.     On August 28, 2007, the Chief Operating Officer of the Archdiocese of New
Orleans signed a FEMA certification document, certifying that the applicant had reviewed
the FEMA Project Worksheet, and that the claims and expenditures therein had been
completed with procedures in accordance with CFR 44. *See* Archdiocese Certification
Document (Exhibit 13).

64.     AECOM's photo documentation of the St. Raphael Cafeteria site, dated
August 14, 2009, showed no visible structural deficiencies that would merit the extensive
replacement and repair described in Krause's Project Worksheet. *See* Photographic
Documentation of St. Raphael Cafeteria Building (Exhibit 14). The roof's multiple glass
skylights were intact, no visible mold damage impacted the drywall, and partitions that had
been marked for teardown appeared to be constructed entirely of brick, an impermeable
material that would not be damaged by two weeks of water submersion. This lack of damage
would have been apparent to any Archdiocese or AECOM personnel who visited the
property. These photographs were furthermore on AECOM's internal group drive, and would
have been accessible to all AECOM personnel assigned to review the project.

65.     Krause's Project Worksheet also fraudulently deflated the estimated
replacement cost of the Cafeteria Building so that the overall repair to replacement ratio that
was calculated would increase to over 50%.  Normally, AECOM and FEMA construction
engineers use a cost estimating methodology called the Cost Estimated Format ("CEF") to
create forward pricing models based on industry standards. The standard replacement cost
calculation method requires inputting relevant data – such as building square footage, and
cost of construction per square foot – into a construction cost estimation program called
"RSMeans." Using RSMeans to estimate the cost of replacing a building the size of the St.

Raphael Cafeteria (first calculated at 22,320 square feet) at even the lowest estimate on dropdown menus, calculated in 2013 costs, yields a replacement cost of ~$3.2M. *See* Relator's RSMeans Cost Projection for the St. Raphael Cafeteria Building (Exhibit 15). Krause's estimate of $2.1M in replacement costs was a fraction of this estimate.

66.     Had an accurate replacement cost been used in good faith to arrive at estimations, the ratio of repair to replacement costs would have decreased substantially, and St. Raphael would have only been eligible for repair funding of somewhere between the original $81,000 estimate and Krause's inflated $1,271,874.58.

67.     Instead, on January 31, 2008, FEMA obligated $5,093,600 for the replacement of the St. Raphael Cafeteria.

68.     The St. Raphael Cafeteria Building was not demolished until December 2010. Despite being on notice of Krause's fraudulent practices prior to this date, AECOM personnel participated in the submission of a funding adjustment to FEMA on August 13, 2010 and October 7, 2010, relying upon and recertifying the original fraudulent calculations *See* AECOM Master Project List Spreadsheet (Exhibit 16).

69.     Later teams including FEMA personnel, AECOM employees, and other contractors relied upon these misrepresentations in subsequent Project Worksheets. As a result, the necessity of the funds and accuracy of the fraudulent calculations were recertified on July 16, 2013, April 21, 2014 and May 28, 2015.

70.     In late 2011, Relator discovered the 2009 photographs of the St. Raphael Cafeteria. After also reviewing the Project Worksheets, Relator orally expressed his concerns to a Lead Estimator within Relator's AECOM unit. The Lead Estimator listened, but did not respond to Relator's concerns. Relator left a CD with the photographs he had discussed on Lead Estimator's desk the following day. Relator received no further response or inquiry.

### d.  Villa St. Maurice – Buildings 2 & 3

71.     The Villa St. Maurice is a complex of three buildings owned and operated by the Roman Catholic Church's Archdiocese of New Orleans. Building 2 is a five story residential building constructed in 1981, with brick veneers and a steel frame, with floors of approximately 11,000 square feet. Building 3 is a five-story residential building constructed in 1990, with brick veneers and interior metal studs, and a first floor that measured approximately 13,000 square feet. Both buildings sustained flood damage during Hurricane Katrina after being flooded with approximately 6 feet of water. The first floor of each brick building is approximately 11 feet high.

72.     In May 2006, an initial FEMA site visit to Building 2 and Building 3 estimated that, respectively, the buildings had sustained $1.3M and $912,481.92 of flood damages. These calculations primarily captured damage to the first floor of the residential complex. *See* Project Worksheet 10800.4 (Exhibit 17); Project Worksheet 11392.4 (Exhibit 18).

73.     In 2007, AECOM Project Specialist Scott White prepared a new damage assessment for both Villa St. Maurice buildings. In a November 30, 2007 Project Worksheet for Building 2, White estimated that damages totaled $5,025,896, while the cost of replacement for the building would total $8,902,377. According to White, the new repair versus replacement ratio was thus 56%, rendering the building eligible for full FEMA cost replacement. *See* Project Worksheet 10800.4 (Exhibit 17). On July 7, 2007, Scott White prepared a revised damage assessment for Building 3. White's revised cost of repair reached $5,500,492.15, and his revised replacement valuation of was $6,924,542.51. The repair versus replacement ratio was thus 79%, rendering the building eligible for full FEMA cost replacement. *See* Project Worksheet 11392.4 (Exhibit 18).

-20-

74.      White's repair costs for both buildings were fraudulently inflated, alleging flood damage to all five floors of each building. Building 2 includes only 9 units on the first floor (approximately 12,000 square feet), while Building 3 includes only eleven units on the first floor (approximately 13,000 square feet). Those first floors of each of these masonry buildings were the only floors of those buildings with any substantial damage caused by Katrina.  Nevertheless, White's Building 2 calculations of flood damage included the cost of replacing floor tiles for all floors (~45,200 square feet), extensive drywall replacement beyond the first floor (~165,370 square feet), replacement of all interior doors (265), replacement of all windows (331), and new medical call equipment for all rooms (77 of each). *See* Project Worksheet 10800.4 (Exhibit 17). White's Building 3 calculations of flood damage similarly falsely included cost of replacing suspended ceiling tiles for all floors (~60,000 square feet), repainting of all floors (~236,000 square feet), and furnishings for all floors, including AC units, refrigerators, bathroom sinks, and tubs (75 of each). *See* Project Worksheet 11392.4 (Exhibit 18).

75.      White's inflated calculations also alleged that flood damage required replacement of over 25,000 square feet each of brick walls and brick veneers in both buildings. Brick, however, is an impermeable material which would not have become damaged due to flood submersion alone. *See* Project Worksheet 10800.4 (Exhibit 17); Project Worksheet 11392.4 (Exhibit 18).

76.      White also fraudulently deflated the replacement cost of Building 3. Relator used RSMeans, using a cost schedule from 2013, to calculate approximately what the replacement costs of a similarly sized residential building should have been, yielding an estimate of $9.1M. See Relator's RSMeans Cost Projection for Villa St. Maurice (Exhibit 19).

77.     In 2008, AECOM recalculated the total cost of replacement for both buildings to include demolition costs, increasing the total required funds.

78.     On May 14, 2008 FEMA obligated $18,995,045.08 for the replacement of Villa St. Maurice, Building 3, and on May 29, 2008, FEMA obligated $26,260,427.46 for the replacement of Villa St. Maurice, Building 2.

79.     Archdiocese and AECOM personnel knew or should have known that flood waters – six feet at their maximum depth -- reached only the first floor of the Villa St. Maurice. The lack of substantial flood damage beyond the first floor, and the fraudulent inclusion of five floors worth of interior damages on the Project Worksheet, would have been apparent to any Archdiocese or AECOM personnel inspecting the Project Worksheet or building site.

80.     Villa St. Maurice Buildings #2 and #3 were demolished in June 2011.

81.     Later teams including FEMA personnel, AECOM employees, and other contractors relied upon these misrepresentations in subsequent Project Worksheets. As a result, the necessity of the funds and accuracy of the fraudulent calculations were recertified on May 1, 2012 and July 29, 2015. Necessary funding obligations for Building 3 were recertified on August 22, 2013.

82.     On Relator's understanding, Ken Oliver, a former AECOM Project Specialist expressed serious concerns about Building #2's categorization as a replacement building during his review of the Project Worksheet. After no follow up on his concerns, Oliver quit.

83.     In late 2016, shortly after Oliver's resignation, Relator was assigned to review, reconcile and approve the ongoing construction related to the Villa St. Maurice replacement buildings.

### e.  **Additional Projects**

84.     Based on Relator's construction expertise and review of related Project Worksheets, dozens of additional ineligible projects were approved for replacement by White and Krause. In numerous projects approved for replacement funding before 2010, Relator considered RSMeans estimates for building replacement – figures based upon square footage and building type – inaccurate in a number of AECOM projects. Relator's experience also suggested that damage captured for a number of projects was unlikely in light of the extent and nature of Katrina flood/wind damage.

85.     Ten of these projects approved by White and Krause represent an additional $121,561,596.61 of wrongfully appropriated FEMA funds. *See* List of Likely Fraudulent Projects (Exhibit 20). Six of these properties are owned by the Archdiocese of New Orleans, and one by Xavier University.

**B.  AECOM management became aware of Krause's fraudulent activity by late 2010, but continued to certify the demolition and construction of ineligible buildings and failed to notify FEMA of past overpayments caused by the fraud of its employees or sub-contractors.**

86.     By not later than 2010, AECOM management was put on notice of Krause's fraudulent practices. After an applicant notified AECOM managers that Krause's worksheets for estimating repairs included contents that had not been provided by the applicant, Krause was terminated. Relator was told by coworkers at AECOM that Krause subsequently accepted employment from Xavier University.

87.     Relator was assigned to AECOM's New Orleans response unit in December 2010, sometime after Krause's termination. Shortly after Relator began work, AECOM Operations Manager Bob Schreibeis requested that Relator review projects where Krause had served as Project Worksheet Preparer. Schreibeis created a list of projects that Krause was involved in evaluating. After review, Relator relayed his concerns about inflated repair and

deflated replacement costs to Schreibeis. Relator was unaware of any follow up between his disclosure, and Schreibeis' resignation from the project in 2012.

88.    AECOM had the obligation and opportunity to disclose information and mitigate damages on multiple occasions between discovery of Krause's wrongdoing in 2010 and the actual demolition of compromised projects. Though the Xavier Gymnasium was not demolished until May 2013, AECOM participated in a funding adjustment to FEMA on December 9, 2010. *See* AECOM Master Project List Spreadsheet (Exhibit 16). Though the St. Raphael Cafeteria Building was not demolished until December 2010, AECOM participated in a funding adjustment to FEMA on October 7, 2010. *See Id.*

89.    Around 2010, AECOM ceased allowing individual Preparers to create RSMeans building replacement estimates, instead creating a centralized Lead Estimator for data. Based on Relator's understanding, AECOM changed its practice after learning of systemic inaccuracies and deflation in individual Preparer estimates. Relator found that the pattern of replacement estimate deflation ceased after AECOM routed estimates to the centralized Lead Estimator.

90.    To Relator's knowledge and understanding, AECOM failed to inform the government of Krause and other employee's actions, or mitigate the overpayments and damages. It relied on pre-2010 evaluations by Krause and others, and allowed other FEMA personnel and contractors to do so. In doing so, AECOM concealed and perpetuated the fraud.

## Count I
## Federal False Claims Act
### 31 U.S.C. § 3729(a)(1) (1986)
### 31 U.S.C. § 3729(a)(1)(A) (2009)

91.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1-90 above as though fully set forth herein.

92.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

93.     By and through the acts described above, within the meaning of the False Claims Act, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to FEMA for payment or approval, in violation of 31 U.S.C.§ 3729(a)(1) (as amended 1986) now codified at 31 U.S.C.§ 3729(a)(1)(A) (as amended May 20, 2009). Such claims that Defendants submitted were false and fraudulent within the meaning of the False Claims Act because, as a result of Defendants' knowing misconduct and in accordance with Defendants' intent, the amounts claimed, approved, and paid were higher than properly due under law.

94.     Defendants' actions that constitute false and fraudulent claims, or caused such false and fraudulent claims to be made, approved, and paid included:

  a.  Xavier University Gymnasium. Defendants AECOM and Xavier University submitted and/or certified the veracity of false pictures of cracks in the concrete foundation of the Xavier University Gymnasium, when in truth, the submissions were of stock photos available on the internet. AECOM and Xavier University also submitted and/or certified the veracity of improperly inflated assessments of the cost to repair the Xavier University Gymnasium.

  b.  Xavier Electrical System. Defendants AECOM and Xavier University submitted and/or certified the veracity of false claims regarding damage to the Xavier Electrical System. Xavier University and AECOM falsely asserted that the damage was sufficient to require replacement. Xavier University and AECOM also submitted and/or certified the veracity of claims that the new replacement Xavier

> Electrical System was equivalent in scope to the original, and thus was eligible to be funded in full by FEMA. In fact, the new system was a major and unnecessary upgrade from the original system.
>
> c.   St. Raphael Cafeteria. Defendants AECOM and the Archdiocese of New Orleans submitted and/or certified the veracity of claims that overstated the cost for repair of the building while understating the cost for replacement.
>
> d.   Villa St. Maurice – Buildings 2 & 3. Defendants AECOM and the Archdiocese of New Orleans submitted and/or certified inflated repair costs, including alleged flood damage to all five floors of the buildings. For Building 3, AECOM and the Archdiocese of New Orleans also artificially deflated the cost of repair.

95.    Defendants submitted and/or certified the veracity of claims that overstated the cost for repair of the buildings while understating the cost for replacement. By driving up the apparent cost to repair while driving down the apparent cost to replace, Defendants caused the ratio of cost to repair vs. cost to replace to artificially surpass fifty percent. This triggered the Fifty Percent Rule, which led FEMA to pay for a full replacement of the building rather than only for its repair. In addition, it increased the amount of oversight and assessment work AECOM was able to perform, which greatly increased the billable hours that it charged to FEMA. The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid such false or fraudulent claims that would not have been paid but for Defendants' illegal conduct.

96.    By reason of Defendants' acts, the United States has been damaged in a substantial amount exceeding $50,000,000.

97.     Additionally, the United States is entitled to the maximum penalty of up to $21,563 for each and every violation alleged herein.

### Count II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(2) (1986)
### 31 U.S.C. § 3729(a)(1)(B) (2009)

98.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1-90 above as though fully set forth herein.

99.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

100.     By and through the acts described above, within the meaning of the False Claims Act, Defendants have knowingly made or used, false records or statements material to false or fraudulent claims for payment to FEMA, in violation of 31 U.S.C.§ 3729(a)(2) (1986) now codified at 31 U.S.C.§ 3729(a)(1)(B) (as amended May 20, 2009).

101.     Such false records and statements submitted by Defendants AECOM and Xavier University included the submission of Project Worksheets for Xavier University Gymnasium in December 2009, including false photo documentation of alleged damage, falsified records of necessary repairs, and creation and use of improperly inflated assessments of repair costs. Defendants AECOM and Xavier University also submitted Project Worksheets for the Xavier Electrical System which included the false records and statements overstating electrical system damage. These records also falsely certified that the replacement Xavier Electrical System was equivalent in scope to the original, when in fact the new system was a major and unnecessary upgrade from the original system.

102.     Defendants AECOM and the Archdiocese of New Orleans submitted false records or statements in Project Worksheets for St. Raphael Cafeteria, overstating the cost of repair for the building while understating costs for replacement. Defendants also submitted false records or statements in Project Worksheets for the Villa St. Maurice, which included

records which overstated the cost for repair of the buildings while understating the cost for replacement.

103.    The false records and statements in Project Worksheets submitted above were for the purpose of getting government payment, 31 U.S.C.§ 3729(a)(2), and were material in FEMA's decision to approve full payment for building replacement rather repair. U.S.C. § 3729(a)(1)(B) (2009).

**Count III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(3) (1986)**
**31 U.S.C. § 3729(a)(1)(C) (2009)**

104.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1-90 above as though fully set forth herein

105.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

106.    By and through the acts described above, within the meaning of the False Claims Act, Defendants have knowingly conspired to defraud the Government by getting a false or fraudulent claim allowed or paid, in violation of 31 U.S.C. § 3729(a)(3). Defendants have also knowingly conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A),(B),(E), (F) and (G), in violation of  31 U.S.C. § 3729(a)(1)(C) (2009).

107.    Defendants AECOM and Xavier University conspired in the commission of false claims to cause FEMA to provide replacement funds for the Xavier Gymnasium and the Xavier University Electrical Distribution System. Xavier University requested AECOM to review the foundation of its gymnasium in 2009, despite normal use of the gymnasium for sports and other activities for three years. Project Worksheet 19154R1, prepared by AECOM employee Randall Krause, states that Xavier University triggered the gymnasium revisit by providing photographic evidence that the concrete floor was damaged. These several photographs, however, are not of the Xavier University Gymnasium, but instead are stock

photographs of concrete cracks that are available on the internet. Similarly, Xavier requested AECOM review the damages to the electrical distribution system, despite apparent functionality. Xavier University's engineering contractor submitted fraudulent reports of damage to AECOM on the University's behalf, and those records were integrated into the subsequent Project Worksheet.

108.    As with all Project Worksheets submitted under FEMA's Public Assistance program, Xavier University reviewed and certified the Project Worksheet's submission to FEMA, though Xavier knew or should have known that the worksheet contained false information.

109.    Defendants AECOM and The Archdiocese of New Orleans conspired in the commission of false claims to cause FEMA to provide replacement funds for the St. Rafael – Cafeteria Building and Buildings 2 and 3 of Villa St. Maurice. In August 2007, Randall Krause, an employee of AECOM, wrote a Project Worksheet in which he artificially inflated the building's estimated repair cost while deflating the replacement cost, which falsely qualified the building for replacement. Similarly, in 2007, Scott White, an employee of AECOM, similarly inflated estimated repair costs and deflated estimated replacement costs in order to falsely qualify Buildings 2 and 3 of Villa St. Maurice for replacement. In the case of Villa St. Maurice, Mr. White included in his assessment extensive repair costs on floors 2 through 5 of both buildings, despite the fact that flood waters never rose past the first floor.

110.    The Archdiocese of New Orleans, which owns the St. Rafael and Villa St. Maurice properties, was a party to the creation of the Project Worksheet, and its agent signed the Worksheet, signaling assent to the information contained therein. As with all Project Worksheets submitted under FEMA's Public Assistance program, The Archdiocese of New Orleans reviewed and certified the Project Worksheet's submission to FEMA, though it knew or should have known that the worksheet contained false information.

## Count IV
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(7) (1986)
## 31 U.S.C. §§ 3729(a)(1)(G) (2009)

111.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1-90 above as though fully set forth herein

112.    By and through the acts described above, within the meaning of the False Claims Act, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government, 31 U.S.C. § 3729(a)(7) (1986) now codified at 31 U.S.C. § 3729(a)(1)(G) (as amended May 20, 2009).

113.    Defendants AECOM and Xavier University submitted Project Worksheets to FEMA, recalculating costs associated to the replacement of the Xavier University Gym, on three separate occasions: the initial fraud, for which funds were obligated, September 30, 2010, again for funding obligated December 9, 2010, and again for funding obligated September 16, 2015.

114.    Once on notice of the fraud in 2010, AECOM had an obligation and opportunity to correct their assessment and return surplus funds. In each subsequent Project Worksheet submitted to the government, AECOM and Xavier University concealed and avoided their obligation to return the wrongfully procured replacement funds.

115.    Defendants AECOM and Xavier University submitted Project Worksheets to FEMA for reconciliation of proposed and actual costs of Xavier University's Electrical Distribution System in 2016. In continuing to reassert the fraudulent claims during the financial reconciliation processes, AECOM and Xavier University concealed and avoided their obligation to return the wrongfully procured replacement funds.

116.    Defendants AECOM and the Archdiocese of New Orleans submitted Project Worksheets to FEMA, recalculating costs associated to the replacement of the St. Raphael Cafeteria and the Villa St. Maurice Buildings 2 and 3 on multiple occasions following the

-30-

initial fraud. For the St. Raphael Cafeteria, Defendants AECOM and the Archdiocese of New Orleans participated in recertifying the necessity of funds and the accuracy of the fraudulent calculations for funding obligated on August 13, 2010, October 7, 2010, July 16, 2013, April 21, 2014 and May 28, 2015. Necessary funding obligations for the Villa St. Maurice Building 2 were recertified for funds obligated on May 1, 2012 and July 29, 2015, and funding for the Villa St. Maurice Building 3 was recertified for funds obligated on August 22, 2013.  In these Project Worksheets submitted to the government, AECOM and Xavier University concealed and avoided their obligation to return the wrongfully procured replacement funds.

## VI.   **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.      That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $10,781 and not more than $21,563 for each violation of 31 U.S.C. § 3729;

3.      That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act;

4.      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.      That the United States and Plaintiff-Relator recover such other and further relief as the Court deems just and proper.

## VII.   **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: September 30, 2016

Respectfully submitted,

BY: _J. Marc Vezina_

J. Marc Vezina, T.A.
**VEZINA LAW, PLC**
LA Bar No. 24683
TX Bar No. 24000141
GA Bar No. 465449
MI Bar No. P76232

Kelli M. Khalaf
LA Bar No. 23213
401 Weyer Street, P.O. Box 461
Gretna, LA 70054
jmv@vezinalaw.com
Tel.: (248) 558-2701
Cell: (504) 813-6100
Fax: (504) 361-3624

Peter W. Chatfield
Amy L. Easton
PHILLIPS & COHEN LLP
2000 Massachusetts Ave NW
Washington D.C. 20036
Tel: (202) 833-4567
peter@phillipsandcohen.com
aeaston@phillipsandcohen.com

Jeffrey Dickstein
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com
Attorneys for Relator-Plaintiff Doe