# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES *ex rel.* [UNDER SEAL], | Case No: |
| Plaintiffs, | |
| v. | **THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *et seq.*]** |
| [UNDER SEAL], | |
| Defendants. | **JURY TRIAL DEMANDED** |
| | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

## DOCUMENT TO BE KEPT UNDER SEAL

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ROBERT ROMERO,<br><br>Plaintiffs,<br><br>v.<br><br>AECOM, XAVIER UNIVERSITY OF LOUISIANA, DILLARD UNIVERSITY, the ROMAN CATHOLIC CHURCH of the ARCHDIOCESE OF NEW ORLEANS, and RANDALL KRAUSE,<br><br>Defendants. | Case No:  16-cv-15092<br><br>**THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *et seq.*]**<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

## COMPLAINT

Pursuant to the *qui tam* provisions of federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, (the "False Claims Act" or the "FCA"), *qui tam* Plaintiff-Relator Robert Romero (hereinafter "Relator"), on behalf of the United States of America for this Complaint against AECOM, Xavier University of Louisiana (hereinafter "Xavier" or "Xavier University"), Dillard University (hereinafter "Dillard"), the Roman Catholic Church of the Archdiocese of New Orleans (hereinafter "Archdiocese" or "Archdiocese of New Orleans"), and Randall Krause (hereinafter "Krause") (collectively, "Defendants"), alleges as follows:

I.   **INTRODUCTION AND OVERVIEW**

1.      Making landfall on August 29, 2005, Hurricane Katrina severely damaged New Orleans triggering a surge of federal disaster aid into the region. Soon thereafter, FEMA, pursuant to its authority under the Stafford Act and federal regulations, began to make funds available under its Public Assistance Program ("Program"), a program which is

still funding recovery from Katrina over ten years later and has led to disbursement of almost $20 billion to entities in the state of Louisiana.

2. Defendant AECOM has been a FEMA contractor since 1997, providing technical assistance to support FEMA's disaster response. In that capacity, its employees were present in New Orleans after Katrina, and did numerous site evaluations to determine whether applicants were eligible for funds under the Public Assistance Program and the amount of funds for which they were eligible.

3. Beginning no later than 2008, AECOM employees, including Defendant Randall Krause, repeatedly submitted false or misleading information to FEMA, fraudulently increasing the amount that FEMA paid in excess of $100 million. This included claims of damage to non-existent concrete building foundations and fictitious basements, systematic inflation of cost estimates for damaged items, inflation of building square footage, and submission of fraudulent damage photographs downloaded from the internet.

4. In some cases, these frauds took advantage of a FEMA policy called the "50% Rule," manipulating repair and replacement estimates so FEMA would pay for full replacement of a facility when it should have paid only for much less expensive repairs. In other cases, the Defendants inappropriately added millions of dollars to the cost estimates for building replacement, thereby substantially increasing the funding that FEMA paid.

5. The grant applicants were not the only entities to benefit from this fraud, in fact, AECOM and its employees also stood to gain advantages in FEMA contract renewal, as FEMA evaluated contractors based on metrics including total productivity, and it enabled AECOM to charge FEMA for hundreds of additional billable hours.

6. By no later than March 2011, management of AECOM was aware that at least one of its employees was engaging in fraud. Relator's supervisor, an AECOM Operations Manager, disclosed to Relator that a Public Assistance Program applicant had sounded the

alarm about an AECOM employee named Randall Krause, revealing that he had included false information in a draft claim submission to FEMA. AECOM fired Krause as a result of the suspected fraud, and tasked Relator to look into Krause's past work.

7.     However, after Relator reported back to AECOM's management his suspicion that Krause had engaged in widespread fraud, AECOM did nothing to inform the government, nor to mitigate the overpayments and damages resulting from the fraud. Krause was involved in the false claims submitted in most of the projects detailed in this Complaint.

8.     Defendant Xavier University, a FEMA Program applicant, knowingly, recklessly, and/or with willful blindness submitted and/or caused to be submitted to FEMA false and misleading documentation regarding the existence and extent of damage to its facilities, thereby increasing the amount of disaster relief funding that FEMA provided by at least $16 million. Xavier University in conjunction with AECOM also made material omissions to FEMA representatives, fraudulently requesting FEMA funds to pay for significant upgrades that were ineligible for FEMA funding.

9.     Specifically, Xavier University fraudulently received approximately $6.6 million of FEMA funding for a gymnasium building ("Xavier Gymnasium") based on the misrepresentation that Katrina had severely damaged the gymnasium's concrete, floating slab foundation when, in fact, the building had no such foundation. In addition, Xavier University fraudulently received approximately $4.7 million for a student center building ("Xavier Student Center") based on the misrepresentation that Katrina had severely damaged the building's basement floor when, in fact, the building had no basement floor. Finally, Xavier University fraudulently received approximately $4.8 million for the replacement of its electrical distribution system ("Xavier Electrical Distribution System") based on the misrepresentation that Katrina had heavily damaged the system such that it required replacement when, in fact, the system was undamaged and ran for six years post-Katrina

-4-

without issue prior to its replacement. Moreover, a portion of the new system was ineligible for FEMA funds because it was owned by Xavier's power utility, Entergy, a private entity not eligible for FEMA funds, rather than applicant Xavier.

10.     Defendant Dillard University, a FEMA Program applicant, knowingly, recklessly, and/or with willful blindness submitted and/or caused to be submitted to FEMA false and misleading documentation regarding the existence and extent of damage to its facilities, thereby increasing the amount of disaster relief funding that FEMA provided by at least $14.3 million.

11.     Specifically, Dillard University fraudulently received $5.4 million for Straight Hall, $4.7 million for Hartzell Hall, and $4.2 million for Camphor Hall, based on damage estimates that it knew to be inflated and overpriced. These estimates caused each building to appear to qualify for full replacement funding when they should have qualified only for repair.

12.     Defendant Archdiocese of New Orleans, a FEMA Program applicant, knowingly, recklessly, and/or with willful blindness submitted and/or caused to be submitted to FEMA false and misleading documentation regarding the existence and extent of damage to its facilities, thereby increasing the amount of disaster relief funding that FEMA provided by at least $46 million.

13.     Specifically, the Archdiocese of New Orleans fraudulently received approximately $10 million of additional FEMA funding for a school building ("St. Raphael School's Cafeteria Building") based on a fraudulently inflated repair estimate containing unnecessary and unjustifiable items, and a fraudulently low replacement estimate. These false claims qualified the building for full replacement funding from FEMA when it should have qualified only for repair funding. In addition, the Archdiocese fraudulently received approximately $36.2 million of additional FEMA funding for two assisted living facilities

("Villa St. Maurice complex, Buildings #2 and #3") based on the misrepresentation that Katrina caused catastrophic damage to the four upper floors of both buildings. Based on this fraudulent damage assessment, FEMA awarded both buildings full replacement funding. But in fact, the upper floors suffered no flood damage and limited, if any, wind damage, and so the buildings should have qualified only for repair funding.

14.     AECOM fraudulently caused FEMA to fund an additional $14.5 million to replace the public Edward Hynes Elementary School ("Hynes Elementary"), owned and operated by the Orleans Parish School Board. AECOM intentionally and fraudulently over-estimated the school's square footage by approximately 40%, and fraudulently inflated the cost estimates for damaged items in the repair estimate.

15.     AECOM fraudulently caused FEMA to pay an additional $19.8 million to replace the public Crocker Elementary School ("Crocker Elementary") and $8.9 million to replace Chester Elementary School ("Chester Elementary"), both operated by the Recovery School District of Louisiana. AECOM systematically inflated the repair cost estimates for both schools, falsely claiming significant roof and/or second floor damage where, in fact, none existed.

16.     AECOM fraudulently caused FEMA to pay an additional $12 million to replace Edward Livingston Middle School ("ELMS"), $11 million to replace Marion Abramson Senior High School ("Abramson"), and $22.2 million to replace Fannie C. Williams Middle School ("FCW"), also operated by the Recovery School District of Louisiana. AECOM fabricated and inflated repair cost estimates for all three schools.

17.     Finally, AECOM fraudulently caused FEMA to pay an additional $15.5 million to replace W. Smith Jr. Elementary School ("W. Smith"), $14 million to replace Joseph J. Davies Elementary School ("JJ Davies"), and $24.3 million to replace P.G.T. Beauregard Middle School ("PGT"), all owned and operated by St. Bernard Parish School

District ("SBP"). AECOM intentionally and fraudulently inflated the size of W. Smith and

PGT, and for all three buildings approved replacement buildings that were significant,

impermissible upgrades from what existed prior to Hurricane Katrina.

II.     **PARTIES**

    A.     **The Relator**

    18.     Plaintiff-Relator Robert Romero is an individual residing and domiciled in the

State of Florida.  He has worked for AECOM (and its legacy companies) since 1994. While

working for AECOM, he has been assigned to work on multiple natural disasters, including

hurricanes Gustav and Katrina. In December 2010, Relator was assigned to New Orleans to

work for AECOM as a Deputy Task Lead under the FEMA Technical Assistance Contract

for Hurricane Katrina, overseeing the administration of FEMA's Hurricane Katrina relief.

    19.     In that capacity, Relator has personal knowledge of Defendants' submission

of false claims, claims, and reports to FEMA and the wrongful receipt and retention of

overpayments from FEMA that resulted.

    B.     **Defendants**

    20.     Defendant AECOM is a Fortune 500 company that provides planning,

consulting, architecture and engineering, design, and construction services. It has a

substantial number of contracts with the Federal Government, including this and many other

Disaster Relief contracts with FEMA.  It is headquartered at 1999 Avenue of the Stars, Suite

2600, Los Angeles, California 90067.

    21.     Defendant Xavier University of Louisiana is a private, coeducational Catholic

liberal arts college in New Orleans. It is headquartered at 1 Drexel Drive, New Orleans,

Louisiana 70125.

22.     Defendant Dillard University is a private, coeducational liberal arts college in New Orleans. It is headquartered at 2601 Gentilly Boulevard, New Orleans, Louisiana, 70122.

23.     Defendant Roman Catholic Church of the Archdiocese of New Orleans is a subdivision of the Roman Catholic Church located at 7887 Walmsley Ave., New Orleans, Louisiana 70125.

24.     Defendant Randall Krause, an individual, is a former Project Specialist at AECOM. While working for AECOM, he did damage assessments and wrote Project Worksheets (official descriptions of damage and estimates of repair or replacement cost) for most of the projects included in this Complaint.

III.    **JURISDICTION AND VENUE**

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

26.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732, which authorizes nationwide service of process.  Moreover, each Defendant can be found, resides in, or has transacted the business that is the subject matter of this lawsuit in this District.

27.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside in, or have transacted the business that is the subject matter of this lawsuit in this District.

28.     Although it is no longer jurisdictional, the public disclosure bar of the federal False Claims Act does not bar this suit.  The Plaintiff-Relator's complaint is not based upon allegations or transactions of fraud that have been publicly disclosed within the meaning of

the False Claims Act. Even if the allegations or transactions of fraud had been publicly disclosed, the Plaintiff-Relator would qualify an "original source" of the information within the meaning of the FCA. His information is based upon his personal observations, independent of any relevant public disclosure and materially adds to any information that could have been publicly disclosed. Relator, moreover, voluntarily provided the information upon which this action is based to the United States government before filing this case.

## IV. APPLICABLE LAW

### A. The False Claims Act

29. The federal False Claims Act (the "FCA") was originally enacted during the Civil War. After finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization, Congress substantially amended the FCA in 1986 to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf. Congress further substantially amended the FCA in 2009 and 2010 to, among other things, strengthen whistleblowers' ability to bring and maintain actions on the Government's behalf.

30. The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; and (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and

improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these three sections of the FCA.  31 U.S.C. §§ 3729(a)(1)-(3) and (7) (1986) and 31 U.S.C. §§ 3729(a)(1)(A)-(C) and (G) (2009).  Any person who violates the FCA is liable for a civil penalty of up to $21,563 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. §3729(a)(1).

31.     For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *See* 31 U.S.C. § 3729(b)(1) (2009) and 31 U.S.C. § 3729(b) (1986). The FCA does not require proof that the Defendant specifically intended to commit fraud. *Id.* Unless otherwise indicated, whenever the word "know" and similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

32.     Each claim for payment that defendants have submitted or caused to be submitted to FEMA and received, for which payment was inflated, is a false and/or fraudulent claim within the meaning of the FCA, so long as defendants knew the claims were false when they were submitted, or the defendants later discovered the falsity and refused to correct the claims.

33.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the *qui tam* relator's complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

**B.**   **Robert T. Stafford Disaster Relief and Emergency Assistance Act**

34.     Congress enacted the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. § 5121 *et seq.* "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which results from [] disasters by . . . [*inter alia*,] providing Federal assistance programs for both public and private losses sustained in disasters." *Id.* at § 5121(b).

35.     Title IV of the Stafford Act gives the President broad authority to respond to major disasters by contributing federal money for the "repair, restoration, reconstruction, or replacement" of private nonprofit facilities, including educational and custodial care facilities. *See* 42 U.S.C. §§ 5122, 5172. Eligible costs for repairing, restoring, reconstructing or replacing a facility shall be estimated on the basis of the design of the facility as it existed immediately before the major disaster. 42 U.S.C. § 5172(e)(1)(A)(i).

36.     In 2003, President George W. Bush delegated most of his authority under the Act to the Secretary of Homeland Security, who then re-delegated the authority to the Director of the Federal Emergency Management Agency ("FEMA"). Exec. Order 13286, 68 Fed. Reg. 10619, 10628 (Feb. 28, 2003); Department of Homeland Security Delegation Number 9001.1 (Dec. 10, 2010).

**C. The Public Assistance Program**

37.     Exercising its authority under the Stafford Act, FEMA has enacted a Public Assistance Program that governs the distribution of federal disaster assistance following major disasters. *See* 42 U.S.C. § 5121 *et seq.*; 44 C.F.R. § 206 *et seq.*

38.     After the President has declared a major disaster in a state, the Public Assistance Program requires that the state enter into a FEMA-State Agreement to receive aid. 44 C.F.R. §§ 206.44. After an agreement is in place, both FEMA and the state solicit

applications for disaster assistance from eligible entities referred to as applicants or "subgrantees."

39.     Applicants may be state agencies, local governments, or eligible private nonprofit organizations. 44 C.F.R. § 206.201. Private nonprofit educational and custodial care facilities (including facilities for the aged) qualify for this designation. 42 U.S.C. § 5172, 44 C.F.R. § 206.221. In the case of private nonprofits, in order for a facility to be eligible for financial assistance, it must be owned and operated by the applicant. *Id.* at § 206.223(b). In addition, all items of work must be the legal responsibility of an eligible applicant. *Id.* at § 206.233(a)(3).

40.     After an applicant submits a request for aid, FEMA, the state, and the applicant document projects that are eligible for disaster assistance in a Project Worksheet. 44 C.F.R. § 206.202(d). The Project Worksheet identifies the damage, specifies the scope of work required, and estimates the cost for repair or replacement.  It also specifies the portion of the cost that will be funded by the Federal Government.  Based on the Project Worksheet, FEMA may make federal disaster assistance funds available (i.e. "obligate" funds) to the state. The state is "the grant administrator for all funds provided under the Public Assistance grant program," and is responsible for distributing the subgrants based on the FEMA-approved Project Worksheets. *Id.* at § 206.202(b), (e).

41.     Cost estimates in the Project Worksheets are broken down into multiple categories called Part A through Part H costs. Part A costs are base costs, including the cost to remove or repair damaged items, and to purchase and install new items, if needed. Part B-H costs are soft costs, including architecture and engineering, project management, overhead, cost escalation factors, and several other ancillary costs.

42.     A FEMA policy known as the "50% Rule" governs whether FEMA will pay to repair a facility or pay for a full replacement facility. In assessing requests for aid, FEMA

will estimate both the cost to repair the facility to its pre-disaster condition and also the cost to replace it. If the Part A repair estimate is under fifty percent of the Part A replacement estimate, the facility is considered repairable, and the grant of federal aid will be limited to the actual cost of repairs. But if the Part A repair estimate exceeds fifty percent of the Part A replacement estimate, the applicant will be eligible to receive grants funding the entire replacement of the facility with an essentially equivalent structure.  44 C.F.R. § 206.226(f).

43.     Once qualified for repair or replacement based on the 50% Rule, FEMA will fund all costs, Parts A-H (which includes soft costs), for the work (not just the Part A portion used for the 50% Rule calculation). For this reason, total FEMA funding for repair or replacement of a facility will be significantly higher than the Part A estimates discussed in the Project Worksheets.

44.     If subsequent changes to the Project Worksheet are needed after it has been approved, for example to add newly discovered damage or to correct an error, a new version of the Project Worksheet will be written. In addition, some projects have multiple Project Worksheets written for different aspects of the building (e.g. mold remediation or mechanical). It is not uncommon for projects to go through several versions of a Project Worksheet or to have multiple Project Worksheets.

45.     If applicants wish to make improvements to a facility above and beyond what is required to restore it to pre-disaster function, they may do so if they seek and are given approval by the state, assuming they pay the additional costs. *Id.* at § 206.203(d)(1).

46.     As a condition of the receipt of any Stafford Act disaster assistance, applicants shall carry out repairs and construction in accordance with applicable standards of safety, decency, and sanitation, and in conformity with applicable codes, specifications, and standards. *Id.* at § 206.400(a).

V.     **ALLEGATIONS**

**D. Defendants knowingly, recklessly, and/or with willful blindness submitted, or caused to be submitted, false information to FEMA to increase the amount of FEMA Katrina-relief funding they received regarding many projects, including:**

### 1. Xavier University

a.    Xavier Gymnasium

47.    Defendants Xavier University, AECOM, and Randall Krause knowingly submitted, or caused to be submitted, claims to FEMA that asserted damage to a non-existent concrete building foundation. These claims were accompanied by demonstrably fake photographic documentation (downloaded from the internet) purporting to show and support the alleged damage. Defendants falsely alleged the damage so that the cost to repair the University's gymnasium would appear to exceed fifty percent of the cost to replace the gymnasium, thereby causing FEMA to pay approximately $7.6 million for the building's full replacement instead of just $1 million for its repair.

48.    During Hurricane Katrina, the Xavier University Gymnasium was submerged in 2'6" of floodwater for approximately three weeks. Flood waters damaged the interior of the building, and high winds damaged the exterior. By the arrival of FEMA evaluators in 2006, initial repairs to the gymnasium were substantially complete. By August 2006, Xavier had already installed new wood flooring for the basketball court. By November 2006, Xavier's basketball team resumed playing all of its home games in the gymnasium.

49.    In March 2007, a Project Worksheet was prepared to capture completed repairs that had been made to 22 Xavier University sites, including the gymnasium. At this time, the Project Specialist who authored the Project Worksheet assessed that the Xavier Gymnasium had required $382,301 of repair work (in Part A base repairs) to the building's doors, windows, ceilings, walls, and floor; repairs to the building's plumbing and HVAC; and replacement of damaged electrical components and lockers. She estimated the gymnasium's replacement cost at $2,814,928. The ratio of her repair cost estimate to her

replacement cost estimate totaled 13.6%, well under the 50% Rule replacement threshold, so FEMA obligated $813,052 to repair the gymnasium.

50.     Two years later, in 2009, Xavier requested two site visits by a FEMA contractor to evaluate minor additional damage. Based on these visits, $80,498 was added to the Part A repair estimate to account for newly discovered roof damage, and $109,148 for newly discovered floor damage. No new repair versus replacement estimate was performed after either visit, since damages were limited. In total, FEMA increased its obligation to $1,003,698 for the repair of the gymnasium.

51.     On December 22, 2009, a different AECOM Project Specialist, Randall Krause performed an additional site visit at Xavier University's request.  On December 29, 2009, Krause submitted a Project Worksheet purporting to detail extensive additional damage to the gymnasium that had not been found or submitted before. (Project Worksheet 19154v0). Most significantly, Krause claimed to discover substantial cracking damage to an 8" thick, re-bar reinforced, concrete floating slab foundation that lay under the entire building.

52.     Xavier's Director of Facility Planning & Management, Marion Bracy signed the Project Worksheet as Applicant Representative. AECOM employee Noel Batenga signed the Project Worksheet as PAC, and would have performed secondary review. His signature indicates AECOM management approval of the Project Worksheet and its contents.

53.     No such foundation or foundation damage had been mentioned in the earlier March 2007, February 2009, or September 2009 Project Worksheets. The reason it was not mentioned is because it did not exist.

54.     Krause included in the Project Worksheet four photographs depicting severe foundation cracking that he claimed were of the Xavier Gymnasium. But they were not photographs of the gymnasium. They were not taken in New Orleans. In fact, Krause

downloaded the photographs from the internet, a fact easily ascertainable by searching for the images online.

55.     Krause kept the original files of the fraudulent photographs taken from the internet in a folder on the FEMA server, and the photograph filenames also indicate that they were not of the Xavier Gymnasium. One file was named "faq_cracks_21538.jpg". Another was named "cracked_wall_in_dry_cleaners.jpg". The photo of the dry cleaners can also be found at https://sites.google.com/site/reactiveclaysoilgeohazard/, where the website indicates it was first uploaded in February 2009, ten months before Krause included it in the Project Worksheet.

56.     Krause asserted that his newly discovered foundation damage necessitated a full replacement of the (non-existent) concrete foundation, costing $951,630.  Krause added this amount to the Xavier Gymnasium's Part A repair estimate, and then calculated a new repair versus replacement ratio for the 50% Rule calculation.  The repair estimate increased to $1,551,791, and he set the replacement estimate at $2,574,080, thus Krause falsely reported that the new ratio was 60%, above the 50% replacement threshold. Based on his fraudulent inclusion of foundation damage, the building was now eligible for full replacement funding.

57.     In 2010, an adjustment was made to the replacement estimate, increasing it to $3,038,966, ostensibly to account for a square footage increase required to meet applicable building codes. This falsely lowered the repair versus replacement ratio to 51%, keeping it just slightly above the eligibility threshold, while increasing the amount of money available to Xavier. Based on the new figure, on September 30, 2010, FEMA obligated $7,663,259 for full replacement of the Xavier University Gymnasium.

58.     The Xavier Gymnasium appeared on paper to become eligible for replacement, and not simply repair, solely due to Krause and Xavier's fraudulent inclusion of

the cost to replace the non-existent concrete foundation in the Part A repair estimate, supported by the fraudulent pictures from the internet.

59.     At some time prior to January 2011, Paul Kilbride, a Program Examiner at the Office of Management and Budget ("OMB"), which oversees aspects of the FEMA program, opened an inquiry into the Xavier University Gymnasium project. Kilbride had become aware of the Xavier Gymnasium through review procedures for FEMA projects greater than $1 million ("the million dollar queue"). Kilbride noticed that intercollegiate sporting events appeared to have resumed in the gym shortly after it reopened post-Katrina, and—even at the time of Kilbride's review—continued to be scheduled there regularly. He wanted to know why the gym needed full replacement when it seemed "back to pre-Katrina status."

60.     On January 10, 2011, AECOM responded to the OMB Inquiry. In a response prepared by AECOM personnel for FEMA Public Assistance Officer Mike McCloskey, AECOM summarily stated that a significant amount of permanent work remained to be performed, including "structural repairs to the gymnasium." The false claims regarding foundation damage from Krause's December 2009 Project Worksheet were reasserted, and three of the four fraudulent photographs of alleged damage from Krause's Project Worksheet were resubmitted in support of the nonexistent damage.

61.     After FEMA granted replacement funding for the Xavier Gymnasium, Xavier filed for and was granted a "Change of Location" request, which allowed them to spend all of the money towards a new sports complex called the "Convocation Center." Xavier had planned on building this new complex to replace the 80-year old Xavier Gymnasium since at least February 2007. In November 2012, the Convocation Center was dedicated and opened for use.

62.     In May 2013, Xavier began demolition on the Gymnasium building. While it was undergoing demolition, Relator visited the worksite. Initial building demolition had

begun two days prior, and the gymnasium's flooring and walls had been removed, exposing the building's foundation.

63.     Upon inspection, Relator discovered nothing resembling the damage alleged in Krause's 2009 report. In fact, he found that the building was supported by a pile and pile cap foundation, not a floating concrete slab foundation as Krause had claimed. What actually lay under the Xavier Gymnasium floor was just a base layer of wood and asphalt.

b.     Xavier Student Center

64.     Defendants Xavier University, AECOM, and Randall Krause knowingly submitted, or caused to be submitted, claims to FEMA for damage to a non-existent basement floor of Xavier's Student Center building. By alleging that the building had three floors instead of just two, Xavier was able to claim an entirely new floor's worth of additional damage in the Project Worksheet, and get a corresponding increase of approximately $4.8 million in FEMA funding for the building's replacement.

65.     Between May 2006 and September 2007, seven Project Worksheets were written for the Student Center. Some pertained only to the building's mechanical repairs or mold remediation. Others covered repairs to the entire building. Each of these Project Worksheets described the building as either "two story" or "2 story."

66.     Four of these seven Project Worksheets were written by Krause, including Project Worksheet 10418v0, which also contained building schematics, created by Xavier University, showing the Student Center had only two floors.

67.     Initially, the Student Center qualified only for repair, but on September 4, 2007, a different Project Specialist named R. Namhumyk wrote a Project Worksheet increasing the earlier repair estimate which yielded a repair versus replacement ratio of 62.1%, qualifying the Xavier Student Center for replacement funding pursuant to the 50% Rule. Based on this, FEMA obligated $7,133,813 in funding to replace the building.

-18-

68.     Two years later, in November 2009, Krause wrote a new Project Worksheet for the Student Center falsely alleging for the first time that it contained a full subterranean basement, of equal square footage to the two above-ground floors. (Project Worksheet 19093v0). He now described the building as "[a] 2-story structure with a finished basement … the two above-ground floors total 28,884 SF. The finished basement covers 14,442 SF, for a total area of 43,326 SF."

69.     Krause asserted in this Project Worksheet that the earlier Project Worksheet written by R. Namhumyk did not include the basement "due to an error." However, Krause did not explain why the four earlier Project Worksheets that he, himself, had written did not include a basement.

70.     The addition of the alleged basement in the Project Worksheet resulted in Krause's increasing the Part A repair estimate by approximately $700,000 for damage to items in the non-existent basement, such as doors, flooring tile, walls, air conditioning, and a three-floor elevator. It also resulted in Krause's reporting a huge increase in square footage, from 28,884 to 43,326, which Krause used to justify a corresponding increase to the estimated cost to replace the building.

71.     This increased the Part A repair estimate from $2,093,844 to $3,130,090, and the Part A replacement estimate from $3,369,671 to $5,365,511. By increasing both the repair and the replacement estimates, Krause was able to ensure that the repair versus replacement ratio remained above 50% so the building would still qualify for replacement under the 50% Rule. The effect of the increase to the replacement estimate, meanwhile, caused FEMA to increase its obligation for the Student Center by nearly $5 million to a total of $11,997,448.

c.      Electrical Distribution System

72.      Defendants Xavier University, AECOM, and Randall Krause knowingly submitted, or caused to be submitted, false claims regarding the damage that Hurricane Katrina caused to Xavier's Electrical Distribution System, falsely asserting that it was severely damaged, and thereby causing FEMA to pay approximately $4.7 million for what was, in fact, an unnecessary and ineligible upgrade.

73.      Immediately following Hurricane Katrina in 2005, while Xavier University was requesting disaster relief from FEMA for damage at over 22 sites on its campus, notably Xavier did not request funding to repair or replace the underground, high-voltage Electrical Distribution System powering its campus. In January 2006, Xavier University reopened its campus, powered by the Electrical Distribution System.

74.      Three years and seven months after Hurricane Katrina, on March 18, 2009, without explanation, Krause prepared the first Project Worksheet for the Electrical Distribution System, estimating that $5,496,450 would be required for its full replacement. (Project Worksheet 18578v0).

75.      In the Project Worksheet, Krause falsely alleged, without providing detail, that saltwater intrusion had severely damaged the entire system, including a half-mile of underground duct bank and nearly four miles each of copper wire and high voltage cable.

76.      On information and belief, based on Relator's extensive knowledge of such high-voltage systems, a system damaged to even a fraction of the extent that Krause alleged in the Project Worksheet would not have been able to supply power across Xavier's campus for the three years and seven months between Hurricane Katrina and the writing of the Project Worksheet. Moreover, the system ultimately operated without issue for six years after Katrina, until its replacement system came online in mid-2011.

77.      In addition to the fact that Xavier's Electrical Distribution System did not require repair after Katrina, Krause's Project Worksheet ignored a fundamental provision of

the program making the claim ineligible:  Xavier's new system was to be a major upgrade, not the restoration to pre-Katrina status, which is all FEMA disaster relief is authorized to do. *See* 42 U.S.C. § 5172(e)(1)(A)(i). Indeed, Xavier admitted on its website that the new electrical system: "[i]s a major *upgrade* that allows us the ability to expand our academic functions and increase the degree of reliable energy." (emphasis added).

78.     In particular, one feature of the new system, costing $1.2 million, that substantially upgraded Xavier's capabilities is a second transformer to convert voltage from the local power utility, Entergy. Xavier already had one such transformer prior to Katrina, upon which it was able operate without issue through 2011. That same transformer is still in use today as part of the new system. Therefore, Xavier did not need—and FEMA should not have paid for —a second transformer, which was added solely to increase Xavier's electrical capacity.

79.     Moreover, the new transformer and its off-site hookup to the Entergy power grid are owned by the utility company, Entergy, not by Xavier. As such, they are ineligible for funding under FEMA's Public Assistance Program. *See* 44 C.F.R. § 206.223(a)-(b).

80.     On June 25, 2009, FEMA obligated $5,944,411 to replace Xavier's Electrical Distribution System, covering Krause's full estimate and additional project management costs.

81.     In May 2016, after the new system was installed, a new Project Worksheet was prepared to reconcile FEMA's obligation amount to the cost Xavier actually incurred. FEMA lowered its obligation to $4,779,560.

### 2.  Dillard University

#### a.      Straight, Hartzell, and Camphor Halls

82.     Defendants Dillard University, AECOM, and Randall Krause knowingly submitted, or caused to be submitted, claims to FEMA for damage that did not exist or was

not eligible for funding under FEMA's Public Assistance Program. For Straight, Hartzell, and
Camphor Halls, Defendants falsely justified increases in funding based upon damage
estimates that it knew to be overpriced and contain ineligible repairs, and took steps to
conceal this fact. The increases caused each building to qualify for full replacement funding
under FEMA's 50% Rule, rather than funding only for repair, increasing the amount of
money FEMA obligated to Dillard University by more than $14 million.

83.    Straight Hall, Hartzell Hall, and Camphor Hall are three-story dormitories at
Dillard University. Straight and Hartzell Halls were built in 1935 and Camphor Hall was
built in 1947. By 1970 Dillard had combined Hartzell and Camphor Halls into a single
68,000 SF dormitory. Straight Hall is a smaller building at approximately 18,000 square feet.
Following Hurricane Katrina, all three buildings flooded with water to approximately four
feet, which remained for three weeks before dissipating.

84.    After the storm, Dillard hired the contracting firm Carl E. Woodward
("CEW") to perform repairs on the campus. Among other work, CEW did damage
assessments of Straight, Hartzell, and Camphor Halls, estimating the scope and cost of work
to fully restore the buildings. On May 2, 2006, CEW wrote a detailed 14-page estimate for
Straight Hall totaling $4,303,305. Similar to damage estimates included in FEMA Project
Worksheets, the estimate broke out each damaged item or piece of required work on its own
line, and for each line item estimated a cost. On May 16, CEW wrote a similar estimate for
Hartzell Hall totaling $6,386,482, and on May 17 a similar estimate for Camphor Hall
totaling $5,745,057. As described further below, these estimates were overpriced and
included many repairs that were ineligible for FEMA Public Assistance Program grant
funding.

85.    FEMA began to assess buildings in New Orleans for grant eligibility in 2006,
and—at approximately the same time CEW was preparing its estimates—on May 12th and

May 22nd, 2006, an AECOM employee named Mira Stanchak performed site visits of all three buildings on behalf of FEMA. The site visits revealed typical flood damage including water and mold damage on the first floors and damage to the buildings' HVAC, electrical, and plumbing systems. They also revealed that wind and rain from the storm caused significant damage to each building's roof, and limited damage to the second and third floors.

86.    In early June 2006, Stanchak, on behalf of AECOM, prepared Project Worksheets for each of the buildings. She split the damage assessments for each building into three Project Worksheets, one for the building's roof, one for its electrical and mechanical, and one for the rest of its damage. (Straight: Project Worksheets 11302, 11137, 11167; Hartzell: Project Worksheets 11293, 11161, 11223; Camphor: Project Worksheets 11389, 11408, 11479) In the main Project Worksheets for each building, Stanchak wrote that the buildings were eligible for disaster relief, and defined eligible scopes of work based on "both the [CEW] contractor scope of work provided by applicant ... and observations by the project officer [from the site visits]."

87.    Notably, for all three buildings, Stanchak described significant problems with the CEW estimates. She noted in her descriptions that "some damages included on the original [CEW] scope of work from the applicant are not included in this [AECOM] PW's scope of work. These items are either upgrades, or were not damaged due to the storm." Neither upgrades nor damage unrelated to Katrina is eligible for FEMA grant funding.

88.    Stanchak attached the CEW estimates to each building's respective Project Worksheet. On the CEW estimates attached to the Project Worksheets for Straight and Camphor Halls, Stanchak or somebody else had used pen to cross out all the ineligible line items, including categories such as "upgrade electrical system," "elevator tower," "add sprinkler system," and "add exterior stairwells." The cost attributable to these items was significant. For example, on the CEW estimate for Straight Hall, just the four categories

listed above totaled nearly $682,000. The total amount of "Code Upgrade" (which are generally not eligible if not caused by the disaster) in the estimate was $1,155,599, over 25% of the total CEW estimate of $4,303,305.

89.     Stanchak also described in the Project Worksheets for all three buildings that she believed CEW had significantly overpriced its scope of work—"the [CEW] pricing was reviewed by our estimator, who has much expertise in the field of estimating. Based on his expertise and comparison to [our estimating software], he has determined that [CEW's] pricing appears to be far out of line with reasonable construction costs."

90.     Per FEMA policy, Stanchak used the Cost Estimating Format (CEF) process and cost estimating software called RS Means Cost Works to generate an itemized repair estimate for each building. In total, combining the three Project Worksheets for each building, she estimated that $889,782 in repairs were necessary for Straight Hall, $1,580,151 for Hartzell Hall, and $1,507,646 for Camphor Hall. She also determined that each building was eligible for repair funding rather than replacement funding under FEMA's "50% Rule."

91.     Dillard University Vice President of Master Facilities Planning & Management Edgar Chase III signed all of the Project Worksheets on behalf of Dillard University as the Applicant Representative.

92.     One year later, for all three buildings, another AECOM employee—Randall Krause—wrote fraudulent Project Worksheets to increase funding for the buildings, relying on the flawed CEW estimates.

93.     In fact, Krause knew that the CEW estimates were fatally flawed, and attempted to hide that fact. As described above, AECOM had previously rejected the estimates as overpriced and containing ineligible work. And Krause, himself, omitted most of the ineligible upgrades that Stanchak had rejected. Nevertheless, by inflating the quantities and cost of the damage estimate, Krause's total estimates were almost exactly the same as the

CEW estimates for both Camphor and Hartzell Halls, and exceeded the CEW estimate for Straight Hall.

94.     All three of Krause's Project Worksheets were reviewed by yet another AECOM employee, Mike Rice, who signed the Project Worksheets as Public Assistance Coordinator (PAC), the individual charged to perform secondary review of the Project Worksheets. His signature indicates AECOM management approval of the Project Worksheets and their contents.

(i)     Straight Hall

95.     In early April 2007, Krause wrote a new version of the main Project Worksheet for Straight Hall—"Version 1"—in which he combined Stanchak's three previous Project Worksheets into one (Project Worksheet 11161v1). The Project Worksheet was purportedly authored by both Stanchak and Krause, but only Randall Krause signed its faceplate. Krause wrote that this Project Worksheet would "supplant the damage description and scope of work in Version 0… to start with a clean slate." He used the new version to increase the total damage estimate by nearly $5.5 million, from $889,782 to $6,290,698.

96.     To illustrate the changes in estimated damage over time: In May 2006, CEW's estimate, which was overpriced and contained ineligible upgrades, was $4,303,305. The following month, in June 2006, AECOM employee Mira Stanchak created a much lower estimate of $889,782. Finally, in April 2007, Krause increased the estimate, higher even than the CEW estimate, to $6,290,698.

97.     The justification Krause proffered for the huge 700% increase in obligation was false.  He claimed: "[after Katrina] Dillard University hired a local contractor, Carl E. Woodward (CEW), LLC, to perform the storm damage repairs. CEW performed an initial damage assessment of the building, created a scope of work, and estimated the cost of repairs … Version 0 of this PW was written prior to the availability of this comprehensive

-25-

evaluation by CEW and thus did not capture all damages caused by the storm. In light of the additional information, FEMA project officers revisited the facility and were able to complete the inspection." In other words, Krause falsely implied that the CEW estimate was accurate, but claimed that it had been unavailable when Version 0 was written.

98.     As described above, the author of Version 0, AECOM's Mira Stanchak, not only had access to the CEW estimate, but explicitly used it as a basis for Version 0's scope of work and recorded the fact that she was doing so. She also described glaring issues with the estimate and included it, in full, as an attachment to Version 0. Krause, in his role as Project Specialist and as a fellow AECOM employee, could not have missed these facts as he prepared the new version.

99.     Nevertheless, for the Straight Hall project, Krause used the CEW estimate as a dollar goal (which he greatly exceeded) even as he falsely and knowingly characterized it as incomplete.

100.    The CEW estimate was complete (inflated as it was); it approximated the same amount of detail that would be expected in a FEMA Project Worksheet, including separate lines to detail each damaged item or piece of work required, and for each line item a quantity and estimated cost.

101.    In order to reach (and exceed) the CEW dollar goal of 4.3 million, Krause performed his own damage estimate, omitting the obviously ineligible work in the CEW estimate, like the new elevator tower or exterior stairwell, while still dramatically increasing the total estimate for repair by including implausible or implausibly expensive items. For example, Krause included over $300,000 to replace structural masonry that would not have been damaged in the flooding, and almost $100,000 to replace boilers and water heaters that the earlier Project Worksheet had described as undamaged.

102.     Krause's new estimate also yielded an implausibly high cost per square foot. His repair estimate totaled $6,290,698 while the building size was 17,832 SF, yielding a cost per SF of $352. On information and belief, based on Relator's years of experience as a damage estimator, a dorm like Straight Hall, on the high end, would not exceed a cost per SF of $200.

103.     Dillard University Vice President of Master Facilities Planning & Management Edgar Chase III, the same individual that signed the earlier Project Worksheet version written by Mira Stanchak, also signed this Project Worksheet on behalf of Dillard University as the Applicant Representative. Having seen both versions, Mr. Chase would have been aware of the differences, including reference to the CEW estimate and the increase in estimated cost to repair the building.

(ii)     Hartzell and Camphor Halls

104.     A month later, in May 2007, Krause prepared new Project Worksheets for Hartzell and Camphor Halls (11479v2 and 11223v2), combining Stanchak's three previous Project Worksheets into a single Project Worksheet for each building. Once again, by falsifying the repair estimates, Krause qualified both Camphor and Hartzell Halls for replacement funding, increasing their obligations from FEMA by $4,218,294 and $4,769,111 respectively—approximately 300% more than the earlier versions.

105.     To illustrate the changes in estimated damage over time: In May 2006, CEW created estimates, which were overpriced and contained ineligible upgrades, of $6,386,482 and $5,745,057 for Hartzell and Camphor Halls, respectively. The following month, in June 2006, Mira Stanchak created a much lower estimates of $1,580,151 and $ 1,507,646. Finally, in April 2007, Krause increased the estimates to $6,349,262 and $5,725,940. As described further below, Krause's estimates were within .6 percent of the original CEW estimates despite his removal of over $1 million each in clearly ineligible upgrades.

-27-

106.    Although Mira Stanchak is described as the sole author of these Project Worksheets—Krause appears only as one of the supporting damage estimators—it is likely that Krause was the actual author. The Project Worksheets closely mirror Straight Hall's PW11161v1, both in the language used and also in the method Krause used to manipulate the damage estimates to reach the funding levels proposed by CEW. In addition, the significant, unexplained changes from the earlier versions—in particular, the complete failure to mention Stanchak's earlier concerns about the CEW estimate—would not make sense if Stanchak had written both versions.

107.    Once again, the new versions began by discarding all of Stanchak's previous estimating work. "The following damage description … and scope of work supplant the damage description and scope of work in Version 0. In addition, all costs in Version 0 … have been reversed … to start with a clean slate." But offered only the explanation that "Version 0 did not capture all damages caused by the storm."

108.    Krause again described Dillard's relationship with CEW, that CEW had been hired "to perform the storm damage repairs, which are not complete," and that they had "performed an initial damage assessment of the building, created a scope of work, and estimated a cost of repairs." Once again, Krause stated that the CEW estimates were incomplete: "Though Dillard has provided CEW's estimate of the cost to repair Camphor Hall … the repairs and documentation assembly are not complete. For this reason, the costs for repair are estimated." Krause knew this to be untrue.

109.    Then, Krause again created fraudulent repair estimates for the buildings, which in this case matched the total estimates by CEW almost exactly despite the fact that AECOM had already concluded that CEW used inflated prices and included ineligible items. Krause inflated costs and added unnecessary items that brought his total estimate for both buildings to within approximately .5 percent of the CEW estimates—a correlation unlikely to

-28-

occur unless it was intentional. Krause estimated that the Parts A-H (base plus overhead and soft costs) repair cost of Camphor Hall was $5,725,940, which equals 99.6 percent of the CEW estimate of $5,745,057. And he estimated that the Parts A-H repair cost of Hartzell Hall was $6,349,262, or 99.4 percent of the CEW estimate of $6,386,482.

110.    Examples of Krause's fraudulent line items again included implausible line items to replace loadbearing masonry, and also approximately $300,000 to replace unnecessary and overpriced feeder conduit and wiring for the buildings.

111.    Dillard University Vice President of Master Facilities Planning & Management Edgar Chase III, the same individual that signed the earlier Project Worksheet versions written by Mira Stanchak, also signed these Project Worksheet on behalf of Dillard University as the Applicant Representative. Having seen all of the versions, Mr. Chase would have been aware of the differences, including reference to the CEW estimate and the increase in estimated cost to repair the building.

112.    Krause continued his involvement with these buildings beyond the creation of the Project Worksheets described above. Between October 8th and 10th, 2007, the Project Worksheets for all three buildings were de-obligated along with the FEMA grant money that had been allocated to the Project Worksheets. Randall Krause was the Public Assistance Coordinator (PAC) on the Project Worksheets for Straight and Hartzell Halls. On October 10th, 2007, Krause resubmitted the claims together with claims for several other buildings at Dillard University in a "Mega-E," Project Worksheet 16934v0. He included the same fraudulent damage estimates that he had included in the earlier Project Worksheets. Krause signed the Project Worksheet as both the author and PAC. On January 20, 2010, Version 4 of the "Mega-E," Project Worksheet 16934v4, de-obligated the claims and funding associated with Straight, Hartzell, and Camphor Halls. Randall Krause signed the Project Worksheet as the Project Officer (author), and AECOM employee Noel Batenga signed as PAC.

113.    Also on January 20, 2010, Randall Krause wrote and submitted new Project Worksheets for each building. In each he included the same fraudulent repair estimates that he had submitted in the previous Project Worksheets, as described above. Based on Krause's estimates, Project Worksheet 19253v0 obligated $5,800,959 for Straight Hall, Project Worksheet 19256v0 obligated $5,958,861 for Hartzell Hall, and Project Worksheet 19254v0 obligated $5,337,502 for Camphor Hall. AECOM employee Noel Batenga signed each of the Project Worksheets as PAC. Each Project Worksheet was signed by Dillard University Vice President of Finance Gerald Williams as Applicant Representative.

### 3.  Orleans Parish School Board (OPSB)

#### a.    Edward Hynes Elementary School

114.    Orleans Parish School Board ("OPSB"), a municipal school board that owned and operated public schools in New Orleans, and Defendants AECOM and Randall Krause knowingly submitted, or caused to be submitted, Project Worksheets to FEMA falsely claiming an inflated square footage for all three buildings on the Edward Hynes Elementary School campus, and containing inflated repair estimates. By submitting these false claims, OPSB fraudulently received an additional increase of approximately $18.4 million in FEMA funding for replacement of the buildings.

115.    Hurricane Katrina flooded the Hynes campus with six feet of water. In October 2006, separate Project Worksheets were written for the Main Building at Hynes and for its two smaller Annexes. Each initially qualified for repairs, and FEMA obligated a total of $3,062,231.

116.    In January 2008, OPSB requested that FEMA reevaluate all three buildings, citing new damage that was uncaptured in the first Project Worksheets. For the Main Building, a new Project Worksheet captured significant additional roof damage. For the Annexes, Project Specialists added scope for "additional quantities [of damage] discovered

during selective demolition." Based on the new repair versus replacement calculations, all three buildings now qualified for full replacement funding under the 50% Rule, and FEMA obligated a total of $13,719,077.

117.    In mid-2008, OPSB requested that FEMA allow it to replace the three old buildings with one new 89,000 square foot building. Although the old buildings' combined square footage was less than 89,000 square feet—the Project Worksheets listed total building size at 65,552 square feet— the Project Worksheet stated that "OPSB [believed] that the 89,000 SF building design [was] equivalent to the current aggregate space…" when modern building codes and design standards were considered. In October 2008, FEMA denied OPSB's request, explaining that "the current 23,000 SF delta could not be fully justified though required codes & standards upgrades."

118.    In June 2009, Krause wrote new Project Worksheets for all three of the Hynes buildings, inflating the Part A replacement estimate for all three buildings by falsely asserting an increase to each building's size, representing them all as significantly larger than they actually were. (Project Worksheets 10554v5, 11421v4, 12301v4).

119.    In fact, Krause increased the aggregate size of the three buildings to 88,990 square feet, virtually the exact size of the new building that FEMA had denied as unjustifiably large. In addition, the increase to square footage was spread evenly among the three buildings, each nearly identical to the overall increase desired by OPSB. The delta between the old Hynes buildings as listed in the Project Worksheets (65,552 SF) and the new building that OPSB requested (89,000 SF) was 37.91%. Krause increased the Main Building by 38.02%, Annex #4 by 37.91%, and Annex #6 by 37.20%. This was done despite the fact that all three buildings differed greatly in shape and size.

120.    Publicly available satellite images also contradict Krause's alleged building dimensions. The images show that his dimensions were larger than the actual buildings, and

incorporated outdoor covered sidewalks, which were not part of the buildings and, therefore, may not be included in the building size estimates.

121.    In addition to inflating the building size to increase the replacement estimates for the buildings, Krause also fraudulently increased the repair estimates by discretely inflating repair estimates from previous versions of the Project Worksheets.

122.    For example, the repair estimate from the earlier Project Worksheet for Hynes' Main Building contained a line item for replacement of 335 auditorium chairs: "Seating, auditorium chair, all veneer construction," CSI# 12611 313 2000, costing $197 per chair (Construction Specifications Institute or "CSI" numbers are an industry standardized set of 12-digit codes that specify specific items). In Krause's subsequent version, he appeared to similarly call for the replacement of 334 "Replace wood veneer floor mounted auditorium seats." The corresponding line item in Krause's new version of the Project Worksheet, however, was not the same. He changed the item to CSI# 12611 313 2220, which is the code for "Auditorium chair, veneer back, padded seat." The padded seat increased the unit cost of each chair to $267, increasing the total repair estimate by over $20,000.

123.    In this manner, Krause inflated the earlier repair estimate for the Hynes Main Building by a total of $1,457,893. Further examples include: substitution of sliding windows for stock windows, adding $86,231; substitution of "B-labeled" fire rated doors for regular wood doors, adding $19,085; substitution of high-end "Tegular" ceiling tiles for regular ceiling tiles, adding $77,668; substitution of 1/2" thick flooring tile for 1/8" thick flooring tile, adding $77,502. In the most expensive example, Krause substituted copper roofing for steel roofing, adding $527,164 to the repair estimate. Each of these examples represent impermissible upgrades, as opposed to the replacements, which is all that the FEMA program is authorized and intended to pay for.

124.     Krause's fraudulent increases to both the replacement and repair estimates kept each building's repair versus replacement ratio above 50%, keeping the buildings qualified for replacement. Based on the new replacement estimates, Krause caused FEMA to obligate an additional $18.4 million to OPSB for the Hynes Buildings, to a total of $32,120,202. AECOM employee Rob Lopez was the PAC for all three Project Worksheets, and would have performed secondary review.

125.     In August 2010, FEMA entered into a comprehensive settlement agreement ("single settlement") with OPSB and another school district to enable them to pool all FEMA-obligated funds and spend obligated money with increased flexibility and less scrutiny out of one centralized pool, rather than through the normal Project Worksheet process. Shortly after the Single Settlement was announced, FEMA approved new Project Worksheets for each of the Hynes buildings, depositing the obligated money into the Single Settlement pool.

### 4.  Recovery School District of Louisiana (RSD)

#### a.     Lawrence D. Crocker Elementary School

126.     Recovery School District of Louisiana ("RSD"), a special state-wide school district that operated schools all over Louisiana including Crocker Elementary School, and Defendants AECOM and Randall Krause, knowingly submitted, or caused to be submitted, a Project Worksheet to FEMA falsely claiming severe damage to the roof and second floor of Crocker Elementary, and containing inflated repair estimates. With these fraudulent claims, RSD and the Defendants caused FEMA to increase its obligation for the school ten-fold, from approximately $2.3 million to $22.1 million.

127.     Crocker Elementary was a 2-story, 75,000 square foot elementary school, built in 1970. Hurricane Katrina flooded the school with four feet of water.

128.    In October 2006, an initial Project Worksheet written for the school cited flood damage to the first floor, but concluded that "[t]he facility was not substantially damaged." On the second floor, the report described minor water damage at two locations, which necessitated replacement of 100 (out of 36,400) square feet of ceiling tile. It also cited three damaged items on the roof: a TV antenna, an HVAC air intake, and an exhaust fan and cover, but stated that otherwise "no roof damage was apparent." Photographs of the second floor and roof damage were included in the Project Worksheet.

129.    The Project Worksheet listed the Part A repair estimate for Crocker Elementary at $1,452,084, and the replacement estimate at $4,946,856, yielding a repair versus replacement ratio of 29.4%—well below the replacement threshold of the 50% Rule. Based on this, on October 12, 2006, FEMA obligated $2,307,444 to repair the building.

130.    Over two years later, on April 16, 2009, Krause prepared a new Project Worksheet for Crocker Elementary falsely alleging extensive additional damages, more than three times what was reported in the previous repair estimate. (Project Worksheet 12558v2). AECOM employee Rob Lopez was the PAC for the Project Worksheet, and would have performed secondary review.

131.    Krause falsely asserted that the roof of the school had been severely damaged by uplift from Katrina's winds, stating: "Ripples ... are the telltale sign. When the roof went up, it stretched, and when it came back down, it was bigger than before, causing ripples to develop." Based on this, he called for extensive replacement of the roof components, adding approximately $500,000 to the Part A repair estimate. This covered not only the top layers of the roof, but, implausibly, also its steel decking.

132.    Krause did not explain how such extensive damage was missed by the original FEMA inspectors, who stated that "no roof damage was apparent."

133.    Satellite images of the roof from February 2006 also indicate minimal damage. No damage or ripples are apparent in the images, and the roof had no blue tarps or other protective items to mitigate against subsequent water intrusion, which was common practice at the time when the roof damage had occurred.

134.    Krause also falsely asserted that the roof damage allowed rain to enter the building, causing extensive damage to the second floor. He called for the replacement of all ceiling and floor tiles (36,400 SF), as well as all fluorescent fixtures, chalk boards, bulletin boards, and cabinets.

135.    Krause offered an explanation for why this damage was not included in the initial Project Worksheet: "[t]he first project officers did not capture damage to the ceiling on the 2nd floor because recent water stains had not yellowed and were indiscernible with flashlights. Damage to the VCT flooring [tile] on the 2nd floor curled edges could not be clearly defined was not captured because the, and project officers were not certain that rain entered the building [sic]." However, the inspection to which Krause referred occurred on May 8, 2006, nine months after Hurricane Katrina, and water damage would have been clearly visible by that time. Instead, that inspection had identified only minor water damage to ceiling tile at two locations on the second floor.

136.    Finally, like in the Project Worksheets for Hynes Elementary, Krause discretely inflated the repair estimate from the previous Project Worksheet by replacing line items with more expensive versions. Examples include substitution of aluminum-framed storefront panels with glass curtain walls, adding $10,930 to the estimate; substitution of split-system, wall-mounted HVAC units with wholly integrated wall-mounted HVAC units, adding $109,458 to the estimate; substitution of regular fluorescent lighting fixtures with high-end, concealed fluorescent lighting fixtures, adding $11,952 to the estimate; and substitution of vitreous china sinks with vitreous china sink assembles that include wall

-35-

mounting and in-wall piping, adding $20,787 to the estimate. Each of these examples represent impermissible upgrades as opposed to the replacements, which is all the FEMA program is authorized and intended to pay for.

137.    By manipulating the repair and replacement estimates, Krause falsely increased the repair versus replacement ratio for the building to 51.3%, just above the eligibility threshold for replacement under the 50% Rule. Based on this fraud, on September 24, 2009, FEMA obligated $22,150,315 to replace the entire school.

138.    In August 2010, FEMA entered into the "Single Settlement" agreement, described in the section on Hynes Elementary, above. After the Single Settlement was announced, FEMA approved a new Project Worksheet that deposited the money obligated for Crocker Elementary into the Single Settlement pool.

b.    Florence J. Chester Elementary School

139.    Recovery School District of Louisiana ("RSD") and Defendants AECOM and Randall Krause, knowingly submitted, or caused to be submitted, claims to FEMA for damage that did not exist or was not eligible for funding under FEMA's Public Assistance Program for Florence J. Chester Elementary School ("Chester Elementary" or "Chester"). RSD and the Defendants falsely claimed severe damage to the second floor of the Chester Elementary Classroom Building although none actually existed, and inflated repair estimates for both the Classroom Building and the Cafeteria Building. These claims falsely qualified both buildings for full replacement funding from FEMA when the buildings should only have been eligible for the funding of repairs, fraudulently increasing the FEMA funding that RSD received by approximately $9 million.

140.    Prior to Hurricane Katrina, Chester Elementary consisted of a two-story main Classroom Building, a one-story Cafeteria Building that also contained two kindergarten classrooms, and a one-story Administration Building. In August 2005, Hurricane Katrina

flooded Chester Elementary with approximately three feet of water, which remained for approximately three weeks. Beginning in 2006, separate Project Worksheets were prepared for all of the Chester Elementary Buildings. The allegations herein refer only to the Chester Elementary Classroom and Cafeteria Buildings.

(i)    <u>Chester Classroom Building</u>

141.    In November 2006, AECOM employee Bill Zuspann wrote the first Project Worksheet for the Chester Elementary Classroom Building (Project Worksheet 15174v0), describing that the first floor had suffered "significant flooding damage." In addition to other items, Zuspann described that 10,000 square feet of tile floor had been ruined and was eligible for replacement, and that an equal amount of ceiling tile was "mildewed and must be replaced." Zuspann also recorded "a small amount of wind damage" to the roof, necessitating the replacement of 30 square feet of standing seam metal siding. His full Part A (base cost) estimate for damage consisted of $146,105.34 for the first floor, and $940.80 to repair the roof.

142.    Zuspann's Project Worksheet described minimal damage to the second floor, and none caused by Hurricane Katrina—an assessment consistent with a building subjected to three feet of flood water that suffered no water intrusion from roof or window damage. He wrote: "[o]n the 2nd floor, the only damage seen was to the floor of classroom 201 and the corridor outside the room. Water has leaked from the drinking fountain probably continuously for some time. The shutoff valve was frozen open and could not be closed by hand." Zuspann did not include an estimate of the cost for the damaged floor because: "[i]t does not appear that this damage, or the leaking drinking fountain was a direct cause of the storm." Only damage directly caused by a disaster can be eligible for FEMA funding. "Until this can be demonstrated, this damage is declared to be ineligible."

143.   Even though Zuspann declared the damage ineligible, he illustrated the scope of damage on the second floor in great detail in the Project Worksheet, indicating that he had reviewed it closely. He wrote that "[t]he damaged area [from the leaking drinking fountain] is shown on the sketch of the 2nd floor attached herein." He attached to the Project Worksheet a schematic diagram of the school's first and second floors. On the diagram of the second floor, he, or someone else, marked the location of the leaking drinking fountain and shaded classroom 201 and the corridor outside the room—approximately 15% of the second floor. A note at the bottom of the page identified the shading as "[t]ile floor area ruined by leaking drinking fountain." No shading or other indications of damage appeared on the diagram in the other 85% of the floor, including in classrooms 202, 203, 204, 205, 206, 207, the second floor library, the second floor bathrooms, or the second floor offices.

144.   Nothing else in Zuspann's Project Worksheet identified or suggested damage to the second floor of the Chester Classroom Building.

145.   In March 2007, a new version of the Project Worksheet for the Classroom Building was written (Project Worksheet 15174v1) to add "items of damages that have not been addressed on the original [Project Worksheet] due to the lack of accessibility to the damaged components of the building to identify a justifiable estimate for dimensions of the damages."

146.   The Project Specialist that authored the Project Worksheet, Morris Sade, had worked with the Applicant RSD to determine what quantities of damage were missing from the estimate. He noted that the "[a]dditional quantities [of damage were] identified after walking the site with the applicant representatives." In addition, Sade included with the Project Worksheet a "School Facility Reconciliation Report," which bore the names of both Morris Sade and "Applicant Representative(s) Larry Choate." The Reconciliation Report listed the damaged items in the building and included a column entitled "Quantity Verified

and Agreed by Both Parties." The column was not populated for every line item, but did indicate, for example, that FEMA and RSD agreed that 10,000 square feet of ceiling tile and 11,375 square feet of flooring tile would be eligible for replacement—quantities which are identical or slightly higher than what was described in Version 0 of the Project Worksheet, and which are still consistent with damage only to the first floor of the building.

147.    In total, Sade added approximately $50,000 of new damage to Part A (base costs) of the repair estimate, primarily with the inclusion of new line items for storage cabinets, door frames, toilet partitions, and cork tile boards. Following ordinary FEMA practice, Sade did not break out the repair estimate by room, instead aggregating damages across the whole building (e.g. a single line item for all damaged blackboards in the entire building), but he noted that "[a] room by room breakdown is attached as back-up." Sade's total Part A repair estimate totaled $199,518.69.

148.    Sade's estimate did not include damage attributable to the second floor. After "walking the site with the applicant representatives" and documenting agreement on quantities of damage in the "School Facility Reconciliation Report," Sade's only reference to the second floor was to adopt Zuspann's description from Version 0 of the damage caused by the leaking drinking fountain.

149.    In February 2008, RSD requested another Project Worksheet version (Project Worksheet 15174v3) for the Classroom Building. "At the request of the Applicant [RSD], the site was re-inspected on February 13, 2008, in order to capture the damaged or destroyed items not addressed in the original PW." The Project Specialist that authored the Project Worksheet, Pat Evans, described that further amendments were needed because "all systems could not be assessed at the original inspection including electrical, mechanical, fire alarm, public address and communications systems. This version captures those damages as well as those which could not be identified due to poor site conditions, lack of power, and lack of

site access on the original version." A later version of the Project Worksheet would describe that Evans' version of the Project Worksheet "was written to make additional adjustments in the project [scope of work] based on Applicant's request for final re-inspection."

150.    After the "final re-inspection," Evans increased the estimated cost of repair from $195,576 in Version 1 to $449,724. Accounting for much of the increase, Evans added approximately $60,000 to replace 972 square feet of custom exterior windows, $64,000 to replace the electrical and alarm systems, and $15,000 to replace door hardware. He also increased the estimated cost of repair for floor tile by approximately $50,000, although this was due to an increase in the estimated cost per square foot, not an increase in the amount of floor tile that needed replacement. The quantities of items that had been listed in the "Quantity Verified and Agreed by Both Parties" column of Version 1's "School Facility Reconciliation Report" remained largely the same. For example, Evans specified that 10,000 square feet of floor tile and 10,000 square feet of ceiling tile would be eligible for replacement, again, consistent with damage only on the first floor.

151.    The new inspection revealed significant damage from vandalism, which was "considered ineligible" because it was not caused by the disaster, "and [has] not been included in the estimate for repair." However, Evans did "identif[y], quantif[y], and list[]" the vandalism damages in the Project Worksheet, recording $65,315.28 of ineligible repairs that included ceramic bathroom sinks, urinals, toilets, and fixtures; split unit air conditioners, electrical panel boards, and circuit breakers.

152.    Evans's estimate also added a limited scope of work on the second floor. In particular, he specified approximately 21,000 square feet—the combined size of both building floors—for both "Paints & Coatings, walls & ceilings, interior…" and "Receptacles and wall switches," i.e. he called for the first and second floors to be repainted and have the

light switches and outlets replaced. The combined cost for this work was $25,919. Evans did not articulate a reason for expanding the quantity of these items to include the second floor.

153.    Finally, Evans performed a 50% calculation based on his estimates. The ratio of his estimated cost to repair the building versus his estimated cost to replace the building was 19.71%, and thus, per FEMA policy, the building qualified only for repair funding and not full replacement funding. Accounting for Evans' Part A (base cost) repair estimate and the associated Parts B-H (overhead) costs, FEMA obligated $1,047,034 to repair the Chester Elementary Classroom Building.

154.    RSD subsequently elected to demolish rather than repair Chester Elementary, and requested that FEMA designate the Project Worksheet for the Chester Classroom Building as an "Alternate Project," allowing RSD to spend the obligated money to construct a high school on a different site. AECOM employee Mike Sikora prepared a Project Worksheet for that purpose on April 8, 2009. The process to request and receive approval for designation as an alternate project typically takes several months, and once granted, it is highly unusual to see substantive changes to a building's damage estimate.

155.    Just three weeks later—and after the three separate, independent inspections and appraisals described above—on April 28, 2009 AECOM employee Randall Krause prepared a fraudulent Project Worksheet (PW15174v5), increasing the Part A (base) repair estimate from $478,116 to $1,498,072. This increase was just large enough to qualify the building for full replacement funding with a repair to replacement ratio of 51.6 percent, and had the effect of increasing FEMA's obligation for the building by nearly 800%, from $1,047,034 for repair in Version 4 to $8,193,710 for replacement in Version 5. AECOM employee Rob Lopez is listed on the Project Worksheet as PAC, and would have performed secondary review.

156.     Approximately $485,000 of Krause's repair estimate—more than the full Part A (base) damage estimate from the earlier version and accounting for nearly half of Krause's increase—was damage that Krause claimed on the building's second floor. He alleged that each of the second floor's 18 classrooms, offices, closets, bathrooms, and other spaces had suffered substantial damage necessitating the full replacement of nearly every component in each room, including the floor tile, doors, countertops, shelving, cabinets, chalkboards, ceiling fans, and packaged air conditioning units.

157.     As described above, most of the previous Project Worksheet versions identified no damage to the second floor, with a single exception of one version, which called for repainting and the replacement of outlets and light switches. Krause gave no explanation for the new damage in the Project Worksheet, nor did he mention damage on the second floor in his narrative description of the Scope of Work.

158.     In fact, Krause structured the Project Worksheet in a manner contrary to FEMA practice in order to obfuscate the fraud, making the second floor damage he included difficult to notice. FEMA estimators are not instructed to do "room by room" assessments, but instead to estimate in as efficient and clear a manner as possible. Indeed, most Project Worksheets, including Project Worksheets written by Krause, aggregate damages by floor or for the whole building (e.g., a line item of $10,000 for 40 doors instead 40 line items of $250 for 1 door), making it easy for secondary reviewers to understand the scope and estimated cost to fix damages.

159.     Krause instead wrote a 1,670 (up from 57) line item repair estimate, which causes reader fatigue, obfuscating the damage that he alone notices to the second floor. He stated in the Scope of Work description that "none of the previous versions included a room by room assessment of the building...." He then included 55 pages of generic, nearly identical room assessments in his CEF estimate. Each room description on its own, other than

-42-

showing it to be a complete loss, appeared largely reasonable in both quantity and cost. But without reading the whole assessment carefully, reviewers would not notice that 33 pages into the CEF estimate, Krause began to describe substantial new damage on the second floor, which three separate, independent reviewers had previously determined did not exist.

160.    Although all of the damage Krause included on the second floor was fabricated, a few of the second floor items were clearly implausible. In particular, those that described a need to clean items "stained by floodwaters." Floodwaters at Chester Elementary reached three feet and never touched the second floor of the building. These items included 3,104 square feet of "masonry walls stained by floodwaters" in the "2nd Floor Interior," 780 square feet of "Ceramic tile floor, stained by floodwaters" in the 2nd floor "Custodial Closet[s]" and bathrooms, and 740 square feet of "Glazed tile wainscot stained by floodwaters" in the 2nd floor bathrooms.

161.    Krause also fraudulently included in the estimate damage that earlier versions had deemed ineligible due to vandalism. Krause wrote that "[w]hile it is true that vandals stole copper from [the damaged items], they were already ruined by exposure to the contaminated, saltwater flood and the effects of sustained high humidity." He did not explain why previous damage estimators would have failed to notice this, why the applicant would not have objected, or how the damage—ceramic sinks, urinals, and toilets, air conditioners, electrical panel boards, and circuit breakers—could have been damaged by saltwater, since all are either impervious to saltwater exposure, or, in the case of the electrical items, would have been mounted on the walls above the three foot floodwaters.

162.    Krause wrote that the amount of Part A (base) repairs necessary for the Chester Classroom Building was $1,498,072 and his Part A replacement estimate was $2,902,780.83. These figures yielded a 50% calculation of 51.6 percent, barely qualifying the Chester Elementary Classroom Building for full FEMA replacement funding. If the falsified

$485,000 that Krause included for second floor damage had not been included, then the Part A (base) repair estimate would have been approximately $1,013,072, which would have yielded a 50% calculation of 34.9 percent, and the building would not have qualified for full replacement funding, only for repair.

(ii)    <u>Chester Cafeteria Building</u>

163.    In addition to the fraud, described above, for the Chester Classroom Building, Krause also created a similar fraudulent damage assessment in the Project Worksheet for the Chester Cafeteria Building.

164.    The course of Project Worksheets for the Chester Cafeteria Building was similar to what is described above for the Classroom Building. The first Project Worksheet (Project Worksheet 14783v1) was prepared October 26, 2006 by Project Specialist Kurt Nicholas, and described limited damage to all rooms of the one-story building. Nicholas noted various items requiring repair, including much of the building's floor tile, the wooden cubbies, chalkboards, and other items. He identified mold on the cafeteria and classroom walls, but described that in the kitchen, the plywood ceiling had "no visible signs of mold." Nicholas estimated $91,108 in repairs, and, after mandatory reductions for flood insurance proceeds, FEMA obligated $28,392.54.

165.    On February 21, 2008, AECOM employee J. Tideman prepared another Project Worksheet for the building (PW14783v2). This Version was created at the same time as Version 3 of the Project Worksheet for the Chester Classroom Building and was written for the same reason: "the Applicant was unable to identify all of the damages at the time the original PW was written…. At the request of the Applicant [RSD], the site was re-inspected on February 13, 2008, in order to capture the damaged or destroyed items not addressed in the original PW."

166.    Tideman added approximately $147,289 to the previous damage estimate, much of which was for cleaning the building's masonry walls, repairing windows, replacing electrical receptacles, and replacing ceramic floor tile. Her total Part A (base) repair estimate was $238,397. She also estimated the building's replacement cost at $872,180. This yielded a 50% calculation of 27.3 percent and thus, per FEMA policy, the building qualified only for repair funding and not full replacement funding. Based on this, FEMA obligated $620,115.54 to repair the building.

167.    Tideman also identified damage in this version that was ineligible for FEMA funding because it was caused by vandals rather than Hurricane Katrina. In particular, she noted that vandalism had caused damage that required the demolition and new construction of two "[r]oof top air conditioner, up through 10 ton" and two "[h]eat pump, air source, split."

168.    On April 7, 2008, AECOM employee Mike Sikora wrote Version 3 of the Project Worksheet (PW14783v3), which, like Version 4 of the Project Worksheet for the Chester Classroom Building, designated the Project Worksheet as an "Alternate Project," allowing the money obligated to be put toward building a high school at a different location.

169.    On April 28, 2008, AECOM employee Randall Krause prepared a fraudulent Project Worksheet (Project Worksheet 14783v4), increasing the Part A (base) repair estimate from $238,397 to $588,024. This increase qualified the building for full replacement funding with a repair to replacement ratio of 59.9 percent, and had the effect of increasing FEMA's obligation for the building by over 450%, from $529,035 for repair in Version 3 to $2,397,834 for replacement in Version 4. AECOM employee Rob Lopez signed the Project Worksheet as PAC, and would have performed secondary review. His signature indicates AECOM management approval of the Project Worksheet and its contents.

170.    Like his Project Worksheet for the Chester Classroom Building, Krause falsely alleged that damage caused by vandalism and excluded in previous versions, should, in fact, be included: "Version 2 lists damages to air conditioners and heat pumps that are ineligible because the damages were due to vandalism. While it is true that vandals stole copper from these items, they were already ruined by exposure to Katrina's contaminated, saltwater flood. These items are listed among the eligible damages in this version." However, it is unclear how Krause could know this if previous damage estimators had not. Moreover, as described by J. Tideman in Version 2, the air conditioner in question was on the roof of the building, and therefore would not have come in contact with the three foot floodwaters caused by Hurricane Katrina. Krause included in his damage estimate $31,000 to remove and replace the exterior air conditioning unit.

171.    In addition, Krause included several implausible items in his repair estimate.

- $23,629 to remove and replace "Exhaust hood, commercial kitchen"—an impervious sheet metal hood attached to an exhaust fan located on the roof.

- $32,822 to remove and replace "Fire suppression system, Ansul type"—a metal tubing apparatus affixed to the ceiling of the kitchen to distribute pressurized foam or gas.

> Neither of these metal, ceiling and roof mounted items would have come into contact with the flood waters, which did not exceed three feet.

172.    Likewise, he included:

- $33,194 to remove and replace "Fan coil A/C ceiling mounted" and "HVAC duct, steel, ceiling mounted."

These ceiling-mounted items also would not have been damaged by three feet of floodwaters.

173.     As a final example, Krause included over $7,500 for a "Pot sink, 3 compartment" and other stainless steel items in the kitchen. Such items are impervious to water, and would not have suffered damage from the floodwaters.

174.     Krause wrote that the amount of Part A (base) repairs necessary for the Chester Cafeteria Building was $588,024 and his Part A replacement estimate was $981,075.87. If the falsified $128,145 that Krause included for the items described above had not been included, then the Part A (base) repair estimate would have been approximately $459,879, which would have yielded a 50% calculation of 46.8 percent, and the building would not have qualified for full replacement funding, only for repair.

c.     Edward Livingston Middle School Main Building

175.     Recovery School District of Louisiana ("RSD") and Defendants AECOM and Randall Krause, knowingly submitted, or caused to be submitted, claims to FEMA for damage that did not exist or was not eligible for funding under FEMA's Public Assistance Program for the Edward Livingston Middle School ("ELMS") Main Building. AECOM and Randall Krause prepared a fraudulent repair estimate for the ELMS Main Building that included line items that were significant, impermissible upgrades from what the school had prior to Hurricane Katrina. In addition, large portions of the repair estimate were not based on actual damage to the building. These claims falsely qualified the building for full replacement funding from FEMA when the building should only have been eligible for the funding of repairs, fraudulently increasing the FEMA funding that RSD received by $12,032,809.

176.     ELMS, located in New Orleans, Louisiana, was originally owned by Orleans Parish School Board, but was transferred to Recovery School District after Hurricane Katrina. The school consisted of two buildings—a 123,825 square foot, single-story main

-47-

school building ("Main Building"), and a smaller 8,320 square foot, single-story classroom annex building. These allegations concern only the ELMS Main Building.

177.    Between 2005 and 2008, Project Officers wrote several project worksheets for the ELMS Main Building. However, in a deviation from normal process, the project worksheets did not undergo normal versioning. Typically, the first project worksheet written for a building will be version 0. Then any changes will be written in version 1, then version 2, and so on. Here, instead of versions 1 and 2, the version 0 underwent two "overwrites," which simply replaced the version 0. This may have made any fraudulent changes more difficult for FEMA QA/QC or other reviewers to catch.

178.    On July 28, 2006, an initial Project Officer wrote the first project worksheet for the ELMS Main Building (PW13542v0). It described moderate damage to the building and called for obligation of $4,070,872 for the building's repair.

179.    On June 20, 2007, a different Project Officer wrote the first overwrite to version 0 (PW13542v0R1) in order to "capture[] those items of damages that have not been addressed on the original PW either due to time constraint and lack of accessibility to the damaged components of the building." In particular, he wrote, it was to capture "damages to HVAC, electrical and power distribution systems." The Project Officer also noted that, prior to writing the overwrite, a "site inspection was conducted with [an RSD] representative ... to reconcile list of the damages and verify dimensions." With the new scope added, the Project Officer determined that the building's 50% calculation yielded 41.2%, so the building qualified only for repair funding. In total, the project worksheet increased FEMA's obligation to repair the building to $13,906,458.

180.    On April 8, 2008, AECOM and Randall Krause prepared a second overwrite to the project worksheet (PW13542v0R2), which contained a new and fraudulent repair estimate. The new estimate inflated the 50% calculation to 55.5%, making the building

-48-

appear to qualify for full replacement funding, increasing FEMA's obligation by $12,032,809 to a total of $25,939,267.

181.    Krause's justification for creating the new repair estimate was a total fabrication. In fact, he identified the exact same issue that had been raised—and resolved—in the previous overwrite. He wrote: "the Applicant was unable to identify all damages at the time the original PW was written. At the request of the Applicant the site was re-inspected ... in order to capture ... items not addressed in the original PW" and that "[u]pon re-inspection it was evident all building systems could not be assessed during the original inspection and the lack of electrical power meant that none of the major building systems, such as, electrical/mechanical systems, communication and security devises could not [sic] be fully evaluated." In other words, Krause asserted that a new repair estimate was needed because the original inspection after Katrina had been deficient due to conditions on the ground, and the deficient inspection had caused inadequate capture of scope, in particular, electrical and mechanical scope.

182.    However, as described in the earlier overwrite—but omitted by Krause—there had already been a subsequent inspection after the initial inspection. It had been conducted with the participation of the applicant, and was specifically intended to remedy the initial inspection's inadequacies, including with respect to the missing electrical and mechanical scope.

183.    Krause's new repair estimate also contradicted earlier damage estimates, adding items that constituted impermissible upgrades to the building. For example, both earlier project worksheets established that the ELMS Main Building had a (relatively inexpensive) steel panel roof, calling for the replacement of 50,000 square feet of steel roofing panels, Krause's estimate, however, called for replacement of 50,000 square feet of zinc-copper roofing panels. Zinc-copper panels were a major upgrade that added significant

-49-

cost. Although the earlier Main Building project worksheets lack pricing information for a direct comparison, Krause estimated the cost of steel roofing in other project worksheets at approximately $5.95 per square foot. By comparison, he estimated the cost of zinc-copper roofing for the Main Building at $16.18 per square foot. Based on these figures, upgrading the roof from steel to zinc-copper increased the total cost by $511,960.

184.    In another example, Krause's repair estimate improperly included nearly $1,000,000 to replace a self-contained air conditioner, condenser, and related duct work. In fact, the earlier overwrite had described an entirely different type of air conditioning system that used individual air handling units and a two-hundred-ton capacity cooling tower. Moreover, the earlier Project Officer concluded that the HVAC components were not damaged such that they required replacement, but instead should be only "clean[ed] and service[d]." The project worksheet did not specify an estimated cost to clean and service the components, but it would have been several hundred thousand dollars less than what Krause included for full replacement of the system.

185.    If the appropriate figures for these two items had been included, then the building would not have qualified for full replacement funding. Krause's total estimate for Part A (base) repair was $6,569,352 and his estimate for Part A (base) replacement was $11,833,119 yielding a 50% calculation of just 55.5%. If Krause's repair estimate is corrected to include steel roofing and one third of the HVAC replacement costs are omitted (a conservative estimate), Krause's repair estimate would have been only $5,724,059, which would have yielded a 50% calculation of 48.3%. The ELMS Main Building would have qualified only for repair funding.

186.    In fact, Krause fabricated most or all of his repair estimate, doing so to such an extent that the building described in the estimate did not even resemble the ELMS Main Building. The estimate lacked detailed building-specific scope that had existed in the earlier

estimates. For example, the ELMS Main Building housed both an auditorium and a gymnasium. The earlier version 0R1—as would be expected—included scope that was easily identifiable as damage that had occurred in those rooms, including wood theater seats, stage curtain track, and wood collapsible bleachers. However, Krause did not include those or any line items that would be associated with an auditorium or a gymnasium.

187.    As described above, with his fraudulent repair estimate, Krause manipulated the 50% calculation so the building would qualify for full replacement funding, which increased FEMA's obligation for the school by $12,032,809 to a total of $25,939,257.

188.    In August 2010, FEMA entered into the "Single Settlement" agreement with Recovery School District, allowing it to combine obligated funds from many project worksheets into a single pool to fund future work. On August 22, 2010, Project Worksheet 13542v1 was written to move $24,408,312 that FEMA had obligated to replace the ELMS Main Building into the Single Settlement fund.

d.    Marion Abramson Senior High School

189.    Recovery School District of Louisiana ("RSD") and Defendants AECOM and Randall Krause, knowingly submitted, or caused to be submitted, claims to FEMA for damage that did not exist or was not eligible for funding under FEMA's Public Assistance Program for the Marion Abramson Senior High School ("Abramson") Main Building. AECOM and Randall Krause fabricated and inflated repair and replacement estimates for the Abramson Main Building, ignoring detailed and "verified" information that existed regarding actual damage to the building, and that significantly inflated the building's size. These claims fraudulently increased the estimated cost to replace the building, which increased the FEMA funding that RSD received by $11,000,663.

190.    Abramson located in New Orleans, Louisiana, was owned and operated by Recovery School District ("RSD"). The school consisted of two permanent buildings—a

-51-

140,129 square foot, two-story main building ("Main Building") and a 5,750 square foot administration building—and five portable buildings. Each building was captured in a separate project worksheet.

191.    On June 20, 2006, FEMA-approved Project Officers wrote the first project worksheet for the Abramson Main Building (PW12798v0). It described that Hurricane Katrina had caused significant damage to the building and its roof. It also described the building dimensions, albeit incorrectly: "[The school] is a 153,000 square foot ... consist[ing] of two (2) structures; a 5750 square foot administration building, and a 148,000 [main] building." The project worksheet contained a 50% calculation yielding 44.1%, which qualified the building only for repair funding. FEMA obligated $8,667,576 to repair the Abramson Main Building.

192.    Approximately six months later, on December 7, 2006, a different FEMA-approved Project Officer prepared another version of the project worksheet (PW12798v1), which detailed problems with the earlier version. In particular, the Project Officer described that initial inspections of the building had been incomplete because much of the building was "locked or inaccessible," and that, therefore, "[l]arge amount [sic] of the damages were not accounted for..."

193.    To correct for these omissions, FEMA engaged in a "reconciliation process" with the applicant, RSD. "Due to large discrepancies between FEMA initial damage assessment and the Applicant claims ..." two additional inspections were "made jointly to reevaluate damage[s]." The Project Officer described that "[d]uring [the inspections], all rooms and places in the building were already opened and accessible which allowed for complete damages account and measurements."

194.    After the inspections, FEMA and RSD prepared a "reconciliation report" to reconcile their disagreements about the quantities of damage to the buildings. For each line

item of damage where the parties had disagreed about quantity, a reconciled quantity was included in a column entitled "Quantity Verified and Agreed by Both Parties." A "Notes" column also stated that, for each line item, "[d]imensions [had been] verified on site." Representatives of both parties signed the report, and the report was attached to the project worksheet.

195.    In addition, the Project Officer described that "erroneous dimensions [had been] reported on [version 0]." And that, after review with the applicant, the Abramson Main Building was actually 140,129 square feet (down from 148,000) and the entire facility was 158,000 square feet (up from 140,129).

196.    The project worksheet updated the estimates for repair and replacement based on the damage as recorded in the reconciliation report and the corrected building size. The estimated Part A (base) cost for repair of the building was $6,976,416, and the estimated Part A (base) cost to replace the building was $13,336,371. This yielded a 50% calculation of 52.31%, which qualified the building for full replacement funding. Based on this, FEMA increased its obligation to a total of $22,983,044 to replace the Abramson Main Building.

197.    On June 26, 2007, another new version of the project worksheet was prepared (PW12798v3) to "make adjustments to the CEF factors to reflect current policy." In other words, to adjust soft costs, such as overhead, associated with the replacement estimate (the Project Officer proposed obligation of an additional $4,556,445). However, for unknown reasons, the project worksheet was put on hold and never finalized.

198.    On April 4, 2008, AECOM and Randall Krause prepared an "overwrite" to version 3 of the project worksheet, which fully supplanted it. The new overwrite was fraudulent, containing falsified repair and replacement estimates for the building.

199.    In the overwrite, Krause made no mention of adjustments to soft costs—the stated purpose of the earlier version 3—and instead offered a false explanation for why a new

project worksheet was needed that contradicted facts described in earlier versions. He wrote: "[d]ue to widespread destruction caused by Hurricane Katrina, the Applicant was unable to identify all of the damages at the time the original PW was written," and that, "[a]t the request of the Applicant, the building was reevaluated in order to capture the ... items not addressed in the original PW... This version captures those damages ... which could not be identified due to poor site conditions, lack of power, and lack of site access on the original version." In other words, the earlier project worksheets did not contain accurate damage descriptions due to lack of access to the site.

200.    However, as described above, this issue had already been identified—and resolved—in version 1 of the project worksheet, which noted explicitly that the building had been fully accessible when it was last inspected. Moreover, both FEMA and the applicant RSD were fully engaged in the prior inspection. As described above, the inspections had occurred as part of a "reconciliation process" between FEMA and RSD, during which the two parties "reconciled" their differences regarding the scope of damage, and used the reconciled figures to adjust the repair estimate for the building.

201.    Despite this, Krause created an entirely new repair estimate for the Abramson Main Building that bore little resemblance to the earlier estimate and did not incorporate the "verified" figures in the reconciliation report. For example, the reconciliation report described that, after verifying dimensions on site, FEMA and RSD agreed that 84,239 square feet of VCT floor tile needed replacement. Krause called for the replacement of 107,100 square feet of VCT floor tile. FEMA and RSD verified and agreed that 429 student lockers needed replacement. Krause called for replacement of 600 lockers. FEMA and RSD verified and agreed that 36 toilets needed replacement. Krause called for replacement of 112 toilets. A final example, FEMA and RSD verified and agreed that 2,200 square feet of carpet needed replacement. Krause called for replacement of 30,600 square feet of carpet.

202.    In addition, Krause falsely inflated the building's size in both the repair and replacement estimates, incorrectly asserting that the Abramson Main Building was "153,000 SF...." This figure had appeared once in the previous project worksheets, but not to describe the size of the Abramson Main Building. Version 0 stated that the aggregate size of all the school buildings was 153,000 square feet, while in the very next sentence stating (incorrectly) that the Main Building was 148,000 square feet. Meanwhile, Version 1 prominently noted that version 0 was incorrect, and that, after consultation with applicant RSD, the correct size of the building was 140,129 square feet. This figure is 12,871 square feet, or 8.5%, lower than the figure asserted by Krause.

203.    Krause used the inflated size to justify increases in both the repair and replacement estimates for the building. Many line items in the repair estimate used a quantity of 76,500 square feet—half, or one floor, of a 153,000 square foot building. These included, for example, roofing, HVAC, VCT tile, ceiling tile, fluorescent lighting, and electrical components. Meanwhile, Krause created a new replacement estimate that estimated the cost to replace a 153,000 square foot building.

204.    Krause increased the estimated Part A (base) cost for repair by $1,067,663, to a total of $8,044,079, and he increased the estimated Part A (base) cost for replacement by $2,909,850, to a total of $15,246,221. The new figures yielded a 50% calculation of 52.7%, so the building still qualified for replacement funding. However, after adding soft costs to the replacement estimate, Krause's fraudulent project worksheet caused FEMA to increase its obligation to replace the building by $11,000,663, to a total of $33,983,707.

205.    In 2010, FEMA entered into the "Single Settlement" agreement with Recovery School District, allowing it to combine obligated funds from many project worksheets into a single pool to fund future work. On July 19, 2010, Project Worksheet

12798v5 was written to move $34,220,221 that FEMA had obligated to replace the Abramson Main Building into the Single Settlement fund.

### Fannie C. Williams Middle School

206.   Recovery School District of Louisiana ("RSD") and Defendants AECOM and Randall Krause, knowingly submitted, or caused to be submitted, claims to FEMA for damage that did not exist or was not eligible for funding under FEMA's Public Assistance Program for Fannie C. Williams Middle School ("FCW"). AECOM and Randall Krause fabricated and inflated repair estimates for the FCW buildings, ignoring detailed and "verified" information that existed regarding actual damage to the buildings. These claims falsely qualified the building for full replacement funding from FEMA when the building should only have been eligible for the funding of repairs, fraudulently increasing the FEMA funding that RSD received by $22,298,729.

207.   FCW, located in New Orleans, Louisiana, was originally owned by Orleans Parish School Board, but was transferred to Recovery School District (RSD) after Hurricane Katrina. FCW was a five building school, with a total size of 110,651 square feet.

208.   In July 2006, FEMA-approved Project Officers wrote detailed project worksheets for each of FCW's five buildings.

209.   On February 6, 2007, representatives for FEMA and applicant RSD co-authored a "school facility reconciliation report," created to document and resolve disagreements between the parties regarding the scope and quantity of damages to the five buildings. For items of damage where FEMA and RSD reported differing quantities, the parties jointly verified and agreed to a quantity, recording it on the report in a column entitled "Quantity Verified and Agreed by Both Parties."

210.   Following the reconciliation, in May and June 2007, FEMA-approved Project Officers wrote new versions of the project worksheets for the library, cafeteria, and

auditorium buildings. As of this time, the FCW auditorium building qualified for full replacement funding while the other four buildings qualified only for repair funding. In total, FEMA obligated $9,337,458 for the five buildings.

211.    On April 24 and June 4, 2008, AECOM and Randall Krause prepared new versions of the five project worksheets, fully de-obligating the funds that had been obligated, and prepared a single, new project worksheet to take their place (PW18093v0). Krause included in the project worksheet a fabricated repair estimate that inflated the 50% calculation for the buildings to 51.8%, making the buildings appear to qualify for full replacement funding. Based on this, FEMA increased its obligation for the buildings by $22,298,729 to a total of $31,636,187.

212.    Krause offered no explanation for why he combined the five earlier project worksheets into one, and FEMA guidance does not require or suggest such a change, but he likely did so to obscure his fraud. By creating an entirely new project worksheet, Krause was able to omit the earlier damage estimates, which he otherwise would have included. This made it more likely to evade detection by FEMA QA/QC or other reviewers.

213.    Krause fabricated the repair estimate instead of basing it on actual damage to the FCW buildings. He did not incorporate—or even mention—the detailed record of damage in the reconciliation report, which had been "verified and agreed" to by both FEMA and the applicant RSD.

214.    Meanwhile, Krause inflated the quantity and cost of many items in the earlier repair estimates. For example, the repair estimates in the earlier project worksheets indicated that Hurricane Katrina damaged 210 regular wooden doors and 40 fire-rated wooden doors, which are much more expensive than regular wooden doors. The average cost to replace the doors in the earlier repair estimates was $181.08 per door, for a total of $45,271.60. Krause's repair estimate, however, called for the replacement of zero regular wooden doors and 250

fire-rated wooden doors, each at an estimated cost of $420 per door, which inflated the total estimate by $59,728.40 to a total of $105,000.

215.    In another example, the earlier repair estimates called for replacement of 69,017 square feet of VCT floor tile at an average cost of $3.16 per square foot, for a total cost of $229,693.84. This is a typical price for VCT floor tile. Krause, however, more than doubled the estimated cost of the VCT floor tile to $6.70 per square foot, increasing the total estimate by $232,720.06 to a total of $462,413.90.

216.    Krause inflated many other items, as well, including fluorescent lighting, gymnasium flooring, and gymnasium bleachers.

217.    If just the doors and VCT floor tile described above are corrected, then the building would not have qualified for full replacement funding. Krause's total Part A (base) estimate for repair was $7,176,807 and his Part A (base) estimate for replacement was $13,859,496 yielding a 50% calculation of 51.8%, which (barely) qualified the building for full replacement funding. If the correct cost estimates were used for doors and VCT floor tile, Krause's Part A (base) repair estimate would have been only $6,884,358.54, which would have yielded a 50% calculation of 49.6%. FCW would have qualified only for repair funding.

### 5. St. Bernard Parish School Board (SBP)

#### a.    W. Smith Jr. Elementary School

218.    St. Bernard Parish School Board ("SBP") and Defendants AECOM and Randall Krause, knowingly submitted, or caused to be submitted, claims to FEMA for damage that did not exist or was not eligible for funding under FEMA's Public Assistance Program for W. Smith Jr. Elementary School ("W. Smith"). AECOM and Randall Krause falsely inflated the size of the W. Smith buildings and improperly performed a "validation test" to approve construction of a new building that was a substantial, impermissible upgrade

over the existing buildings. These claims fraudulently increased the FEMA funding that SBP received by $15,559,565.50.

219.   W. Smith was a two-building school located in Violet, Louisiana, operated by the St. Bernard Parish School Board. The two buildings were a main building and a gymnasium.

220.   On February 21, 2006, an initial Project Officer prepared a comprehensive project worksheet for the W. Smith main building. It described "[t]he total area of the School footprint is calculated at 57,655 SF." The project worksheet also included building schematics that confirmed the building size and a four-page memorandum written by a professional engineer that detailed the damage resulting from Hurricane Katrina.

221.   The project worksheet estimated Part A (base) repair cost at $3,996,558 and Part A (base) replacement cost at $5,293,537, yielding a 50% calculation of 75.50%, which qualified the building for full replacement funding. Based on this, FEMA obligated $9,649,997 to replace the W. Smith main building.

222.   On March 30, 2006, the same Project Officer prepared a project worksheet for the W. Smith gymnasium. It listed the size of the gym building at 15,369 square feet. Like the project worksheet for the main building, this project worksheet was comprehensive, and contained both building schematics and a memorandum of damage written by a professional engineer.

223.   The project worksheet for the gym building estimated Part A (base) repair cost at $742,596 and Part A (base) replacement cost at $1,417,474, yielding a 50% calculation of 52.39%, which qualified the building for full replacement funding. Based on this, FEMA obligated $2,219,832.

224.    In summary, the two project worksheets for W. Smith described the school as a combined 73,024 square feet, and FEMA obligated a total of $11,869,829 to replace both buildings.

225.    On July 7, 2007, a project worksheet was created to "trigger and initiate EHP review of the entire construction site, as defined on the attached diagrams." In other words, to start a process of environmental review required before construction of the new building could begin.

226.    The project worksheet contained architectural plans created for SBP by John C. Williams Architects LLC, dated June 28, 2007. The plans did not specify square footage of the planned building, but the plans appeared to be for the school building that was eventually built, which was 86,737 SF, significantly larger than the existing buildings.

227.    On August 31, 2007, Randall Krause co-prepared a fraudulent project worksheet with another Project Officer that, without explanation, asserted a new, larger size for the original W. Smith buildings. Written to obligate funds for the buildings' demolition, it described: "Hurricane Katrina on August 29, 2005, destroyed W. Smith, Jr. Elementary School, a 86,737 SF, 1-story, brick building on a slab-on-grade foundation built in 1997." Krause's inflated size of 86,737 square feet is 13,713 square feet (18.7%) larger than the actual size of the buildings—and it is the exact size of the new school building that SBP wanted to build.

228.    Krause's inflation of the school's size was entirely false. Satellite photos of the buildings confirm that the measurements in the earlier project worksheets were correct and Krause's new measurements were incorrect.

229.    Krause inflated the building size so FEMA would pay for the "actual cost" of replacing the building. In general, FEMA will only pay actual costs (i.e. the reasonable cost) for a replacement building if it is substantially equivalent to the original building, including

in terms of size. If the proposed new building is larger or is otherwise an upgrade over the original building, the applicant must apply for an "alternate" or "improved" project, and the funding will be capped at the estimated cost to replace the original building—in this case $11,869,829.

230.    Having ensured that the school would be eligible for "actual cost" replacement, Krause proceeded to fraudulently approve a bid to build a replacement school that was an expensive and impermissible upgrade over the existing school buildings. Around this time, SBP solicited and was receiving bids to build the new building on the W. Smith site based on the 86,737 square foot building plans created by John C. Williams Architects, described above. The lowest bid of $17,078,000 was submitted by Gibbs Construction, LLC. This was as increase of $5,208,171 (43.8%) from the $11,869,829 that FEMA had already obligated based on the replacement estimates in the earlier project worksheets. Such a disparity would be unlikely if the bid and the FEMA obligation were based on similar scopes of work. Because they differ significantly, it is likely that the Gibbs bid—and therefore also the plans that SBP put out for bid—were significant, impermissible upgrades from the buildings that existed previously.

231.    On October 29, 2007, AECOM and Krause prepared another project worksheet that contained a fraudulent "validation test," which caused FEMA to obligate the full cost of the Gibbs bid. A validation test examines a third-party estimate for work to determine if the estimated cost of the work is "reasonable," as required by the Stafford Act. To perform a validation test, an estimator performs a partial estimate ("validation estimate") on the scope of work in the bid, and then compares it to the cost estimate created by the third party. If the two estimates are within 10%, then the third party's estimated costs are deemed reasonable.

232.    However, it was inappropriate for Krause to perform a validation test on the Gibbs bid. Validation tests are typically used to check change orders; it is highly unusual to use them on bids for new buildings because FEMA requires new buildings to be competitively bid, and competitive bidding, itself, is sufficient to demonstrate cost reasonableness. Moreover, validation tests do not address whether the scope of work covered in a bid is eligible (i.e. whether it is for a scope of work that has been approved in a project worksheet). Project Officers evaluating third-party bids are also supposed to ensure that this is the case.

233.    In fact, Krause's use of a validation test was intentional misdirection, done to draw attention to the reasonableness of the bid estimate when the real issue with the bid was that it was for an invalid scope of work.

234.    The scope of work in the bid was invalid because it was for a much larger, 86,737 square foot school building. With such a large increase to the size—from 73,037 to 86,737—the new building was a huge upgrade from what existed prior to hurricane Katrina, and should not have been eligible for "actual cost" replacement. Or, examined another way, the cost of the Gibbs bid was unreasonable for a building of 73,037 and should not have passed the validation test. If Krause's validation estimate had been performed using the correct building size, it would have been 12% lower than the equivalent portion of the Gibbs bid, exceeding the 10% variance allowed by FEMA.

235.    Also demonstrating that the bid was for an invalid scope of work, Krause had to inflate his validation estimate significantly beyond what existed in the earlier W. Smith buildings in order to match the estimated cost of the Gibbs bid. This supports a conclusion that either the estimated cost of the Gibbs bid was unreasonably high for the eligible scope of work, or that the Gibbs bid was for an upgraded and more expensive—and therefore ineligible—scope of work.

-62-

236.    Demonstrating Krause's inflation of the validation estimate, he included $1,387,792 for cast-in-place concrete, while the previous replacement estimates for the W. Smith buildings specified only $295,551.41 for comparable items. Krause's estimate included $1,076,320 for tile partitions—an expensive type of glazed block interior wall that cost $24.80 per square foot. However, the original buildings had interior walls constructed of drywall, which earlier project worksheets estimated at $1.22 per square foot. Finally, Krause included $177,120 for 9,600 square feet of expensive terrazzo flooring, but earlier project worksheets described that the buildings had no more than 960 square feet of terrazzo flooring.

237.    In the project worksheet, in addition to "validating" and including the cost of the Gibbs bid, Krause additionally added $2,437,264 for project management and design costs, and for change orders. Based on Krause's project worksheet, FEMA obligated an additional $9,865,267, to a total of $19,515,264.

238.    Applicant SBP later submitted several change orders to the Gibbs contract that increased the cost of the work to rebuild the school, causing FEMA to obligate an additional $2,847,149.25 (PW7166v4-v10). These change orders only existed because Krause fraudulently approved the Gibbs bid that led to the underlying contract, and therefore these FEMA obligations were also a result of AECOM and Krause's fraudulent scheme.

239.    As described further below, Krause appears to have created this fraudulent project worksheet and validation test on the same day that he created a similarly fraudulent project worksheet and validation test for another SBP school, Joseph J. Davies Elementary School.

b.    Joseph J. Davies Elementary School

240.    St. Bernard Parish School Board ("SBP") and Defendants AECOM and Randall Krause, knowingly submitted, or caused to be submitted, claims to FEMA for

damage that did not exist or was not eligible for funding under FEMA's Public Assistance Program for Joseph J. Davies Elementary School ("JJ Davies"). AECOM and Randall Krause improperly performed a "validation test" to fraudulently approve construction of a new building that was a substantial, impermissible upgrade over the existing building. This claim fraudulently increased the FEMA funding that SBP received by $14,043,529.

241.    Joseph J. Davies Elementary School, located in Mereaux, Louisiana, was operated by St. Bernard Parish School Board. The school consisted of one 70,204 square foot building.

242.    On January 25, 2006, an initial Project Officer prepared a project worksheet for JJ Davies. It described that the building was one-story, with a footprint of 70,204 square feet. Similar to the project worksheets described above for the W. Smith buildings, the project worksheet for JJ Davies was comprehensive, containing building schematics and a four-page memorandum of damage written by a professional engineer, detailing the damage resulting from Hurricane Katrina.

243.    The project worksheet estimated Part A (base) repair cost at $5,487,689 and (Part A) replacement cost at $7,584,444, yielding a 50% calculation of 73.91%, which qualified the building for full replacement funding. Based on this, FEMA obligated $12,783,035 to replace JJ Davies.

244.    As with W. Smith, described above, at some time prior to October 29, 2007, SBP solicited and received bids to build a new school building on the JJ Davies site. The lowest bid of $22,760,000 was submitted by Gibbs Construction, LLC. This was as increase of $9,976,965 (78%) from the $12,783,035 that FEMA had already obligated based on the replacement estimate in the earlier project worksheet. Such a disparity would be unlikely if the bid and the FEMA obligation were based on similar scopes of work. Because they differ

significantly, it is likely that the Gibbs bid—and therefore also the plans that SBP put out for bid—were significant, impermissible upgrades from the building that existed previously.

245.    As described above in the section on W. Smith, FEMA will only pay "actual cost" for replacement buildings that are substantially equivalent to the original building. For new buildings that are significant upgrades to the original building, the applicant must apply for an "alternate" or "improved" project, and the funding will be capped at the estimated cost to replace the original building—in this case $12,783,035.

246.    On October 29, 2007, AECOM and Randall Krause prepared a project worksheet that contained a fraudulent "validation test," which caused FEMA to obligate the full cost of the Gibbs bid. As with W. Smith, it was inappropriate for Krause to perform a validation test on the Gibbs bid because the competitive bidding process that FEMA requires for new buildings is, itself, sufficient to demonstrate cost reasonableness. However, again, Krause's use of the validation test was intentional misdirection, focusing attention on whether the bid estimate was reasonable and away from the real issue—that the bid was for an invalid scope of work.

247.    Further demonstrating that the bid was for an invalid scope of work, Krause had to significantly, and in several cases bizarrely, inflate his validation estimate beyond what existed in the earlier JJ Davies building in order to match the estimated cost of the Gibbs bid. This supports a conclusion that either the estimated cost of the Gibbs bid was unreasonably high for the eligible scope of work, or that the Gibbs bid was for an upgraded and more expensive—and therefore ineligible—scope of work.

248.    For example, in a section estimating the cost of masonry items for the new building, Krause included far more, and far more expensive brick wall systems than existed in the original JJ Davies building. Based on the professional engineer's report in the earlier project worksheet, the original school building used brick only as veneer for the exterior

walls. That project worksheet specified in its replacement estimate 24,132 square feet of brick veneer (the approximate size of all exterior building walls), at a per square foot cost of $14.90, for a total cost of $359,566.80. The report and the project worksheet also described that the building's interior walls were comprised, not of brick, but of 6,182 linear feet of galvanized steel studs and 123,325 square feet of drywall, at a combined estimated cost for replacement of $403,355.82. Meanwhile Krause's estimate, for comparison, included a combined 91,700 square feet of brick wall at a total cost of $2,725,273, an average cost of $29.71 per square foot. This estimate for brick is $1,962,350.38 greater than the earlier project worksheet's combined cost for both exterior brick veneer and interior walls. In fact, the figure is so high that either Krause completely made it up, or it constitutes a huge, impermissible upgrade over the building that existed prior to Hurricane Katrina.

249.    Krause also included significant, expensive upgrades to the school's flooring. As illustrated in the table below, Krause increased the estimated cost per square foot to replace VCT floor tile and carpet, and in addition added $930,210 for expensive pre-cast terrazzo flooring ($50.50 per square foot), which did not exist in the original school building. In total, Krause's estimate to build a new school floor was a $1,133,417.15 (850%) upgrade over what existed prior to Hurricane Katrina.

250.

| Initial Project Worksheet Replacement Estimate | | | | |
|---|---|---|---|---|
| Item | Quantity | Cost/SF | | Total Cost |
| VCT | 55,547 | $ | 1.73 | $      96,096.31 |
| Carpet | 8,928 | $ | 1.73 | $      15,445.44 |
| Quarry tile | 3,800 | $ | 10.40 | $      39,520.00 |
| **TOTAL:** | 68,275 | | | $     151,061.75 |

| Randall Krause Validation Test Estimate | | | | |
|---|---|---|---|---|
| Item | Quantity | Cost/SF | | Total Cost |
| VCT | 26,600 | $ | 6.95 | $     184,870.00 |
| Carpet | 26,510 | $ | 6.39 | $     169,398.90 |
| Terrazzo | 18,420 | $ | 50.50 | $     930,210.00 |
| **TOTAL:** | 71,530 | | | $ 1,284,478.90 |

251.    In other examples, Krause included $200,284 in his comparison estimate for electrical "branch installation", but also included $310,141 for electrical receptacles and switches, which is duplicative. He included $132,330.50 for 71,350 square feet (the whole building) of high-intensity discharge lighting (HID), which is powerful overhead lighting that would only be plausibly appropriate in the school's gymnasium. And finally, Krause included $414,874 for fluorescent lighting—too expensive for a building of this size.

252.    In the project worksheet, in addition to "validating" and including the cost of the Gibbs bid, Krause additionally called for the obligation of $3,237,873 for project management and design costs, and for change orders. Based on Krause's project worksheet, FEMA obligated an additional $13,214,838, to a total of $25,497,873.

253.    Applicant SBP later submitted several change orders to the Gibbs contract that increased the cost of work to rebuild the school, causing FEMA to obligate an additional $828,691 (PW3230v3-v9). These change orders only existed because Krause fraudulently approved the Gibbs bid that led to the contract, and therefore these FEMA obligations were also a result of AECOM and Krause's fraudulent scheme.

c.    P.G.T. Beauregard Middle School

254.    St. Bernard Parish School Board ("SBP") and Defendants AECOM and Randall Krause, knowingly submitted, or caused to be submitted, claims to FEMA for damage that did not exist or was not eligible for funding under FEMA's Public Assistance Program for P.G.T. Beauregard Middle School ("PGT"). AECOM and Randall Krause inflated damage quantities and costs in the repair estimates for each of the PGT buildings, and falsely inflated the size of the buildings by approximately 20 percent. These claims falsely qualified the buildings for full replacement funding from FEMA when the buildings should only have been eligible for the funding of repairs, fraudulently increasing the FEMA funding that RSD received by $24,370,555.

255.    P.G.T. Beauregard Middle School, located in St. Bernard, Louisiana, was owned and operated by the St. Bernard Parish School Board. The school consisted of four buildings—a two-story main building, a second classroom building, a cafeteria, and a gymnasium.

256.    Between 2006 and mid-2008, Project Officers wrote several versions of a project worksheet that captured damages for all four of the PGT buildings (9700v0-v2). These project worksheets described that the building interiors had been severely damaged, and that the applicant, SBP, had fully gutted all of the buildings. However, they went on, "[e]xcept for roof damage to Bldg A and the Gym (Bldg D), no structural damage occurred to any of the buildings." The project worksheets contained detailed repair estimates, and based on the estimates, FEMA obligated $2,563,577.42 to repair the school buildings.

257.    In October and November 2008, AECOM and Randall Krause deobligated the project worksheet and replaced it with four new project worksheets (PW18272v0, PW18283v0, PW18293v0, PW18295v0, and PW12778v3), one for each of the PGT buildings. Each of the project worksheets was fraudulent, containing a fabricated repair estimate.

258.    Several items in the estimates directly contradicted descriptions of damage from the earlier project worksheets. For example, earlier project worksheets stated that only buildings A and D (not B and C) suffered roof damage. However, Krause called for the replacement of all built-up roofing and roof deck insulation for buildings B and C. In addition, Krause substantially inflated the quantity of damaged roofing for buildings A and D. He increased the quantity of roof damage for Building A from 800 square feet, which was the number from prior project worksheets, to 19,700 square feet. He also inflated the quantity of roof damage for building D from 9,128 square feet to 14,175 square feet.

259.    In another example, Krause changed the quantity and type of many line items in the repair estimates despite the fact that he could not have had more accurate information than the Project Officers who wrote the earlier project worksheets—the buildings had been gutted two years prior. Earlier project worksheets described in detail that the building was fully gutted in 2006, specifically mentioning removal of items such as carpet, floor tile, and marker boards. Despite this, in 2008 Krause made significant changes to the earlier repair estimates, including, for example, adding significant quantities of carpeting, changing VCT floor tile to more expensive epoxy terrazzo floor tile, and replacing 16' x 4' whiteboards with 4' x 8' chalkboards.

260.    In a final example, earlier project worksheets stated that "no structural damage occurred to any of the buildings." However, Krause added hundreds of thousands of dollars to the repair estimates for the replacement of CMU block and brick veneer.

261.    Based on Krause's new repair estimates, each building qualified for full replacement funding. Based on this, FEMA increased its obligation for SBP by $24,370,555.58, to a total of $26,934,133 (an increase of 999.21%).

262.    Approximately one year later, in October 2009, AECOM and Krause wrote new project worksheets (PW18272v1, PW18283v1, PW18293v1, and PW18295v1) for the four buildings that falsely inflated each building's size. Krause described that the building sizes recorded in the earlier project worksheets had been incorrect, and he increased each of the buildings between 21.52% and 21.86%, adding 18,254 square feet, to a combined total of 102,029 square feet.

263.    Krause's inflation of the building sizes was entirely false. Satellite photos of the buildings confirm that the measurements in the earlier project worksheets were correct and Krause's new measurements were incorrect. In addition, the four buildings were all substantially different shapes and sizes. Even if they had been measured incorrectly by early

Project Officers, it is implausible that—as described by Krause—the margin of error for all four buildings would be so similar. Finally, an increase in size of 20% would normally result in a corresponding increase to the repair and replacement estimates for a building, and to the amount FEMA obligated for the building's replacement. However, despite the large increase to size, Krause's project worksheets only changed the FEMA obligations for the buildings by between $1,010 and $1,364.

264.    Krause likely inflated the building sizes to avoid scrutiny based on the high cost per square foot of the school. Replacement of school buildings like those at PGT would likely not exceed $200 per square foot. Based on Krause's repair and replacement estimates, the cost to replace three of the four PGT buildings was $330 per square foot, which would have been an obvious red flag to anyone who saw it (the fourth was $265 per square foot). By increasing the reported building sizes while maintaining the same FEMA obligations, Krause lowered the estimate cost to replace the buildings to approximately $270 per square foot ($218 for the fourth building)—still high, but far less alarming.

265.    Krause likely knew that the PGT buildings could undergo scrutiny by the FEMA regional administrator during the approval process for an alternate project. Prior to Krause's new project worksheets, SBP had hired an architect to design a new school building for the site, and the design was for a 100,785 square foot building. FEMA policy allowed grant applicants, under certain circumstances, to combine replacement buildings as an "alternate project" into a single new building, but such changes had to be approved by the Regional Administrator.

266.    Alternatively, Krause may have believed that by increasing the reported size of the original school to a figure similar to the size of the planned replacement building, SBP could have qualified for an "actual cost" replacement. This would have allowed SBP and

Krause the opportunity to further increase FEMA's obligation to replace the school in a manner similar to the fraudulent scheme at W. Smith and JJ Davies, described above.

267.   On July 23, 2010, FEMA approved consolidation of the PGT buildings as an "alternate project" (PW19308v0), obligating $27,666,589 in funding drawn from the PGT buildings to build a new school building on the PGT site.

### 6.   Archdiocese of New Orleans (ADNO)

#### a.   St. Raphael School's Cafeteria Building

268.   Defendants Archdiocese of New Orleans, AECOM, and Randall Krause knowingly submitted, or caused to be submitted, to FEMA a Project Worksheet containing 1) a repair estimate inflated with unnecessary and unjustifiable items, and 2) a replacement estimate that fraudulently minimized building size and left out required costs. By manipulating these estimates, the Defendants fraudulently caused the repair versus replacement ratio for the building to exceed the 50% replacement threshold, causing FEMA to pay approximately $10.1 million for the building's full replacement when it should have paid only $81,000 for its repair.

269.   The St. Raphael School's Cafeteria Building was a two-story school building, constructed of brick veneer and concrete block. During Hurricane Katrina, the building was submerged in approximately eight feet of water for two weeks.

270.   On April 10, 2006, an initial Project Worksheet for the building stated that Katrina had caused limited flood damage to the first floor. The Project Specialist noted that "silt, water stains, and rust stains" needed cleaning, and the terrazzo floors needed to be reground and polished. It also called for replacement of the first floor's electrical outlets and switches, and to hang drop ceilings in the damaged rooms in order to contain asbestos.

271.    The Project Worksheet listed the Part A repair estimate for the building at $401,920, and after subtracting funds paid to the Archdiocese by its insurance company, FEMA obligated $81,000 to repair the building.

272.    On August 24, 2007, an AECOM team including Krause prepared a new Project Worksheet for the Cafeteria Building. Krause prepared the new repair and replacement estimates. (Project Worksheet 7319v2). FEMA employee Maurice Rheam signed the Project Worksheet as PAC, and would have performed secondary review. His signature indicates AECOM management approval of the Project Worksheet and its contents.

273.    On August 28, 2007, the Chief Operating Officer of the Archdiocese of New Orleans signed a FEMA certification document, certifying that the applicant had reviewed the Project Worksheet, and that the claims and expenditures therein had been completed with procedures in accordance with CFR 44.

274.    In that Project Worksheet, Krause inflated the repair estimate by more than $800,000—to a total of $1,271,874—by adding three fraudulent items. He added $280,293 for asbestos abatement, which is higher than appropriate for a building of this size, and moreover, abatement had already been adequately addressed in the earlier Project Worksheet. Second, Krause added $386,011 to repair and replace the school's interior ceramic glazed walls. Krause claimed that the demolition was necessary to repair the electrical wiring within the walls, but FEMA procedure, in such situations, is to run new, wall-mounted electrical on the wall exterior. In fact, AECOM pictures of the Cafeteria Building's interior show that the building was already heavily retrofitted with wall-mounted electrical prior to Katrina.

275.    Finally, Krause added $242,172 to repair a large "[m]ultizone, air conditioner" serving the entire Cafeteria Building, but the Cafeteria Building had no such system. Instead, as described in a later Project Worksheet, the Cafeteria Building's HVAC consisted of "natural ventilation (operable windows, exhaust fans, and through wall/roof

packaged units [sic]." In addition, photos taken of the building in July and August of 2009 indicate that the school's actual HVAC, located on the roof away from any flooding, suffered minimal damage from Katrina. The roof's multiple glass skylights were left intact, the gravel topping was still in place, fragile windows near some of the units were undamaged, and the interior ceiling near the through-roof vents suffered none of the water damage that would be expected if the through-roof units had been compromised.

276.    In addition to inflating the repair estimate, Krause also included in the Project Worksheet an implausibly low replacement estimate of $2,183,978. The estimate is low, in part, because Krause understated the size of the building by nearly 20%—a fact later identified and corrected in a subsequent Project Worksheet. In addition, Krause failed to include funding to raise the building to the flood plain elevation, which was mandatory for all FEMA replacement buildings at that time.

277.    With Krause's fraudulent estimates, the new repair versus replacement ratio for the Cafeteria Building was 58.2%, above the replacement threshold of the 50% Rule. Based on this, on January 31, 2008, FEMA obligated $4,995,520 to replace the Cafeteria Building.

278.    In December 2010, the Archdiocese demolished the St. Raphael School's Cafeteria Building.

279.    At some time prior to July 2013, the Archdiocese requested that FEMA revise Krause's replacement estimate for the building upwards, so more money could be obligated to fund the replacement building. In July 2013, a Project Worksheet was prepared "to more accurately reflect the cost of replacing the facility at its existing location." The new, "more accurate" replacement estimate was determined to be approximately $2.9 million, nearly $800,000 higher than Krause's estimate.

280.   Based on the new replacement estimate, the repair versus replacement ratio for the Cafeteria Building fell below 50%, disqualifying it for replacement funding under the 50% Rule. However, FEMA agreed to continue funding the replacement because the building had already been demolished. On July 16, 2013, FEMA increased its obligation to $7,265,614.

281.   In 2014, the Archdiocese solicited contractor bids to rebuild the building, but the lowest estimate came in significantly above the obligation amount, at $8,984,000. To account for this, on April 21, 2014, FEMA again increased its obligation to $9,817,748 to align with actual costs.

282.   Minor subsequent increases to the obligation were made, and as of December 21, 2016, FEMA has paid out $10,158,258 to replace the Cafeteria Building.

b.   Villa St. Maurice, Buildings #2 & #3

283.   Defendants Archdiocese of New Orleans and AECOM knowingly submitted, or caused to be submitted, Project Worksheets to FEMA that falsely asserted catastrophic damage to the four upper floors of two assisted living facilities owned by the Archdiocese. These claims inflated the repair estimates, causing both buildings to appear qualified for replacement funding, thereby increasing FEMA's obligation to the Archdiocese by approximately $36.2 million.

284.   The Villa St. Maurice was a complex of three assisted living facilities owned and operated by the Roman Catholic Church's Archdiocese of New Orleans. Building #2 was a five-story residential building constructed in 1981, with brick veneers and a steel frame. Building #3 was a five-story residential building constructed in 1990, with brick veneers and interior metal studs. Both buildings sustained flood damage from Hurricane Katrina after being flooded with approximately 6 feet of water. The first floor of each building was approximately 11 feet high, so flood waters never reached above the first floor.

-74-

285.    In May 2006, Project Worksheets were written for Buildings #2 and #3. Two different teams completed the assessments, but both similarly concluded that damage was limited to the first floor. The only exception, in both buildings, the Project Worksheets reported that the apartment doors on the upper floors required replacement, a result of damage incurred by search and rescue teams breaking into each of the doors immediately after Hurricane Katrina. Based on the Project Worksheets, FEMA obligated $1,346,053 to repair Building #2, and $912,461 to repair Building #3.

286.    In December 2007, AECOM Project Specialist Scott White prepared new Project Worksheets for both buildings, including new repair estimates that were more than 500% higher than the previous estimates. (Project Worksheets 10800v2, 11392v2). White included allegations of catastrophic damage to all five floors of both buildings, calling for the replacement of practically every item in every apartment. For example, in Building #2, which contained a total of 77 apartments, he called for the replacement of 77 ranges, refrigerators, sinks, toilets, bathtubs, and electrical panels. He called for the replacement of all the building's flooring tiles, windows, walls, and light fixtures. In addition, he alleged that the brick veneer on the building exterior needed to be completely demolished and replaced. White's assessment of damage to Building #3 was nearly identical.

287.    However, White's Project Worksheets contain no explanation of how the damage occurred or why it was not reported in the earlier Project Worksheets. In addition, photographs of the Villa St. Maurice building exteriors taken in 2007 and 2009 contradict White's claims, showing only minor damage to the building's windows and exterior walls.

288.    With White's new estimates, the repair versus replacement ratio for Buildings #2 and #3 increased above 50%, qualifying the buildings for replacement funding under the 50% Rule. Based on this, on May 14, 2008, FEMA increased its obligation for Building #2 by $26,260,427. On May 29, 2008, FEMA increased its obligation for Building #3 by

$18,995,045. AECOM employee Maurice Rheam signed both Project Worksheets as PAC, and would have performed secondary review. His signature indicates AECOM management approval of the Project Worksheets and their contents.

289.    In June 2011, the Archdiocese demolished Villa St. Maurice Buildings #2 and #3.

290.    On May 1, 2012, Project Worksheets were written to reconcile FEMA's obligation amount to the actual cost of work. FEMA decreased its obligation for Buildings #2 and #3 by $3.3 million and $5.5 million, respectively.

291.    The obligation process for the Villa St. Maurice is still ongoing. As of February 2017, FEMA has paid out $26,737,551, leaving over $10 million still in the pot to be paid out to the Archdiocese.

### 7.    Additional Projects

292.    Relator has knowledge of fraud in other building projects in which Krause was involved, which is similar to the fraud described in this Complaint. A list of Krause projects in excess of $3M is attached as Exhibit 1.

### E.    AECOM acted knowingly, recklessly, or with willful blindness to its legal obligations in its hiring, training, supervision, and retention of Krause and White, and once informed that the fraud had occurred, failed to report the fraud or take any action to recover or safeguard FEMA's funds.

293.    AECOM is responsible for all of the fraud at issue in this Complaint by virtue of the fact that it was AECOM's employees, Randall Krause and Scott White, acting with actual and apparent authority, who authored and submitted the fraudulent Project Worksheets described above. At all material times, Randall Krause and Scott White were employees and agents of AECOM, working within the course and scope of their employment.

294.    FEMA entrusted AECOM to be a gatekeeper for the vast amount of disaster relief funds that it intended to distribute in response to Katrina, a distribution that ultimately totaled nearly $20 billion dollars.

295.    When AECOM hired Krause and White to perform damage assessments and write Project Worksheets for applicants, it knew that they were going to be responsible to oversee and obligate these huge sums. In fact, the true scope of their responsibility was staggering—Krause, alone, signed Project Worksheets that obligated over $500 million. White signed Project Worksheets obligating over $80 million.

296.    AECOM picked Krause and White for these roles, and without having done so, neither Krause nor White would have been empowered to perform these tasks, nor would they have had the opportunity to commit the fraud described herein.

297.    Therefore, and in particular due to the substantial role that they were hired to perform, AECOM was recklessly inadequate in its vetting of Krause and White at the time of hiring, for example, by not performing adequate background checks and interviews to determine whether they could be trusted in these roles. And once hired by failing to provide adequate training to Krause and White about the proper methods, rules, and restrictions for such work.

298.    Even more critically, however, AECOM knowingly or recklessly failed to perform any meaningful oversight of Krause and White, which could have and should have detected and prevented this fraud.

299.    In many cases, as illustrated above, Krause and White's fraud was straight-forward, brazen, and would not have been difficult to detect, often alleging damage that a simple visual inspection would have verified did not exist. Yet AECOM was unable to detect the fraud until, as described further below, it was reported by an applicant.

300.    Indeed, not only did AECOM simply fail to perform its own oversight, but it also undermined the oversight regime that FEMA had put in place. FEMA procedure for the approval of Project Worksheets required that after drafting by a Project Specialist, a Project Worksheet had to be reviewed and signed by secondary reviewers called Public Assistance

Coordinators (PACs). At a minimum, these PACs should have been able to recognize obviously implausible damage estimates in a Project Worksheet, such as damage that earlier reviewers said did not exist, and then report such incidents to AECOM, FEMA, or to the proper authorities.

301.    In fact, AECOM also employed the PACs that reviewed and signed at least sixteen, and likely eighteen, of the fraudulent Project Worksheets at issue in this Complaint. AECOM employee Noel Batenga signed Krause's fraudulent Project Worksheet for the Xavier Gymnasium. AECOM employee Rob Lopez signed Krause's fraudulent Project Worksheets for the Edward Hynes Main Building and Annexes, and for Florence Chester Elementary. AECOM employee Caro Manokian signed Krause's fraudulent Project Worksheet for the Edward Livingston Main Building. AECOM employee Maurice Rheam signed White's fraudulent Project Worksheets for Villa St. Maurice Buildings #2 and #3, and Krause's fraudulent Project Worksheet for the St. Raphael School Cafeteria Building. And AECOM employee Mike Rice signed Krause's fraudulent Project Worksheets for Dillard's Straight, Camphor, and Hartzell Halls.

302.    The fact that these Project Worksheets were overseen by AECOM PACs and the failure of these PACs to perform meaningful oversight further demonstrates the failure by AECOM to adequately train and monitor its employees.

303.    Finally, AECOM further undermined oversight of these Project Worksheets by blurring oversight role boundaries, employing individuals as both Project Specialists and PACs, sometimes within the same project or even on the same Project Worksheet. For example, as described above, Randall Krause signed variously as both Project Specialist and PAC for several of the Dillard building Project Worksheets, and on Project Worksheet 16934v0, Krause signed as both Project Officer and PAC.

304.     Taken together, these failures show that, at minimum, AECOM demonstrated reckless disregard or was willfully blind in regards to its work on behalf of FEMA, including its submission of fraudulent Project Worksheets on behalf of applicants.

**1. After AECOM learned of Krause's fraud, it continued to certify the repair, demolition, and construction of ineligible buildings and failed to notify FEMA of hundreds of millions of dollars in overpayments.**

305.     By not later than March 2011, AECOM management was put on notice of Krause's fraudulent practices. Relator's supervisor, an AECOM Operations Manager named Bob Schreibeis, disclosed to Relator that an applicant to FEMA's Public Assistance Program notified AECOM managers that Krause had written a draft Project Worksheet including claims disputed by the applicant. Krause was subsequently terminated as a result of the suspected fraud.

306.     Relator was informed by coworkers at AECOM that Krause subsequently worked for Xavier University in some capacity.

307.     Relator was assigned to AECOM's New Orleans response unit in December 2010, sometime after Krause's termination. Shortly after Relator began work, Schreibeis requested that Relator and a coworker review projects in which Krause was involved for improprieties.

308.     After review of certain projects, Relator relayed his concerns about fraudulent repair and replacement estimates to Schreibeis. Relator is unaware of any follow up by AECOM between his disclosure and Schreibeis' resignation from his position in 2012 or anytime thereafter.

309.     To Relator's knowledge and understanding, despite knowing that Krause lied on a Project Worksheet and that he was singularly responsible for over $500 million in FEMA obligations, AECOM failed to inform the government of Krause and other employee's fraudulent actions or fraudulently induced payments, or mitigate the

overpayments and damages.  Instead it repeatedly relied on pre-2010 evaluations by Krause and others that it knew or suspected to be fraudulent, and allowed other FEMA personnel and contractors to do the same. In doing so, AECOM concealed and perpetuated the fraud.

310.    AECOM had the obligation and opportunity to disclose information and mitigate damages on multiple occasions after the discovery of Krause's wrongdoing by early 2011. For example, the Xavier Gymnasium was not demolished until May 2013, years after AECOM was aware that Krause had engaged in fraud.

311.    AECOM also submitted, or caused to be submitted, some of the multiple funding adjustments that took place for each of the buildings.

- Xavier Gymnasium- September 2015.

- Xavier Student Center- May 2011, August 2011, September 2011, and August 2014.

- Xavier's Electrical Distribution System- August 2016.

- Dillard Straight Hall- July 2010, January 2013, and January 2014.

- Dillard Hartzell Hall- October 2010, July 2011, April 2013, August 2013, and July 2014.

- Dillard Camphor Hall- October 2010, July 2011, and April 2013.

- Hynes Elementary- November 2012 and December 2015.

- Crocker Elementary- August 2011.

- Chester Elementary Buildings- August 2010, June 2011, January 2012, May 2013, June 2013, January 2015, November 2015, and December 2016.

- Edward Livingston Middle School- August 2010, July 2011, January 2012, February 2015, and September 2015.

- Marion Abramson Senior High School- December 2008, July 2010, June 2011, January 2012, February 2015, and November 2015.

- Fannie C. Williams Middle School- February 2009, January 2010, July 2011, February 2012, June 2012, February 2015, and August 2015.

- W. Smith Jr. Elementary School- April 2008, May 2009, June 2009, June 2010, September 2011, August 2013, and October 2016.

- Joseph J. Davies Elementary School- April 2008, January 2009, April 2009, October 2010, May 2012, December 2013, and October 2018.

- P.G.T. Beauregard Middle School- July 2010, May 2011, March 2013, April 2013, and September 2015.

- St. Raphael School's Cafeteria Building- July 2013, April 2014, September 2014, May 2015, August 2015, November 2016, and December 2016.

- Villa St. Maurice- May 2012, August 2013, July 2015, and August 2016.

### F. **Defendants' Fraudulent Conduct and Misrepresentations Were Material**

312.    The Government has limited funds for disaster relief and appropriates those funds to applicants who comply with the rules and regulations primarily set forth in CFR Section 44.

313.    FEMA relies on the truthfulness of the applicants and its contractors to only submit claims for funds to which they are entitled, and which adhere to FEMA's statutory authority, determining eligible cost for repair or replacement "on the basis of the design of the facility as the facility existed immediately before the major disaster." 42 U.S.C. § 5172(e)(1)(A).

314.    The obligation process for funds includes certifications such as the Applicant Certification Form in which the applicant acknowledges that they are "knowledgeable of the guidelines for FEMA Public Assistance funding" and that "all expenditures claimed [in the Project Worksheet] have been incurred following proper procedures outlined in CFR 44."

315.    All Project Worksheets describing the damages and making claims for government funds must be reviewed by the Applicant and a QA/QC reviewer. Moreover, the Project Worksheets described in this Complaint were in each case signed by the respective Applicant.

316.    Projects that obligate more than a million dollars have another level of review by FEMA and the Office of Management and Budget to ensure that unwarranted funds are not paid.  Money will not be released for those Project Worksheets until that additional review is completed.  However, due to the nature of this fraud, FEMA was unable to uncover it.

317.    As set forth above, Defendants submitted, or caused to be submitted, false claims to FEMA for damage that did not exist or was less severe than reported, including the submission of fraudulent pictures and blatantly inaccurate repair and replacement estimates. In addition, Defendants repeatedly concealed or improperly avoided or decreased an obligation to pay money to the Government by failing to alert the Government to the fraud when it learned of it, including in subsequent project and payment adjustments, reconciliations and/or recalculations.

318.    These material misrepresentations and/or omissions were in violation of FEMA's statutory, regulatory, and policy requirements and certifications, and were designed to fraudulently maximize the funding received from FEMA.

319.    The Government, unaware of the falsity of the claims, obligated funds and/or paid for such false and fraudulent claims that it would not have had it been aware of the Defendants' illegal conduct.

### Count I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1) (1986)
### 31 U.S.C. § 3729(a)(1)(A) (2009)

320.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1-319 above as though fully set forth herein.

321.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

322.    By and through the acts described above, within the meaning of the False Claims Act, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to FEMA for payment or approval, in violation of 31 U.S.C.§ 3729(a)(1) (as amended 1986) now codified at 31 U.S.C.§ 3729(a)(1)(A) (as amended May 20, 2009). Such claims that Defendants submitted were false and fraudulent within the meaning of the False Claims Act because, as a result of Defendants' knowing misconduct, the amounts claimed, approved, and paid were higher than properly due under law.

323.    Defendants submitted, or caused to be submitted, claims to FEMA for damage that did not exist or was less severe than reported, often with false repair and replacement estimates, designed to maximize available funding from FEMA. The Government, unaware of the falsity of all such claims, has obligated and/or paid such false or fraudulent claims that would not have been but for Defendants' illegal conduct.

### Count II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(2) (1986)
### 31 U.S.C. § 3729(a)(1)(B) (2009)

324.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1-319 above as though fully set forth herein.

325. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

326. By and through the acts described above, within the meaning of the False Claims Act, Defendants have knowingly made or used, false records or statements material to false or fraudulent claims for payment presented to FEMA, in violation of 31 U.S.C.§ 3729(a)(2) (1986) now codified at 31 U.S.C.§ 3729(a)(1)(B) (as amended May 20, 2009).

327. AECOM, Xavier University, Dillard University, the Archdiocese of New Orleans, and Randall Krause have made and used false records and statements to defraud FEMA, including the creation and use of false Project Worksheets, assessments of damage, documentation of damage, estimates of cost to repair facilities, and estimates of cost to replace facilities.

328. The false records and statements submitted above were for the purpose of getting government payment, 31 U.S.C.§ 3729(a)(2), and were material in FEMA's decision to approve full payment for each facility. U.S.C. § 3729(a)(1)(B) (2009).

### Count III
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(3) (1986)
### 31 U.S.C. § 3729(a)(1)(C) (2009)

329. Relator realleges and incorporates by reference the allegations contained in paragraphs 1-319 above as though fully set forth herein

330. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

331. By and through the acts described above, within the meaning of the False Claims Act, Defendants have knowingly conspired—in one or more conspiracies each involving AECOM and one or more of its representatives—to defraud the Government by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3)

(1986). Defendants have also knowingly conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A),(B),(E), (F) and (G), in violation of 31 U.S.C. § 3729(a)(1)(C) (2009).

332.   Defendants AECOM, Xavier University, and Randall Krause conspired in the commission of false claims to cause FEMA to provide replacement funds for the Xavier University Gymnasium, the Xavier University Student Center, and the Xavier University Electrical Distribution System. Xavier requested that AECOM write Project Worksheets claiming damage that it knew or should have known did not exist. In addition, Xavier University reviewed and signed the Project Worksheets prior to their submission to FEMA, though Xavier knew or should have known that the Project Worksheets contained false information.

333.   Defendants AECOM, Dillard University, and Randall Krause conspired in the commission of false claims to cause FEMA to provide replacement funds for Dillard's Straight, Hartzell, and Camphor Halls. Dillard requested that AECOM write Project Worksheets claiming damage that it knew or should have known did not exist. In addition, Dillard University reviewed and signed the Project Worksheets prior to their submission to FEMA, though Dillard knew or should have known that the Project Worksheets contained false information.

334.   Defendants AECOM, the Archdiocese of New Orleans, and Randall Krause conspired in the commission of false claims to cause FEMA to provide replacement funds for the St. Raphael School's Cafeteria Building, and Villa St. Maurice Buildings #2 and #3. The Archdiocese requested that AECOM write Project Worksheets claiming damage that it knew or should have known did not exist. In addition, the Archdiocese reviewed and signed the Project Worksheets prior to their submission to FEMA, though the Archdiocese knew or should have known that the Project Worksheets contained false information.

**Count IV**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(7) (1986)**
**31 U.S.C. §§ 3729(a)(1)(G) (2009)**

335.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1-319 above as though fully set forth herein

336.    By and through the acts described above, within the meaning of the False Claims Act, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government, 31 U.S.C. § 3729(a)(7) (1986) now codified at 31 U.S.C. § 3729(a)(1)(G) (as amended May 20, 2009).

337.    Defendants AECOM, Xavier University, and Randall Krause submitted Project Worksheets to FEMA asserting false claims regarding the Xavier Gymnasium, the Xavier Student Center, and the Xavier Electrical Distribution System, fraudulently causing FEMA to pay more money to Xavier University than it was entitled. At that time or after, Defendants knew or should have known that the claims were fraudulent, and that Xavier University was not entitled to the fraudulently obtained FEMA funds. On multiple occasions, Defendants participated in updates and adjustments to each of the projects, based upon and reaffirming the false claims. Defendants had an obligation to return fraudulent payments/overpayments but instead ignored their duties, continually perpetuating the prior fraud.

338.    Defendants AECOM, Dillard University, and Randall Krause submitted Project Worksheets to FEMA asserting false claims regarding Dillard's Straight, Hartzell, and Camphor Halls. At that time or after, Defendants knew or should have known that the claims were fraudulent, and that Dillard University was not entitled to the fraudulently obtained FEMA funds. On multiple occasions, Defendants participated in updates and adjustments to each of the projects, based upon and reaffirming the false claims. Defendants had an

-86-

obligation to return fraudulent payments/overpayments but instead ignored their duties, continually perpetuating the prior fraud.

339.    Defendants AECOM, Archdiocese of New Orleans, and Randall Krause submitted Project Worksheets to FEMA asserting false claims regarding the St. Raphael School's Cafeteria Building and the Villa St. Maurice Buildings #2 and #3, fraudulently causing FEMA to pay more money to the Archdiocese than it was entitled. At that time or after, Defendants knew or should have known that the claims were fraudulent, and that the Archdiocese was not entitled to the fraudulently obtained FEMA funds. On multiple occasions, Defendants participated in updates and adjustments to each of the projects that were based upon and reaffirming the false claims.  Defendants had an obligation to return fraudulent payments/overpayments but instead ignored their duties, continually perpetuating the prior fraud.

340.    Defendants AECOM and Randall Krause submitted Project Worksheets to FEMA asserting false claims regarding Edward Hynes Elementary School, Crocker Elementary School, Chester Elementary School, Edward Livingston Middle School, Marion Abramson Senior High School, Fannie C. Williams Middle School, W. Smith Jr. Elementary School, Joseph J. Davies Elementary School, and P.G.T. Beauregard Middle School fraudulently causing FEMA to pay more money to FEMA's Public Assistance Program applicants than they were entitled. At that time or after, Defendants knew or should have known that the claims were fraudulent, and that the applicants were not entitled to the fraudulently obtained FEMA funds. On multiple occasions, Defendants AECOM and Krause participated in updates and adjustments to each of the projects that were based upon and reaffirming the false claims.  Defendants AECOM and Krause had an obligation to return fraudulent payments/overpayments but instead ignored their duties, continually perpetuating the prior fraud.

341.    Beginning with the initial fraudulent submissions, again at each adjustment and renewal of the claims, and finally at the closeout of each project, Defendants had and avoided an obligation to correct the fraudulent claims made to the government and to adjust the funding provided by FEMA to the correct amount, returning any overpayments that had occurred.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $10,957 and not more than $21,916 for each violation of 31 U.S.C. § 3729 occurring after November 2, 2015, and a civil penalty of not less than $5,500 and not more than $11,000 for each violation occurring before November 2, 2015;

3.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act;

4.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.    That the United States and Plaintiff-Relator recover such other and further relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated:  September 23, 2019            Respectfully submitted,

Peter W. Chatfield
Amy L. Easton
Luke J. Diamond
PHILLIPS & COHEN LLP
2000 Massachusetts Ave NW
Washington D.C. 20036
Tel:  (202) 833-4567
peter@phillipsandcohen.com
aeaston@phillipsandcohen.com
ldiamond@phillipsandcohen.com

Jeffrey W. Dickstein
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

J. Marc Vezina, TA,
LBSA #24683, TX#24000141
VEZINA & GATTUSO, LLC
401 Weyer Street
PO Box 461
Gretna, LA 70054
Tel. (504) 368-5223
Fax. (504) 361-3624

Attorneys for *Qui Tam* Plaintiff Robert
Romero

By:  J. Marc Vezina