# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES ex rel.<br> ROBERT ROMERO, | * | No. 16-CV-15092 |
| | * | SECTION "L" (4) |
| v. | * | |
| | * | JUDGE FALLON |
| AECOM, et al. | * | |
| | * | MAGISTRATE JUDGE ROBY |

\* \* \*

## UNITED STATES' MEMORANDUM IN OPPOSITION TO
## LOUISIANA DEPARTMENT OF EDUCATION'S MOTION TO DISMISS

**NOW INTO COURT,** through undersigned counsel, comes Plaintiff, the United States of America, who respectfully submits this memorandum in opposition to the Motion to Dismiss filed by Defendant Louisiana Department of Education (LDOE).  R. Doc. 89.

### PRELIMINARY STATEMENT

LDOE submitted false statements to the Federal Emergency Management Agency (FEMA) concerning the pre-disaster design and post-storm condition of five LDOE facilities, which caused FEMA to obligate taxpayer funds to reimburse LDOE for ineligible costs.  LDOE never corrected its false statements and never returned the federal funds to the United States.

Once it learned about LDOE's false statements, the United States elected to pursue a civil action for common law remedies, as Congress expressly allows.  This Court has subject matter jurisdiction over such cases brought by the United States.  In addition to notice that the United States provided LDOE two years before filing suit—a fact LDOE omits from its brief—the United States' Complaint in Intervention adequately and timely put LDOE on notice of facts sufficient to state a claim of negligent misrepresentation, payment by mistake, and unjust enrichment.  The Court should, therefore, deny LDOE's motion to dismiss.

1

**STATEMENT OF THE CASE**

The United States' Complaint in Intervention ("Complaint") alleges that the Recovery School District (RSD), which is administered by LDOE,[1] received millions of taxpayer dollars that it was not entitled to receive as a direct result of RSD's false descriptions of the pre-disaster design and damage to five of its facilities—the Lawrence D. Crocker Elementary School ("Crocker"), the Florence J. Chester Elementary School Classroom Building ("Chester Classroom Building"), the Florence J. Chester Elementary School Cafeteria ("Chester Cafeteria"), the Edward Livingston Middle School Building ("Livingston"), and the Fannie C. Williams Middle School ("Fannie Williams") (collectively, "LDOE Projects" or "Projects").

The Stafford Act authorizes FEMA to provide funds to repair or replace schools and other public facilities damaged by a major disaster.  R. Doc. 59 ¶¶ 29-30; *see* 42 U.S.C. §§ 5121-5208; 44 C.F.R. §§ 206.1-206.440.  To be eligible for these grants, a subgrantee like LDOE must comply with Public Assistance (PA) Program rules, including the "Pre-Disaster Design Rule" and the "50% Rule."  R. Doc. 59 ¶¶ 32-34.  Under the Pre-Disaster Design Rule, a subgrantee was only eligible for funds necessary to restore the facility to "the design of the facility as the facility existed immediately before the major disaster" and was not eligible for funds to restore damage that pre-existed the disaster or was the result of vandalism after the disaster.  *Id.* ¶¶ 35-38 (quoting 42 U.S.C. § 5172(e)(1)(A)(i) (2005)).  Under the 50% Rule, FEMA was authorized to pay for the cost to repair an eligible facility ("Repair Project") if the cost to repair the facility was estimated to be 50% or less of the cost to replace the facility with a new facility of the same design, function, and capacity.  R. Doc. 59 ¶¶ 39-46; *see also* 44 C.F.R. § 206.226(f) (2005).  FEMA was only authorized to pay the higher cost of replacing an eligible facility ("Replacement

---

[1]	For the sake of clarity, RSD and LDOE will be referred to herein collectively as LDOE.

Project") if the estimated cost of repairing the facility to its pre-disaster design, function, and capacity exceeded half of the estimated cost of replacing the facility with a new facility of the same design, function, and capacity.  R. Doc. 59 ¶¶ 39-46; *see* 44 C.F.R. § 206.226(f) (2005).

Damage to an eligible facility and a 50% Rule calculation were memorialized in a "project worksheet," also called a "PW."  R. Doc. 59 ¶¶ 47-59.  FEMA could not obligate funds without a submitted PW that complied with the Stafford Act and PA Program rules.  *Id.* ¶ 62.  As the Complaint explains, "subgrantees such as [LDOE] were obligated to ensure that their requests for PA Program funding were based on truthful descriptions of the damaged facilities," to provide "evidence of the facilities' pre-disaster design and storm-related damages," and to certify "the accuracy of the damage description and repair estimate and that the funding request complied with PA Program rules."  *Id.* ¶ 108.  In PWs, consistent with PA Program rules, FEMA expected subgrantees to include only truthful and accurate factual statements about the design, function, capacity, and disaster-related damage of eligible projects.[2]  *See id*. ¶¶ 108, 261-62.

In 2008, Congress allowed LDOE to use its FEMA Disaster Relief Fund (DRF) obligated funds as an Alternative Project, referred to as the "Single Settlement."  *See* R. Doc. 59 ¶¶ 66-68. Under the Alternate Project rubric, FEMA was authorized to reimburse the costs a subgrantee actually incurred on an alternative project (*i.e.*, by building a new school that better served the post-Katrina student population rather than repairing the school that was actually damaged in the storm), but the funding was capped at the amount the subgrantee would have received to repair or replace the disaster-damaged building.  *Id.* ¶ 256 (quoting 44 C.F.R. § 206.203(d)(2)(ii) (2005)).  Under the Single Settlement, after LDOE signed and certified a PW version that was

---

[2]      During the relevant timeframe, the terms "applicant" and "subgrantee" were interchangeable, but, contrary to Defendant's arguments, they were not then referred to as "subrecipients."  R. Doc. 59 ¶ 30 (citing 44 C.F.R. § 206.201(l) (2005)); R. Doc. 89 at 16-17.

supposed to describe the actual design of and damage to a facility, and after it was determined that the project would have been eligible for Repair Project or Replacement Project funds, FEMA calculated the obligation amount. *Id.* ¶ 68. For Single Settlement projects eligible for Replacement Project funds, FEMA multiplied the square footage of the existing structure by $267.67. R. Doc. 89 at 15. For Single Settlement projects deemed eligible only for repair funds, FEMA multiplied the square footage of the existing structure by a lower number. The product, after multiplying the appropriate factors, was FEMA's obligation amount. Once the obligation amount was determined, FEMA provided funds from the congressionally-appropriated DRF to the Governor's Office of Homeland Security & Emergency Preparedness (GOHSEP). R. Doc. 59 ¶ 31. GOHSEP used the DRF funds to reimburse subgrantees, including LDOE under the Single Settlement, as the subgrantees incurred actual costs. *Id.* ¶¶ 62, 66.

In 2017, the United States learned that LDOE violated the PA Program rules by making and failing to correct material misstatements in the LDOE Project PWs. R. Doc. 6 ¶¶ 88-100; R. Doc. 59 ¶¶ 183-242. Contrary to LDOE's assertion that "[o]ther than through service of this Complaint in Intervention, neither LDOE nor RSD received notice that FEMA believed it overpaid on the projects," R. Doc. 89 at 10, the United States actually notified LDOE of its investigation two years before filing the Complaint in Intervention. On July 26, 2018, the United States sent a letter to LDOE, notifying it of the investigation and, on June 24, 2019, provided a multi-hour presentation to LDOE concerning its investigative findings. Finally, the United States provided a written notification to the State of Louisiana on June 26, 2020, advising that it anticipated filing a lawsuit against LDOE relating to the investigative findings that the United States presented to LDOE in June 2018 and July 2019. The United States provided a courtesy copy of this letter to LDOE counsel on June 29, 2020.

4

As described in its Complaint, LDOE's false statements caused FEMA to provide LDOE

with higher-cost replacement funds for five buildings that were only eligible for lower-cost

repair funds.  R. Doc. 59 ¶¶ 183-242.  Specifically, the United States' Complaint alleges:

- LDOE engaged in what it described as a "50% pursuit" to "generate money to the [LDOE] now."  *Id*. ¶ 188.

- As part of this drive to generate money, LDOE sought and received FEMA Replacement Project funds for Crocker by submitting a PW version that (1) falsely claimed that Hurricane Katrina lifted the roof off of the building frame, and inaccurately claimed that the non-existent roof damage caused water damage to Crocker's second floor, and (2) described damage to a non-existent air conditioning system and light fixtures.  *Id*. ¶¶ 184-97.

- LDOE sought and received FEMA Replacement Project funds for the Chester Classroom Building by submitting a PW version that (1) falsely described wind and flood damage to the second floor of a building that did not endure high winds and only had three-foot floodwaters, and (2) included the costs to repair damage that was ineligible because it was actually caused by vandals.  *Id*. ¶¶ 198-208.

- LDOE sought and received FEMA Replacement Project funds for the Chester Cafeteria Building by submitting a PW version that (1) included the costs to repair damage that was ineligible because it was actually caused by vandals, and (2) fraudulently asserted that water-resistant kitchen components were damaged by the storm and needed to be replaced.  *Id*. ¶¶ 209-218.

- LDOE sought and received FEMA Replacement Project funds for the Livingston Main Building by submitting a PW version that (1) falsely described damage to a non-existent copper roof, (2) falsely stated that concrete masonry unit walls were irreparably damaged and required complete replacement, and (3) fraudulently described damage to a non-existent air conditioning unit.  *Id*. ¶¶ 219-229.

- LDOE sought and received FEMA Replacement Project funds for Fannie Williams by submitting a PW version that (1) falsely characterized five separate facilities as a single facility causing an inflation in both the repair and replacement estimates in the PW, (2) falsely inflated the percentage of the roof that was damaged by the storm, and (3) falsely inflated the size of damaged components like the auditorium's bleachers.  *Id*. ¶¶ 230-42.

FEMA, to its detriment, reasonably relied on each of LDOE's material and uncorrected

false statements when determining its funding obligations.  *Id*. ¶¶ 195-97, 206-08, 216-18, 227-

29, 240-42.  If LDOE had accurately described pre-disaster design and storm damage to each of

these five facilities, FEMA would have funded each facility only as a less expensive Repair

Project.  R. Doc. 59 ¶¶ 195-97, 206-08, 216-18, 227-29, 240-42.  Instead, as a direct result of

these uncorrected false design and damage descriptions, FEMA agreed to fund each facility as a

more expensive Replacement Project.  *Id.* ¶¶ 195-97, 206-08, 216-18, 227-29, 240-42.

## LEGAL FRAMEWORK

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a district court's subject

matter jurisdiction.  "[T]he standard of review applicable to motions to dismiss under Rule

12(b)(1) is similar to that applicable to motions to dismiss under Rule 12(b)(6)."  *Chauvin v.*

*Symetra Life Ins. Co.*, 422 F. Supp. 3d 1145, 1150 (E.D. La. 2019).  However, "a 12(b)(1)

motion can consist of either a facial attack on the pleadings or a broader, factual attack that

examines matters outside the pleadings."  *Id.* (citing *Williams v. Wynne*, 533 F.3d 360, 364-65

n.2 (5th Cir. 2008)).  "A facial attack challenges the complaint, 'requiring the court merely to

assess whether the plaintiff has alleged a sufficient basis of subject matter jurisdiction, taking all

allegations in the complaint as true.'"  *Owens v. United States*, No. CV 19-485, 2019 WL

1587159, at *1 n.6 (E.D. La. Apr. 12, 2019) (quoting *Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th

Cir. Unit A Apr. 1981)).  "By contrast, a factual attack 'challenges the facts on which jurisdiction

depends.'"  *Id.* (quoting *Oaxaca*, 641 F.2d at 391).

When a defendant challenges a court's authority to hear a case, the plaintiff, as the party

asserting subject matter jurisdiction, bears the burden of proof.  *Ramming v. United States*, 281

F.3d 158, 161 (5th Cir. 2001).  But, because jurisdiction "should not be disturbed by mere

implication," *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 9 (1st Cir. 2005) (quoting

*Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 808 (1976)), "a motion to

dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the

plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief," *Ramming*, 281 F.3d at 161.

"In considering a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, No. CIV.A. 12-2202, 2014 WL 1512001 at *3 (E.D. La. Mar. 26, 2014).  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).

## ARGUMENT

**I.      This Court Has Subject Matter Jurisdiction Over the United States' Complaint.**

The United States brought this action against LDOE, under common law theories of payment by mistake, negligent misrepresentation, and unjust enrichment.  R. Doc. 59 ¶¶ 276-84.  As articulated in the Complaint, this Court has original subject matter jurisdiction under 28 U.S.C. § 1345 (United States as Plaintiff) and, alternatively, under 28 U.S.C. § 1331 (Federal Question).  R. Doc. 59 ¶ 15.  LDOE does not appear to dispute the bedrock principle that the United States may bring common law claims seeking to reclaim money wrongly paid.  *See United States v. Wurts*, 303 U.S. 414, 415 (1938) ("The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid.  No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute.") (internal citation omitted).  Rather, LDOE erroneously contends that the Court lacks jurisdiction over the instant common law action because such jurisdiction has been impliedly repealed.  *See* R. Doc. 89 at 5-13.  As demonstrated below, LDOE's argument is wrong.

### A.  Only an Act of Congress Can Deprive this Court of Subject Matter Jurisdiction in a Civil Action Commenced By the United States.

LDOE has characterized one aspect of its attack on the United States' Complaint as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See* R. Doc. 89 at 5-13. Without ever acknowledging that one of the United States' stated bases for subject matter jurisdiction is 28 U.S.C. § 1345—which gives federal district courts original jurisdiction over *all* civil actions, suits, or proceedings commenced by the United States "except as otherwise provided by Act of Congress"—LDOE argues that this court is divested of jurisdiction in this case because the United States did not avail itself of certain administrative remedies. *See* R. Doc. 89 at 5-13. This is incorrect.

The general rule in actions brought by the United States is that "[i]n light of § 1345, the United States needs no additional grant of subject matter jurisdiction to sue in the district courts" where "[j]urisdiction exists because the United States is a party." *Marshall v. Gibson's Prod., Inc. of Plano*, 584 F.2d 668, 676 n.10 (5th Cir. 1978). Given "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," any attempt to deprive the district court of authority to adjudicate actions brought by the United States must be carefully scrutinized. *Colo. River*, 424 U.S. at 808-09, 817 (affirming the district court's jurisdiction over a case brought by the United States upon a finding no explicit repeal and no irreconcilability between the statute at issue and section 1345 jurisdiction).

"Section 1345 creates subject matter jurisdiction, and the statute can only be limited, as the initial proviso provides, by (1) an explicit repeal of the statute by an Act of Congress or (2) an implicit repeal by total irreconcilability of the two acts." *Lahey*, 399 F.3d at 9. An explicit repeal of section 1345 jurisdiction can only happen when the clear language of the statute deprives the court of jurisdiction. *See, e.g.*, *Colo. River*, 424 U.S. at 807 ("The McCarran

8

Amendment does not by its terms, at least, indicate any repeal of jurisdiction under § 1345"); *Lahey*, 399 F.3d at 12 (finding no explicit repeal where the cited statute does not "mention §1345").  Implicit repeal of section 1345 occurs only when there is an "irreconcilable" conflict between a statute and section 1345, or a clear indication that the statute is intended to "substitute" for section 1345.  *Colo. River,* 424 U.S. at 808-09; *Lahey,* 399 F.3d at 9; *United States v. Comm. of Puerto Rico,* 721 F.2d 832, 386 (1st Cir. 1983).  "There is a strong presumption against implied repeals of federal statutes, and this presumption is perhaps an even stronger one when the repeal is a grant of jurisdiction to the federal courts." *Lahey*, 399 F.3d at 9 (internal citations omitted); *see also Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 468 (1982).

### B.     Congress Has Neither Explicitly nor Implicitly Repealed the Court's Subject Matter Jurisdiction Over Common Law Claims Brought by the United States.

Although LDOE does not specify whether its Rule 12(b)(1) argument constitutes a facial or factual attack on this Court's power to hear this case, LDOE's attack appears to be facial: without acknowledging that the United States presumptively has jurisdiction to bring this case under section 1345, LDOE argues that the United States has not alleged a sufficient basis for subject matter jurisdiction because, in its view, certain laws and regulations create alternative administrative remedies that deprive this court of subject matter jurisdiction.  *See* R. Doc. 89 at 5-13.  LDOE's arguments fail because none of the cited statutes either explicitly or implicitly repeal this Court's jurisdiction.

In support of its argument that this Court lacks the jurisdiction to adjudicate this case, LDOE first points to two sections of the Stafford Act: 42 U.S.C. § 5189a regarding applicant appeals procedures, and 42 U.S.C. § 5205, regarding disaster grant closeout.  *See* R. Doc. 89 at 5-7, 9.  LDOE next points to a provision in the judicial review chapter of the Administrative

Procedure Act (APA), 5 U.S.C. § 704, and the implementing regulations of the Stafford Act to argue that because the United States did not exhaust certain administrative remedies, this Court should not hear this case.  *See id*. at 7-13.

LDOE cannot point to any statutory language that explicitly repeals this Court's jurisdiction.  *See Colo. River*, 424 U.S. at 807 (looking to the terms of the statute to find evidence of explicit repeal).  Therefore, LDOE can only succeed if it can establish (1) an "irreconcilable" conflict between section 1345 and the Stafford Act or the APA, or (2) clear Congressional intent to substitute the statute(s) for this Court's section 1345 jurisdiction.  *See id.* at 808-09; *Lahey*, 399 F.3d at 9-10.  But LDOE has not identified any such implicit irreconcilability or legislative history showing a clear intent to abrogate this Court's longstanding authority to adjudicate common law claims brought by the United States to recover money wrongly paid from the Treasury.  *See, e.g.*, *United States v. Texas*, 507 U.S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law"); *Wurts*, 303 U.S. at 415-16.

### 1. Congress Did Not Intend the Stafford Act to Deprive the Court of Subject Matter Jurisdiction in a Civil Action Brought by the United States.

Neither section of the Stafford Act cited by LDOE creates an irreconcilable conflict with section 1345 nor evidences clear Congressional intent to displace this Court's authority to hear common law claims brought by the United States.  First, the Stafford Act's appeals procedures, described in 42 U.S.C. § 5189a, outline the procedures a dissatisfied subgrantee may use to appeal a FEMA funding decision.  *See* 42 U.S.C. § 5189a(a) (describing the right to appeal FEMA's "decision regarding eligibility for, from, or amount of assistance"); 42 U.S.C. § 5189a(d)(1) ("an applicant for assistance…may request arbitration").  Here, we are in the

converse situation, where the United States is proceeding against a subgrantee.  This provision does not limit the United States' ability to bring a claim against FEMA subgrantees.  Nor does this provision describe what the United States can or must do upon discovering that FEMA has paid for ineligible costs based on a misstatements by a subgrantee.  Therefore, the United States' ability to seek common law relief in this Court for erroneous payments to applicants can coexist with the Stafford Act's descriptions of how dissatisfied subgrantees can appeal FEMA's administrative decisions.  *See Colo. River,* 424 U.S. at 808-09 (finding no implied repeal of section 1345 jurisdiction when the statute was not irreconcilable with such jurisdiction).  This subgrantee appeals process cannot be reasonably interpreted as "cover[ing] the whole subject matter area" such that it demonstrates a clear and manifest Congressional intent to substitute section 1345 jurisdiction over cases like this case.  *See Lahey*, 399 F.3d at 9, 10.

Second, the Stafford Act's disaster closeout procedures in 42 U.S.C. § 5205(c) describe limitations on whether a state or local government can be "liable for reimbursement or any other penalty."  The provision says nothing about the Court's power to hear this case.  *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642-43 (2002) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to hear the case.") (internal citation omitted).  This provision is neither "irreconcilable" with the United States' right to bring a common law case alleging that a subgrantee made material false statements, nor does it demonstrate clear Congressional intent to "cover[] the whole subject matter area."  *See Lahey*, 399 F.3d at 9, 10.

LDOE incorrectly argues that *South Florida Water Management District v. FEMA*, No. 13-80533-CIV, 2014 WL 4805856 (S.D. Fla. Sept. 18, 2014) stands for the proposition that 42

U.S.C. § 5205(c) deprives this court of subject matter jurisdiction.  R. Doc. 89 at 6-7.  That case is entirely distinguishable for two reasons.  First, that case was brought by a dissatisfied applicant, rather than by the United States, such that jurisdiction under 28 U.S.C. § 1345 was not at issue.  *S. Fla. Water*, 2014 WL 4805856 at *1.  Second, FEMA discovered that it had incorrectly applied its own rules, through no fault of the applicant, and chose to deobligate the funds, which opened the door for the applicant to proceed through the administrative appeals process and to argue that 42 U.S.C. § 5205(c) barred its liability for reimbursing those funds.  *See id.* at *2-4, 7-10.

Here, by contrast, the United States is alleging that LDOE made several false statements about the pre-disaster design and storm damage to its facilities that caused FEMA to incorrectly believe that LDOE was eligible for funds.  *See* R. Doc. 59 ¶¶ 183-242.  Under these circumstances, the United States has elected, as is its right, not to deobligate the funds but to instead pursue this civil action to recover the wrongly paid funds.  *See Wurts,* 303 U.S. at 415-16 (affirming the government's right to use a civil action to recover funds paid by mistake); *cf. Lahey*, 399 F.3d at 16 (finding that even where a statute expressly authorized an agency to seek repayments using an administrative scheme, the statute did "not displace the United States' longstanding power to collect monies wrongfully paid through an action independent of the administrative scheme").

LDOE has provided no legislative history in support of its argument that Congress intended these provisions, or any other provision of the Stafford Act, to repeal jurisdiction under section 1345.  Every indication from the statutory text and legislative history suggests the opposite.  Elsewhere in the Stafford Act, Congress has taken affirmative steps to underscore the role of federal district courts in adjudicating actions brought by the United States against parties,

like LDOE, alleged to have violated the Stafford Act.  For example, the Act expressly grants the Attorney General the right to "bring a civil action" for relief "[w]henever it appears that any person has violated any provision of" the Act, which "may be brought in an appropriate United States district court."  42 U.S.C. § 5157(b).  When Congress amended the Stafford Act in 1988 to add section 5157(b), the House Judiciary Committee expressed the intention that "for the bringing of remedial actions created by acts of Congress, the preferred approach is to allow suits to be brought in accordance with the existing Federal Rules of Civil Procedure and interpretive case law."  134 Cong. Rec. H938-03, 1988 WL 1084748.  None of the sources LDOE cites support the theory that Congress intended the Stafford Act to supplant section 1345.

> **2.** **Congress Did Not Intend the Administrative Procedure Act to Deprive the Court of Subject Matter Jurisdiction in a Civil Action Brought by the United States.**

LDOE turns next to section 704 of the Administrative Procedure Act (APA).  *See* R. Doc. 89 at 13.  As with the Stafford Act, nothing in the plain language of section 704 explicitly repeals section 1345 jurisdiction.  *See* 5 U.S.C. § 704 (describing when a challenged "agency action" is subject to judicial review); *Colo. River*, 424 U.S. at 807.  Additionally, nothing in the APA is irreconcilable with section 1345 jurisdiction, nor does the APA purport to "cover the whole subject matter area."  *See Lahey*, 399 F.3d at 9, 10; *Colo. River*, 424 U.S. at 808-09.  Instead, the judicial review rules and restrictions articulated in Chapter 7 of the APA relate to cases brought by aggrieved parties against the United States or its agencies, not to cases, like this one, brought by the United States as the plaintiff.  *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof… The United States may be named as a defendant in any such action…."); *see also De La Garza Gutierrez v. Pompeo*, 741 F.

App'x 994, 997 (5th Cir. 2018) (describing section 702 of the APA as waiving the government's sovereign immunity to allow certain parties to sue agencies of the United States and describing section 704 as providing "additional limits on the waiver" of sovereign immunity).

Tellingly, none of the cases LDOE cites involve an action brought by the United States; instead, each case was brought by a party challenging a decision of a Federal agency. *See* R. Doc. 89 at 13; *see also Darby v. Cisneros*, 509 U.S. 137, 139, 143-47 (1993) (evaluating whether the plaintiff, a real estate developer, needed to exhaust administrative remedies before seeking judicial review of a decision by a federal agency); *United States v. Sing Tuck*, 194 U.S. 161, 166-69 (1904) (considering whether an individual had to "appeal to the Secretary" before judicial review would be available); *Pembroke Pines v. FEMA*, No. 9:19-CIV-81140, 2020 U.S. Dist. LEXIS 65996 at *4-10, 12-23 (S.D. Fla. April 13, 2020) (issuing a report and recommendation recommending that the district court grant the government's motion to dismiss because the court lacked jurisdiction to adjudicate claims by aggrieved subgrantees against FEMA). None of these cases support LDOE's theory Congress intended the APA to supplant section 1345.

### C. Administrative Exhaustion Does Not Apply to the United States and Does Not Deprive This Court of Subject Matter Jurisdiction.

In an effort to support its interpretation of the APA and the Stafford Act's impact on this Court's jurisdiction, LDOE argues that the United States was required to exhaust administrative remedies. LDOE contends—without citing any statutory or judicial authority—that "[o]nce the Government believed that LDOE was not in compliance with the Stafford Act, the Government was required to provide LDOE with the opportunity to object and challenge that decision in accordance with the procedures published by FEMA." R. Doc. 89 at 12. But the administrative procedures LDOE relies on for this argument were established by Congress and FEMA to allow aggrieved subgrantees to appeal FEMA's funding decisions. *See Barbosa v. United States Dep't*

14

*of Homeland Sec.*, 263 F. Supp. 3d 207, 216 (D.D.C. 2017), *aff'd,* 916 F.3d 1068 (D.C. Cir. 2019) (citing *United States v. Mitchell*, 463 U.S. 206, 212, (1983)) ("As a general rule, the United States is immune from suit unless it consents to be sued… Under the Stafford Act, the United States only has partially granted such consent.").

As the Fifth Circuit has made clear, where the Government "itself decides to pursue a judicial remedy, the exhaustion of remedies doctrine is simply not applicable." *United States v. Paternostro*, 966 F.2d 907, 912 (5th Cir. 1992); *see also United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 776 n.71 (N.D. Tex. 2003) ("[T]he United States is not required to pursue an administrative action before seeking an overpayment action under theories of unjust enrichment or payment by mistake."), *aff'd sub nom. United States v. Medica Rents Co.*, No. 03-11297, 2008 WL 3876307 (5th Cir. Aug. 19, 2008); *cf. United States ex rel. Borges v. Doctor's Care Med. Ctr., Inc.*, No. 01-8112-CIV, 2007 WL 9702639, at *8 (S.D. Fla. Jan. 29, 2007) (describing an administrative appeals process for dissatisfied Medicare recipients as "[f]ar from being an attempt to restrict the Government's common-law right to recoup monies erroneously paid," and instead as "manifest[ing] Congressional intent that actions brought by the United States are excluded from its scope" of the administrative exhaustion requirements).

To the extent that LDOE argues that the Stafford Act's implementing regulations somehow deprive this court of subject matter jurisdiction, that argument, too, must fail. Only an Act of Congress can deprive a district court of subject matter jurisdiction in a case initiated by the United States. 28 U.S.C. § 1345. Agency regulations are, therefore, incapable of depriving this Court of jurisdiction in this case. *See Lahey*, 399 F.3d at 13-14 ("[T]o permit an agency by its actions to repeal an act of Congress or displace a long standing power of the United States would pose grave constitutional questions of violation of separation of powers."); *cf. id.* at 16

(concluding that even where the Medicare administrative scheme gives the agency the right "to reopen initial payment determinations and to recoup overpayments administratively in certain circumstances…the statute does not displace the United States' long standing power to collect monies wrongfully paid through an action independent of the administrative scheme, nor is there any inconsistency" with the government's suit to recover) (internal citations omitted).

## II.   The Complaint Satisfies 12(b)(6) Pleading Requirements.

### A.   Funds LDOE Received as a Result of False Statements in PWs were Wrongful, Erroneous, or Illegal Obligations, Not "Excess Funds."

LDOE argues that the Complaint fails to state a claim of unjust enrichment or payment by mistake because FEMA allowed subgrantees to use obligated funds that remained after construction on any repair projects and new structures. R. Doc. 89 at 15-16. But whether, and how, FEMA allowed applicants to use lawfully-obligated "excess funds" is not relevant here. Instead, in bringing unjust enrichment and payment by mistake claims, the United States is required to plead—and has pleaded—that the funds LDOE received were wrongfully, erroneously, or illegally paid.

The United States may recover funds "wrongfully, erroneously, or illegally paid" under the federal common law claims of payment by mistake or unjust enrichment. *Wurts*, 303 U.S. at 415; *United States ex rel. Robert v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 819 (W.D. La. 2007) (quoting *Medica-Rents*, 285 F. Supp. 2d at 776); *see also United States ex rel. Campbell v. KIC Dev., LLC*, EP-18-CV-193-KC, 2019 WL 6884485, at *17 (W.D. Tex. Dec. 10, 2019) (citing *Medica-Rents Co.*, 285 F. Supp. 2d at 776). To prevail on a federal common law claim of payment by mistake, the United States must show that FEMA "made...payments under an erroneous belief which was material to the decision to pay." *Aging Care Home Health, Inc.*, 474 F. Supp. 2d at 819 (quoting *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970)).

"To prevail on a claim for unjust enrichment under federal common law, the United States must show: '(1) [it] had a reasonable expectation of payment, (2) [Defendants] should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment.'" *Id.* (quoting *United States v. Rogan*, 459 F. Supp. 2d 692, 727 (N.D. Ill. 2006)).  The Complaint adequately pleads both of these claims.

The United States pleaded a claim of payment by mistake, *i.e.* that FEMA made payments to LDOE "under an erroneous belief which was material to the decision to pay."  *Id.* Although FEMA expected truthful and accurate factual statements about the design, function, capacity, and disaster-related damage of eligible projects, R. Doc. 59 ¶¶ 108, 261-62, LDOE included false information in project worksheets versions for the LDOE Projects.  *Id.* ¶¶ 184-242.  For instance, an April 2008 PW version for the Edward Livingston Middle School described a copper roof that needed a complete replacement, yet the facility was actually covered by a less expensive non-copper roof that needed repairs only to a few panels.  *Id.* ¶ 223.  This false statement, along with others in the Livingston PW version, caused FEMA to obligate Livingston as a Replacement Project rather than the lower-cost Repair Project that LDOE was entitled to receive.  *Id.* ¶¶ 224-227.

In fact, the false statements in each of the LDOE Projects PW versions were material to the payment decisions, in each case causing FEMA to obligate Replacement Project funds rather than the lower Repair Project funds that LDOE deserved under the Stafford Act and PA Program rules.  *Id.* ¶¶ 189-92 (Crocker), 201-206 (Chester Classroom Building), 210-16 (Chester Cafeteria Building), 234-40 (Fannie Williams).  If FEMA had known of the false statements in the Project PWs, it would not have obligated funds based on those false statements.  *Id.* ¶¶ 195-97 (Crocker), 206-208 (Chester Classroom Building), 216-218 (Chester Cafeteria Building),

227-29 (Livingston), 240-42 (Fannie Williams).  Thus, FEMA "made...payments under an erroneous belief which was material to the decision to pay." *Aging Care Home Health, Inc*., 474 F. Supp. 2d at 819.

With these same facts, the United States also adequately pleaded a claim of unjust enrichment.  By including materially false information in each of the LDOE Project PWs, LDOE received funds inconsistent with the PA Program rules, namely, the Pre-Disaster Design Rule and the 50% Rule.  These rules were so important to the structure of the PA Program that federal law allows FEMA to de-obligate PA Program funds obtained in violation of PA Program rules. R. Doc. 59 ¶ 262 (citing 42 U.S.C. § 5205(a)(2)).  Thus, the United States had a reasonable expectation of repayment, Defendant should have expected to repay any funds obligated as a result of material false statements, and "society's expectations of person and property would be defeated by nonpayment." *See Aging Care Home Health, Inc*., 474 F. Supp. 2d at 819.  Any funds that FEMA obligated as a result of these false statements are unjust enrichments, or "wrongful, erroneous, or illegal" obligations, and cannot be characterized as "excess funds." *Id*.

LDOE argues that because FEMA "allows excess costs to be used for activities that improve future public assistance operations and planning," any funds FEMA provided to LDOE as a result of false statements cannot be mistaken payments or funds that unjustly enriched LDOE.  R. Doc. 89 at 16.  But whether FEMA allowed applicants to use *lawfully*-obligated "excess funds" is irrelevant here.  Under the Single Settlement, once the funding amount was determined, FEMA obligated the funds as one large lump sum, similar to an alternate project, which allowed LDOE flexibility in determining how to rebuild its school district.  R. Doc. 59 ¶ 68 (citing Pub. L. No. 11-161, § 552, 121 Stat. 1844, 2081 (2008)).  As LDOE incurred actual costs, it received reimbursements from FEMA, via GOHSEP, similar to non-Single Settlement

projects.  *Id*. ¶ 62.  If LDOE had received all funds in accordance with the Stafford Act and PA

Program rules, any funds remaining after LDOE completed construction could be used for

mitigation purposes.   However, the funds LDOE received as a result of false statements in the

LDOE Project PWs were not obligated in compliance with the Stafford Act and PA Program

rules and, thus, cannot be considered "excess funds."   Notably, and contrary to LDOE's

argument, even if these funds had been obligated in accordance with the Stafford Act and PA

Program rules, any remaining obligated funds after LDOE completed construction would not

have been considered "excess funds" pursuant to 42 U.S.C. § 5189f, because Congress did not

pass 42 U.S.C. § 5189f until January 2013, well after the structure of the Single Settlement was

in place.  Pub. L. 113-2, 127 STAT 4 (Jan. 29, 2013); R. Doc. 89 at 15-16.

Finally, LDOE argues that because "excess costs" were used to "improve future public

assistance operations and planning," these funds cannot be considered mistaken payments or

unjust enrichments.  R. Doc. 89 at 15-16.  Yet the manner in which LDOE used the improper,

excess funds that it received from FEMA is not relevant to whether the funds should have been

obligated in the first place, and thus, LDOE's use of the funds is irrelevant to a payment by

mistake or unjust enrichment claim.  *See Aging Care Home Health, Inc*., 474 F. Supp. 2d at 819

(outlining the elements of unjust enrichment and payment by mistake claims); *see also KIC Dev.*,

2019 WL 6884485, at * 17 (same).

The false statements in the LDOE Project PW versions caused FEMA to obligate

Replacement Project funds for these Projects when LDOE was entitled only to Repair Project

funds.  *See*, *e.g*., R. Doc. 59 ¶ 183.  These false statements caused FEMA to make "payments

under an erroneous belief which was material to the decision to pay."  *Aging Care Home Health,*

*Inc*., 474 F. Supp. 2d at 819.  And any payments LDOE received as a result of these false

statements were payments that LDOE should have expected to repay. *Id.* Thus, the United

States has adequately pleaded that any funds LDOE received as a result of false statements in the

PWs are wrongful, erroneous, or illegal payments. *See Wurts*, 303 U.S. at 415-16.

### B. LDOE was Reimbursed Solely with Federal Funds from the DRF.

LDOE next contends that the Complaint does not adequately plead claims for payment by

mistake and unjust enrichment because LDOE received DRF funds through an intermediary,

GOHSEP. R. Doc. 89 at 16-19. Under both payment by mistake and unjust enrichment theories,

the United States is required to prove that it "wrongfully, erroneously, or illegally paid" funds.

*Aging Care Home Health, Inc.*, 474 F. Supp. 2d at 819. The United States has adequately

pleaded that all PA Program reimbursements, including the funds LDOE inappropriately

received, were federal funds from the DRF. R. Doc. 59 ¶ 31 (citing 44 C.F.R. § 206.201(k)); *id.*

¶ 63 (citing Pub. L. No. 110-28, § 4501, 121 Stat. 112, 156 (2007)).

After a PW was approved, FEMA provided the funds required to restore the subgrantee's

structure to GOHSEP. *Id.* ¶ 64. These FEMA funds were earmarked for specific projects based

on PWs. *Id.* The subgrantee then obtained reimbursement from FEMA by submitting

documentation of its actual costs to GOHSEP. *Id.* ¶ 61, 64, 97. GOHSEP did not contribute any

funds. *Id.* ¶ 31. Thus, although GOHSEP distributed funds to LDOE and other subgrantees,

GOHSEP served solely as a pass-through entity, reimbursing applicants for actual costs. *Id.*

¶ 31; *see also* 2 C.F.R. § 200.74 (defining "pass-through entity" as "a non-Federal entity that

provides a subaward to a subrecipient to carry out part of a Federal program").

The United States has adequately pleaded that the false information in the PWs caused a

financial loss to the United States, but even if the Court determines that the funds LDOE

received came solely from GOHSEP, "the government is entitled to obtain repayment from a

third party into whose hands the mistaken payments flowed where that party participated in and

benefitted from the tainted transaction." *LTV Educ. Sys., Inc. v. Bell*, 862 F.2d 1168, 1175 (5th

Cir. 1989) (citing *United States v. Mead*, 426 F.2d 118 (9th Cir. 1970)).  Here, the United States

has pleaded that LDOE "participated in and benefitted from the tainted transaction."  *Id.*

       LDOE participated in the tainted transactions in at least three ways.  First, as part of its

"50% pursuit," LDOE and a GOHSEP representative took steps to "covertly build[] a case for

replacement" for Crocker Elementary even though it should have only been funded as a Repair

Project.  R. Doc. 59 ¶ 188.  LDOE's "50% pursuit" included misrepresenting to FEMA that

Crocker's roof was damaged irreparably by Hurricane Katrina and submitting two misleading

engineer reports to support those false statements.  *Id.* ¶ 189.  This effort resulted in a fraudulent

inflation of the repair estimate, improperly resulting in Crocker qualifying for replacement funds

from FEMA.  *Id.* ¶¶ 191-92.  Second, LDOE participated in these tainted transactions by signing

and certifying the accuracy of LDOE Project PWs that included false information.  *See, e.g., id.*

¶¶ 72, 201 (Chester Classroom Building), 213 (Chester Cafeteria).  Third, LDOE participated in

the tainted transactions by seeking reimbursements from GOHSEP for the LDOE Projects based

on the falsehoods in the LDOE Project PWs.  *Id.* ¶¶ 193 (Crocker); 204 (Chester Classroom

Building), 214 (Chester Cafeteria), 225 (Livingston), 238 (Fannie Williams).

       By seeking federal funds from GOHSEP for the LDOE Projects based on the fraudulent

PWs, LDOE both participated in and benefitted from the tainted transactions.  The false

statements in the LDOE Project PW versions caused FEMA to obligate more money to LDOE

for the LDOE Projects than it was entitled to receive.  *Id.* ¶¶ 192 (Crocker); 203 (Chester

Classroom Building); 212 (Chester Cafeteria); 224 (Livingston); 237 (Fannie Williams).  And,

ultimately, the higher obligations resulted in LDOE receiving more DRF funds than it was

entitled to receive for the LDOE Projects.  *Id.* ¶ 31.  So LDOE not only participated in the tainted

transactions, it also benefitted from these transactions.

The United States has adequately pleaded that all of LDOE's PA Program reimbursements came from FEMA's DRF.  GOHSEP acted solely as an intermediary, reimbursing applicants for actual costs and ensuring reimbursements complied with the scopes of work in the project worksheets.  *Id.* ¶¶ 31, 61-63.  Also, GOHSEP did not contribute additional funds when reimbursing the applicants.  *Id.* ¶ 63.  However, even if the Court determines that the funds belonged to GOHSEP at the time it paid LDOE, the United States may still obtain repayment from LDOE, because LDOE participated in and benefitted from the tainted transaction.  *See id.* ¶¶ 183-242; *LTV Educ. Systems*, 862 F.2d at 1175.

### C.   The United States Learned of Facts Material to the Negligent Misrepresentation Claim After Relator Filed His *Qui Tam* Complaint.

LDOE argues that, for two reasons, the United States' negligent misrepresentation claim is barred by the statute of limitations and, thus, must be dismissed under Federal Rule of Civil Procedure 12(b)(6).[3]  First, LDOE argues that the United States learned about facts material to the negligent misrepresentation claim when relator filed his *qui tam* complaint on September 30, 2016, which required the United States to file its Complaint in Intervention on or before September 30, 2019.  R. Doc. 89 at 19-20.  Second, LDOE argues that FEMA learned in 2010 that an AECOM employee, Randall Krause, had falsified items on a project worksheet for a non-LDOE project and, thus, that FEMA had inquiry notice of the negligent misrepresentation claim against LDOE in 2010.  *Id.* at 20-21 (citing R. Doc. 59 ¶ 126).  For the reasons set forth below, neither argument demonstrates that the negligent misrepresentation claim is time-barred.

---

[3]    LDOE does not argue that the statute of limitations bars either the unjust enrichment claim or the payment by mistake claim that the United States brought related to the same projects.  These claims are subject to a six-year statute of limitations.  28 U.S.C. §§ 2415(a).

The United States' negligent misrepresentation claim accrued, at the earliest, when the Department of Justice learned about facts material to all elements of the claim.  Under 28 U.S.C. § 2415(b), an "action for money damages brought by the United States…which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues."  This limitations period is tolled while "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances."  28 U.S.C. § 2416(c).  "[F]acts material to the right of action" under 2416(c) are those "facts indicating the presence of all elements of the right of action."  *United States v. Bollinger Shipyards, Inc*., 2013 WL 393037, at *11 (E.D. La. Jan. 30, 2013) (citing *United States ex rel. Wilkins v. N. Am. Const. Corp*., No. 95-5614, 2001 WL 34109383 (S.D. Tex. Sept. 26, 2001)).  The Supreme Court has further instructed that "[s]tatutes of limitations to be applied to bar rights of the Government, must receive a strict construction in favor of the Government."  *Badaracco v. C.I.R.*, 464 U.S. 386, 391 (1984).

Contrary to LDOE's argument, the United States did not learn of the facts material to all elements of the negligent misrepresentation right of action until well after relator filed his initial *qui tam* complaint.  R. Doc. 89 at 20.  Relator's initial *qui tam* complaint, filed September 30, 2016, did not name RSD or LDOE as defendants or include any facts material to a right of action against RSD or LDOE.  R. Doc. 1.  The only mention of LDOE or any LDOE project appears in a list of "potentially fraudulent projects" attached as an exhibit to the complaint.  *Id.* Ex. 20. This exhibit merely lists a single LDOE Project, the Chester Main Building, among numerous "potentially fraudulent projects," but otherwise falls far short of providing "facts indicating the presence of all elements of the right of action," *Bollinger Shipyards, Inc*., 2013 WL 393037, at *11, such as information about the building, the actual content of the Chester Main Building PW

versions, or the nature of the false statements included in the Chester Main Building PW versions.  R. Doc. 1, Ex. 20.  Moreover, none of the other LDOE Projects are listed in this exhibit to the complaint.  *Id*.

Relator first included material facts about LDOE's Crocker Elementary in his First Amended Complaint, filed on August 3, 2017.  R. Doc. 6 ¶¶ 88-100.  Unlike Relator's original complaint, the First Amended Complaint included a description of the Crocker building, an account of the specific false statements included in Crocker PW version, and discussion on the consequences to FEMA of the inclusion of the false statements in the Crocker PW version.  *Id*. ¶¶ 88-100.  In his later-amended *qui tam* complaints, filed on April 29, 2019 and September 24, 2019, respectively, Relator added material facts related to the additional LDOE Projects.  R. Doc. 17 ¶¶ 137-160 (Chester Main Building), ¶¶ 161-172 (Chester Cafeteria); R. Doc. 24 ¶¶ 175-188 (Livingston), ¶¶ 206-217 (Fannie Williams).

LDOE's second argument—that the negligent misrepresentation claim is time-barred because FEMA learned that an AECOM employee, Randall Krause, had falsified items on a non-LDOE project worksheet and was, thus, "on notice to further investigate Krause's work and submissions"—also must fail.  R. Doc. 89 at 20-21.  To prevail on a statute of limitations argument at the motion to dismiss stage, LDOE must demonstrate that the United States actually learned, at least three years prior to filing its Complaint in Intervention, of "facts indicating the presence of all elements of the right of action."  *Bollinger Shipyards, Inc*., 2013 WL 393037, at *11.  Learning that Krause had falsified information relating to a different applicant, on a project that had no nexus whatsoever to LDOE, is not equivalent to the United States learning of "facts indicating the presence of all elements of" a claim of negligent misrepresentation against LDOE based on all of the LDOE Projects.  Nothing about Krause's attempted falsification of a single

project worksheet version for a subgrantee other than LDOE, related to a non-LDOE project, would have reasonably led a responsible United States official to learn about the existence of the elements of a negligent misrepresentation claim against LDOE for the projects alleged in the Complaint.

Finally, whether the United States had sufficient notice that would require it to "further investigate Krause's work and submissions," R. Doc. 89 at 20-21, "is a 'fact-intensive inquiry' that is 'typically appropriate for consideration by a jury.'"  *Sudo Props., Inc. v. Terrevonne Parish Consol. Gov't,* 503 F.3d 371, 376 (5th Cir. 2007) (quoting *Margolies v. Deason,* 464 F.3d 547, 553 (5th Cir. 2006)); *see also Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 900 (E.D. La. 2014) (("Defendants bear the heavy burden of demonstrating that 'uncontroverted evidence irrefutably demonstrates when a plaintiff discovered or should have discovered the fraudulent conduct.'") (quoting *In re Franklin Bank Corp. Sec. Litig.,* 782 F. Supp. 2d 364, 384 (S.D. Tex. 2011))).  Accordingly, in this particular case, LDOE is not entitled to dismissal on this basis at the pleading stage.

## CONCLUSION

Plaintiff United States respectfully requests that the Court deny Defendant LDOE's Motion to Dismiss.  Alternatively, should the Court conclude that the Complaint does not satisfy Rules 12(b)(1) or 12(b)(6), the United States respectfully requests that the Court permit the United States the leave that is freely given to amend as "justice so requires."  Fed. R. Civ. P. 15(a)(2); *Ducote Jax Holdings, L.L.C. v. JDC Grp., Inc.*, No. 07-CV-9353, 2009 WL 10679788, at *4 n.1 (E.D. La. Jan. 12, 2009).

December 8, 2020                              Respectfully submitted,

                                             JEFFREY BOSSERT CLARK
                                             Acting Assistant Attorney General


                                             /s/ Loan "Mimi" Nguyen
                                             JAMIE ANN YAVELBERG
                                             COLIN HUNTLEY
                                             ZACH WILLIAMS
                                             LAURA E. HILL
                                             BREANNA L. PETERSON
                                             United States Department of Justice
                                             Civil Division, Fraud Section
                                             175 N Street, NE
                                             Room 10.1330
                                             Washington, DC 20002
                                             Tel: (202) 353-1272
                                             Email:  Zachary.M.Williams@usdoj.gov

                                             MICHAEL M. SIMPSON
                                             First Assistant United States Attorney
                                             Acting Under Authority Conferred by
                                                28 U.S.C. § 515

                                             LOAN "MIMI" NGUYEN
                                             Assistant United States Attorney
                                             CHARLES SCHEXNAILDRE
                                             Special Assistant United States Attorney
                                             650 Poydras Street, Suite 1600
                                             New Orleans, LA 70130
                                             Tel: (504) 680-3000
                                             Email: Mimi.Nguyen@usdoj.gov

                                             Attorneys for the United States of America